**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MAYDAY HEALTH,<br><br>     Plaintiff,<br><br>  v.<br><br>MARTY J. JACKLEY, Attorney General of<br>South Dakota, in his official capacity,<br><br>     Defendants. | Case No. 1:26-cv-00078-KPF |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................ 1

RELEVANT BACKGROUND ..................................................................................................... 2

    A.    Mayday Publishes Truthful Public Health Information on Its Website.................. 2

    B.    Mayday Publicizes Its Website, Including to South Dakotans ............................... 3

    C.    The South Dakota Governor Directs the Attorney General to Investigate and
            Punish Mayday by Any Means Available .............................................................. 4

    D.    The Attorney General Mails Retaliatory Threats to Mayday in New York ........... 4

    E.    The Attorney General Purports to Seek an Injunction Against Mayday in South
            Dakota, But Does Not Actually Commence Any Enforcement Action.................. 6

    F.    Mayday Self-Censors in Response to the Attorney General's Threats................... 7

    G.    Mayday Files This Action to Vindicate Its Constitutional Rights.......................... 7

LEGAL STANDARD................................................................................................................... 7

ARGUMENT ............................................................................................................................... 8

I.      Mayday Is Likely to Prevail on Its First Amendment Claims. .......................................... 8

    A.    The First Amendment Protects Mayday's Speech.................................................. 8

    B.    The Attorney General's Threats Violate the First Amendment............................ 11

          1.      The First Amendment bars viewpoint-based prior restraints against
                truthful speech of public concern............................................................ 12

          2.      The First Amendment also bars retaliation against protected speech....... 14

II.     Mayday Will Suffer Irreparable Harm Absent an Injunction. .......................................... 17

III.    Mayday Satisfies the Remaining Preliminary Injunction Factors. ................................... 18

CONCLUSION.......................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*725 Eatery Corp. v. City of N.Y.*,
    408 F. Supp. 3d 424 (S.D.N.Y. 2019)................................................................................18, 19

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963).............................................................................................................12

*Bartels v. Inc. Vill. of Lloyd*,
    751 F. Supp. 2d 387 (E.D.N.Y. 2010) ...................................................................................17

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)........................................................................................................8, 12

*Bigelow v. Virginia*,
    421 U.S. 809 (1975)...............................................................................................9, 10, 13

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983)...........................................................................................................10

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984)........................................................................................................10

*Brooklyn Branch of NAACP v. Kosinski*,
    735 F. Supp. 3d 421 (S.D.N.Y. 2024)...................................................................................14

*Cath. Charities v. Whitmer*,
    --- F. 4th ----, 2025 WL 3653774 (6th Cir. Dec. 17, 2025) ....................................................13

*Curley v. Vill. of Suffern*,
    268 F.3d 65 (2d Cir. 2001)..................................................................................................14

*Davis v. Avvo, Inc.*,
    345 F. Supp. 3d 534 (S.D.N.Y. 2018)...................................................................................11

*Decker Advert. Inc. v. Delaware Cnty., N.Y.*,
    765 F. Supp. 3d 128 (N.D.N.Y. 2025)..................................................................................15

*Deferio v. City of Syracuse*,
    193 F. Supp. 3d 119 (N.D.N.Y. 2016)..................................................................................18

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)........................................................................................................2, 8

*Elrod v. Burns*,
    427 U.S. 347 (1976)........................................................................................................17

*Free Speech Coalition, Inc. v. Paxton*,
    606 U.S. 461 (2025)........................................................................................................13

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)............................................................................................................8

*Harris v. Quinn*,
    573 U.S. 616 (2014)........................................................................................................10

*Holley v. Cnty. of Orange, NY*,
    625 F. Supp. 2d 131 (S.D.N.Y. 2009)........................................................................14, 17

*Houston Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022)........................................................................................................14

*Huminski v. Rutland Cnty.*,
    134 F. Supp. 2d 362 (D. Vt. 2001)................................................................................15

*Junior Sports Mags. Inc. v. Bonta*,
    80 F.4th 1109 (9th Cir. 2023) ........................................................................................13

*Lawrence v. Altice USA*,
    841 F. App'x 273 (2d Cir. 2021) .....................................................................................8

*Lowe v. SEC*,
    472 U.S. 181 (1985)........................................................................................................11

*Matsumoto v. Labrador*,
    122 F.4th 787 (9th Cir. 2024) ........................................................................................10

*McCullen v. Coakley*,
    573 U.S. 464 (2014)........................................................................................................13

*Monserrate v. N.Y. State Senate*,
    599 F.3d 148 (2d Cir. 2010)..............................................................................................7

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)........................................................................................................18

*Morrison v. Olson*,
    487 U.S. 654 (1988)..................................................................................................16, 17

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)........................................................................................17, 18

*New York Times Co. v. United States*,
   403 U.S. 713 (1971)...................................................................................................12

*New York v. U.S. Dep't of Homeland Sec.*,
   969 F.3d 42 (2d Cir. 2020)...................................................................................7, 18

*Nieves v. Bartlett*,
   587 U.S. 391 (2019)...................................................................................................14

*NIFLA v. James*,
   160 F.4th 360 (2d Cir. 2025) ...........................................................................9, 11, 13

*NRA of Am. v. Vullo*,
   602 U.S. 175 (2024)...................................................................................................11

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ..................................................................................13

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)...................................................................................................13

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995)...................................................................................................12

*Satellite TV of N.Y. Assocs. v. Finneran*,
   579 F. Supp. 1546 (S.D.N.Y. 1984).........................................................................18

*Schlaifer Nance & Co. v. Est. of Warhol*,
   194 F.3d 323 (2d Cir. 1999)......................................................................................15

*Smith v. Daily Mail Publishing Co.*,
   443 U.S. 97 (1979).....................................................................................................12

*The Florida Star v. B.J.F.*,
   491 U.S. 524 (1989)...................................................................................................12

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000)...................................................................................................13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)...................................................................................................15

*W. Va. Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)...................................................................................................13

*Welty v. Dunaway*,
   791 F. Supp. 3d 818 (M.D. Tenn. 2025)...................................................................10

*Zauderer v. Off. of the Disciplinary Counsel,*
  471 U.S. 626 (1985)................................................................................................................10

**State Statutes**

N.Y. Gen. Bus. Law § 349...........................................................................................................11

N.Y. Gen. Bus. Law § 350...........................................................................................................11

S.D. Codified Laws § 22-17-5.1 ..............................................................................................4, 13

S.D. Codified Laws § 36-4-8 ....................................................................................................4, 13

S.D. Codified Laws § 37-24 ...........................................................................................................15

S.D. Codified Laws § 37-24-6 .........................................................................................................4

S.D. Codified Laws § 37-24-6(1) .............................................................................................6, 10

**Constitutional Provisions**

U.S. Const. amend. I .........................................................................................................*passim*

**INTRODUCTION**

Plaintiff Mayday Health is a 501(c)(3) non-profit public health education organization—not a medical provider that prescribes, handles, sells, or earns revenue from any healthcare service—dedicated to sharing accurate, evidence-based information about reproductive healthcare. After discovering that Mayday had placed signs at South Dakota gas stations stating "Pregnant? Don't want to be? Learn more at www.mayday.health," South Dakota Governor Larry Rhoden invoked his government's "proud pro-life stance" and asked Attorney General Marty J. Jackley to prosecute Mayday's New York-based website and ban Mayday from publicizing it to South Dakotans, by any means necessary. The Attorney General—who shares the Governor's contempt for the lawful choices people may make with the information Mayday publishes, as well as Mayday's conviction that access to abortion is a human right—has now threatened to do so. Mayday brings this motion to prevent further violation of its First Amendment rights.

Mayday will prevail on the merits of its First Amendment claims because the First Amendment absolutely protects the publication of truthful information of public concern. The U.S. Food and Drug Administration (FDA) has approved abortion pills—mifepristone and misoprostol—for safe and effective use, and adopted official guidance permitting those drugs to be prescribed online and delivered through the mail. The Attorney General may not prevent Mayday from publishing this information to South Dakotans, or information involving the availability of legal abortion services generally, just because South Dakota has made abortion illegal. Nor may the Attorney General hunt down and retaliate against Mayday because of hostility toward Mayday, the information Mayday publishes, and the beliefs that impel Mayday to publish it. The Attorney General's suggestion that Mayday's speech is misleading commercial advertising regulable as a "deceptive trade practice" is meritless and pretextual.

The remaining factors also favor preliminary injunctive relief. Mayday is suffering and

will continue to suffer irreparable injury from the violation of its First Amendment rights. The balance of equities and the public interest strongly favor the vindication of those rights, as the public has a profound interest in the dissemination of truth without fear of reprisal.

Mayday respectfully asks the Court to preliminarily enjoin the Attorney General from taking any further action to deter or prohibit it from publishing truthful public health information.

## RELEVANT BACKGROUND

### A.    Mayday Publishes Truthful Public Health Information on Its Website

Mayday is a nonprofit health education organization that operates an online clearinghouse for reproductive health resources at https://mayday.health. The website was launched in June 2022 in response to the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). Mayday's mission is "to share information about abortion pills, birth control, and gender-affirming care in any state" and "empower people to make their own informed decisions about their own bodies." Declaration of Adam Sieff ("Sieff Decl.") at Ex. 1; Declaration of Liv Raisner ("Raisner Decl.") ¶ 2.

When a reader accesses Mayday's website, they are asked what category of information they are looking for—abortion, morning-after pills, birth control, or gender-affirming care. *See* Sieff Decl. Ex. 1; Raisner Decl. ¶¶ 3-4. For each category, the website provides a series of links to third-party organizations that provide access to such care or resources. For the abortion category, Mayday provides links to well-established third-party websites, including Aid Access, Cambridge Reproductive Health Consultants, A Safe Choice, Abuzz, and We Take Care of Us. Mayday also links to organizations offering supporting services, including the Digital Defense Fund's privacy guide, the Miscarriage and Abortion Hotline, and the If/When/How Repro Legal Helpline. Much of the information to which Mayday's website links is from clinicians, lawyers, and health experts. Raisner Decl. ¶ 3. If medically appropriate, some of these third-party websites may provide access

2

to abortion pills, such as mifepristone and misoprostol. *Id.* The FDA has repeatedly and as recently as 2025 confirmed the safety of such medication, Sieff Decl. Exs. 2-3, as have independent and rigorous scientific studies published in peer-reviewed journals like the New England Journal of Medicine, *id.* Ex. 4.

Mayday does not sell, handle, or benefit financially from abortion pills, and operates independently from organizations that do so. *See* Raisner Decl. ¶ 5. Nor does Mayday itself provide any medical or legal advice, charge any fee, collect any revenue related to the provision of medical or legal services, or obtain any other valuable consideration in exchange for disseminating its message. *Id.* It does not monetize its users' data. *Id.* Rather, Mayday simply wants people to know their options regarding reproductive healthcare. *Id.* ¶ 6. The information it publishes is provided as a donor-funded public service—free to users—as an expression of Mayday's values and beliefs. *Id.* Through its website and advocacy, Mayday provides truthful, non-commercial information of public concern, including resources for individuals seeking to understand their reproductive healthcare options. Mayday believes its work is essential to ensuring that individuals, regardless of their location, can make informed decisions about their health and wellbeing. *Id.*

### B.    Mayday Publicizes Its Website, Including to South Dakotans

To raise awareness about the availability of reproductive health services to communities across the country, Mayday publicizes its website through social media platforms like TikTok and Instagram, as well as through billboards, plane-pulled banners, art installations, apparel, and other tangible media.  Raisner Decl. ¶ 5. As part of these efforts, on December 8, 2025, Mayday placed signs at gas stations around South Dakota. *Id*. ¶ 7. The signs ask "Pregnant? Don't want to be?" with a prompt to "learn more" by visiting Mayday's website.  *Id*.

### C.     The South Dakota Governor Directs the Attorney General to Investigate and Punish Mayday by Any Means Available

The next day, December 9, 2025, South Dakota Governor Larry Rhoden and Attorney General Marty J. Jackley issued a joint press release announcing a formal letter from the Governor urging the Attorney General to "investigate" Mayday for spreading information that "appears to conflict with South Dakota's proud pro-life stance." Raisner Decl. ¶ 8; Sieff Decl. Ex. 5. The press release quotes the Attorney General saying he would do so. *Id.*  The Governor's letter asked the Attorney General to drum up charges against Mayday under the State's "pro-life laws, including SDCL § 22-17-5.1 and § 36-4-8," that prohibit administering or providing abortions. Sieff Decl. Ex. 6. The letter accused Mayday of providing information about "an illegal service in the state of South Dakota." *Id.*  "South Dakota has the most pro-life laws in the nation," the Governor stated, "I am proud of that fact. Our voters resoundingly supported those laws with the defeat of Amendment G"—which would have legalized abortion in South Dakota—"in the last election." *Id.*  He charged that Mayday's signs "threaten[] the lives of children yet to be born in our state," and could "facilitat[e] the mailing of pills into our state, which would be illegal." *Id.*

### D.     The Attorney General Mails Retaliatory Threats to Mayday in New York

The Attorney General accepted the Governor's charge and commenced an investigation into Mayday. Unable to investigate Mayday under the "pro-life" laws the Governor cited because Mayday does not provide abortions, the Attorney General directed his office to investigate Mayday for possible violations of the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-6.  *See* Sieff Decl. Ex. 8.

The ensuing "investigation" involved a single official reading Mayday's website and some of the third-party websites to which Mayday's website links. *See* Sieff Decl. Ex. 7. The official did not find that any consumer had been misled by Mayday's website, or by the gas station signs

publicizing it. *Id.* She notes receiving only one complaint from one business, Cowboy Country Stores, that objected to the publication of Mayday's "abortion media campaign" on leased signs in front of its business—an objection to Mayday's expressed point of view, and a contractual matter for Cowboy Country Stores to take up with its media leasing agent, not actionable evidence of consumer deception or confusion that would normally warrant State intervention. *Id.* at ¶ 7. The absence of any evidence of consumer harm is, of course, unsurprising: no one in South Dakota or anywhere else has been or could be deceived by the literally true public health information Mayday publishes and links to on its website, much less by its "Pregnant? Don't want to be?" signs that simply invite people to "learn more."

Despite coming up empty handed, the Attorney General pressed on. On December 10, 2025, the Attorney General sent Mayday a letter to an address in New York (as well as by e-mail) demanding that Mayday immediately desist from publishing information that could be used to facilitate "the delivery of abortion drugs to the State of South Dakota." Sieff Decl. Ex. 8; Raisner Decl. ¶ 10. Failure to comply, he threatened, exposed Mayday to "felony criminal consequences or civil penalties up to $5,000 per violation." Sieff Decl. Ex. 8 at 2. The letter falsely accuses Mayday of "urging women not to seek medical care after taking abortion pills" and claims (*id.* at 1), among other things, that Mayday had engaged in "deceptive act[s] or practice[s]" by republishing official FDA and other medical findings that abortion pills are safe. *Id.* at 2. The Attorney General's allegations refer almost entirely to information published by *third-party* websites that Mayday linked to, but did not author.

Mayday responded by letter through counsel on December 19, 2025. Raisner Decl. ¶¶ 12-13; Sieff Decl. Ex. 9. Objecting to the Attorney General's demand in its entirety, Mayday explained that it was a non-profit information resource that does not sell, handle, provide, offer for

sale, or financially benefit from the sale of abortion medication. Raisner Decl. ¶ 12; Sieff Decl. Ex. 9. at 1. It advised that Mayday accordingly does not engage in "the sale or advertisement of any merchandise" that is subject to the South Dakota deceptive trade practices law. SDCL § 37-24-6(1). Sieff Decl. Ex. 9 at 1. Instead, Mayday explained that it provides truthful information about healthcare options, including but not limited to abortion medications approved by the FDA for safe and effective use. Raisner Decl. ¶ 13; Sieff Decl. Ex. 9 at 1. It stressed this information is not commercial speech subject to regulation under the South Dakota deceptive practices statute and that the First Amendment protected the information it shared under longstanding Supreme Court precedent.  Sieff Decl. Ex. 9 at 2.

### E.    The Attorney General Purports to Seek an Injunction Against Mayday in South Dakota, But Does Not Actually Commence Any Enforcement Action

Disregarding Mayday's response, on December 22, 2025, the Attorney General filed a motion in South Dakota state court purporting to seek an injunction against Mayday and the company that placed Mayday's signs at gas stations in South Dakota. Sieff Decl. Ex. 10. The Attorney General did not properly serve the motion on Mayday and did not file or serve any complaint and summons on Mayday. Raisner Decl. ¶ 16. Mayday only learned about the motion from news reports.  *Id.* at ¶ 15. Service still has not been effected, and there is still no complaint or summons on file.

The Attorney General's inchoate motion underscores his threats. The motion seeks a broad and vague injunction that (like his demand letter) refers almost entirely to third-party content to which Mayday's website links—not content published by Mayday itself. Sieff Decl. Ex. 10 at 5-11.  The injunction seeks to require Mayday to remove existing content and links from its New York-based website when published to South Dakotans, and to ban Mayday from posting signs at gas stations publicizing its website to audiences in South Dakota.  *Id.* at 3-4.

### F.    Mayday Self-Censors in Response to the Attorney General's Threats

Although Mayday remains committed to its mission of providing truthful, evidence-based information to the public, the Attorney General's actions have forced Mayday to weigh the risks and costs of defending bad faith legal actions against its desire to continue its educational efforts. *See* Raisner Decl. ¶¶ 18-20. Already, Mayday has refrained from engaging in protected speech to avoid incurring future charges and legal costs defending that speech. For example, Mayday is refraining from putting up additional signs at gas stations or other venues in South Dakota. *Id.* ¶ 19. It is also refraining from publishing already-produced content through its social media platforms—to audiences everywhere in the world—sourced from South Dakota residents describing their healthcare challenges. *Id.* And in light of the Attorney General's actions, Mayday is more closely vetting press interview requests and self-censoring the statements it makes publicly—a significant injury for a non-profit whose very mission is to raise awareness through earned media like newspapers, radio, and television stations. *Id.* ¶ 20.

### G.    Mayday Files This Action to Vindicate Its Constitutional Rights

Mayday filed this action on January 6, 2026, to prevent the Attorney General from censoring and retaliating against its protected speech. *See* Compl. (ECF No. 1).

### LEGAL STANDARD

A preliminary injunction should issue where a plaintiff demonstrates a likelihood of success on the merits and a threat of irreparable harm absent relief. *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010). Courts also consider whether equity tips in the plaintiff's favor, and whether the public interest favors an injunction. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020). Where, as here, the government is a party to the lawsuit, the equity and public interest factors "merge." *Id.* at 58-59.

ARGUMENT

**I.     Mayday Is Likely to Prevail on Its First Amendment Claims.**

The reproductive health information Mayday publishes is literally true and of great public interest.  The Attorney General's threat to penalize Mayday for publishing that information—or to prevent Mayday from publishing it at all—is both a prior restraint and unconstitutional retaliation against protected speech.  Mayday will likely prevail on these claims.

**A.     The First Amendment Protects Mayday's Speech**

"Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned."  *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *see Lawrence v. Altice USA*, 841 F. App'x 273, 277 (2d Cir. 2021) (same).  Truthful speech about matters of public concern thus enjoys virtually absolute constitutional protection. *See Bartnicki v. Vopper*, 532 U.S. 514, 527, 535 (2001) (First Amendment protected publication of truthful information on public issues even when the information had been leaked unlawfully).

The public health information on Mayday's website—and the signs publicizing it to audiences offline—fall squarely within the First Amendment's protections for truthful speech on matters of public concern. There is no question that "[a]bortion presents a profound moral question" of great public interest.  *Dobbs*, 597 U.S. at 302.  And the information at issue is literally and undisputedly true. Mifepristone and misoprostol are FDA-approved as safe and effective "to end an intrauterine pregnancy," and may be prescribed and distributed over the internet and by mail across the United States.  *See* Sieff Decl. Exs. 11 and 12 at 1 (attaching FDA's current official Risk Evaluation and Mitigation Strategy (REMS) guidance); *see also id.* Exs. 2-4, 15 (FDA and independent studies confirming safety). Mayday likewise truthfully informs readers what third-party providers charge for abortion pills, where those providers mail abortion pills, and how long those providers predict it will take for the pills to arrive.  *See id.* Ex. 7 at 51-53.  Mayday does not

8

provide legal advice or direct any action that would violate any state's laws.  *Id.* Exs. 13-14; Raisner Decl. ¶ 5. Instead, Mayday links to third-party resources a reader can consult to make their own choices.  Sieff Decl. Exs. 13-14; Raisner Decl. ¶ 6

The Second Circuit just last month affirmed that the same publishing activities *by abortion opponents* were fully protected by the First Amendment in *NIFLA v. James*, 160 F.4th 360, 379-80 (2d Cir. 2025). That case involved anti-abortion non-profits' First Amendment rights "to make informational statements on their websites" about options to *reverse* mifepristone-and-misoprostol induced abortions—including by posting "links and instructions for accessing" third-party providers—"so that women can receive more information about" these options and "if they so choose, be matched with a third-party provider." *Id.* at 375.  Because the non-profits are "morally motivated," "receive no renumeration or financial benefit for engaging in" their speech, and "do not provide" the procedures themselves, "but rather provide the public with information … and access to third-party providers who can offer" them, the Second Circuit affirmed that the First Amendment protected their websites. *Id.* at 375-76.  That conclusion applies here.

It makes no difference that it is now illegal to provide most abortions in South Dakota and some other states.  The Supreme Court addressed this exact fact pattern in *Bigelow v. Virginia*, 421 U.S. 809 (1975), holding that a Virginia law criminalizing the dissemination of information with tendency to "encourage or prompt the procuring of an abortion" violated a Virginia newspaper's First Amendment right to publish information about, and endorse an organization that facilitated, access to abortions that were then illegal in Virginia.  *Id.* at 811-12. The Court explained that the published material "conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter," and that Virginia had no

legitimate "interest in shielding its citizens" from this information. *Id.* at 822 & n.7, 827-28.  The Attorney General has no legitimate interest here either.  *See also, e.g.*, *Matsumoto v. Labrador*, 122 F.4th 787, 812 (9th Cir. 2024) (First Amendment "squarely protect[s]" providing "[i]nformation and instructions regarding the availability and means of procuring an abortion procedure or drug," including "specifics, such as who the provider is, when and where the procedure would take place, or what a drug would cost"); *Welty v. Dunaway*, 791 F. Supp. 3d 818, 831 (M.D. Tenn. 2025) (First Amendment protects sharing information about how "to get abortion pills and do a self-managed abortion or to seek abortion care outside" prohibition states).

The Attorney General also cannot avoid the First Amendment by mischaracterizing Mayday's publications as deceptive or illegal commercial speech.  *Cf.* Sieff Decl. Ex. 8 at 2 (making this contention).  For one thing, Mayday's speech is not deceptive and does not propose any illegal transaction—it is literally true and provides information for readers to make lawful choices.  *Supra* p. 8-9.  But just as critically, Mayday's speech is not commercial speech regulable as a deceptive trade practice at all. *See Zauderer v. Off. of the Disciplinary Counsel*, 471 U.S. 626, 638 (1985) (deceptive practices statutes constitutional only to restrict "the dissemination of commercial speech"); *e.g.*, SDCL § 37-24-6(1) (statute invoked by the Attorney General applies only to "the sale or advertisement of any merchandise" or solicitation).  Commercial speech at its core "does no more than propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014) (citation omitted).  Even in close cases—unlike this one—involving speech with a mix of commercial and noncommercial elements, speech is *not commercial* when it is does not advertise the sale of a specific product the speaker has an economic motivation for selling. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983) (setting forth these *Bolger* factors).  Thus in *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503-14 (1984), it was not

commercial speech to inform consumers about the price, quality, and availability of a loudspeaker, nor was it commercial speech in *Lowe v. SEC*, 472 U.S. 181, 210 & n.58 (1985), to publish advice and commentary about investments.  *See also, e.g.*, *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 540 (S.D.N.Y. 2018) (professional services directory not commercial speech).

The Second Circuit's decision in *NIFLA* is again dispositive.  160 F.4th at 374-75. As the Attorney General does here, the New York Attorney General there asserted authority to regulate anti-abortion organizations' websites pursuant to New York's consumer protection laws (N.Y. Gen. Bus. Laws §§ 349-50), claiming the organizations published commercial speech that was "false or misleading because they misrepresented the efficacy and safety" of abortion-pill reversal procedures and "induced individuals" to undertake them.  *Id.* at 365-66. The court rejected this contention and held that the non-profits' speech advising readers as to the availability of these services was informational and educational.  *Id.* at 375-76.  Predicting *this very case*, the court warned any other ruling would "subject a sweeping range of non-profits to regulation of their speech for providing the public with information," including "a reproductive rights group in a state with abortion restrictions that provides information about out-of-state organizations that will help women obtain the procedure."  *Id.* at 376.  The First Amendment protects Mayday's truthful non-commercial speech without qualification.

### B.     The Attorney General's Threats Violate the First Amendment

The Attorney General's threats to Mayday's protected speech violate at least two separate First Amendment doctrines. First, the Attorney General's attempt to punish and prevent Mayday's truthful speech of public concern is a prior restraint and content-based restriction of speech that fails strict scrutiny.  Second, the Attorney General's actions violate the First Amendment by retaliating against Mayday for engaging in protected activity.  *See, e.g.*, *NRA of Am. v. Vullo*, 602 U.S. 175, 203 (2024) (Jackson, J., concurring) (noting the First Amendment violation alleged in

that case could be described as both a prior restraint and retaliation).

### 1. The First Amendment bars viewpoint-based prior restraints against truthful speech of public concern.

"[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki*, 532 U.S. at 527 (citation omitted). The Supreme Court has never upheld state action to prevent or punish the publication of such information, whether they be state secrets, *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971), names of juvenile delinquents, *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 105-06 (1979), identities of rape victims, *The Florida Star v. B.J.F.*, 491 U.S. 524, 532-41 (1989), or even information obtained through "a stranger's illegal conduct," *Bartnicki*, 532 U.S. at 527, 535. Even when the Supreme Court has "hypothesiz[ed]" what "state interest[s] of the highest order" might justify restricting truthful speech on issues of public concern under the strictest imaginable scrutiny, it has confined those interests to the extreme margins of ordinary discourse, such as preventing "publication of the sailing dates of transports or the number and location of troops" at sea in wartime. *Fla. Star*, 491 U.S. at 532-33 (quoting *Near v. Minnesota*, 283 U.S. 697, 716 (1931)).

This strictest possible scrutiny applies to the Attorney General's threats not only because they seek to impose formal and informal prior restraints preventing Mayday from publishing truthful information about reproductive healthcare, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (explaining that "the threat of invoking legal sanctions" against protected speech is an "informal" prior restraint subject to strict scrutiny), but also because the Attorney General's reasons for silencing Mayday are transparently predicated on contempt for "the specific motivating ideology" behind Mayday's publications. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). This kind of viewpoint-based censorship is the most "egregious form" of speech restriction, *id.*, because it seeks through suppression "to prescribe what shall be orthodox

in politics, nationalism, religion, or other matters of opinion." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Viewpoint-based prior restraints are thus arguably not just subject to strict scrutiny, but "unconstitutional per se." *Cath. Charities v. Whitmer*, --- F. 4th ----, 2025 WL 3653774, at *6 (6th Cir. Dec. 17, 2025); *see also Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (citing cases); *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1124 & 1124 n.1 (9th Cir. 2023) (Van Dyke, J., concurring) (same).

The Attorney General cannot justify his threats even assuming strict scrutiny applies. "Strict scrutiny is unforgiving" and effectively "fatal" "absent truly extraordinary circumstances." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 484-85 (2025). State action subject to strict scrutiny is presumptively invalid unless the government shows it is necessary to achieve a compelling interest and uses the least restrictive means. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813, 817 (2000). This is the government's burden. *NIFLA*, 160 F.4th at 378. To survive review, the Attorney General "must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Id.* (quotation omitted).

Nothing justifies the Attorney General's threats to censor Mayday's speech under this standard. If the Attorney General's interest is preventing the dissemination of information that could enable readers to make the informed choice to obtain a legal abortion, that is not a compelling—much less legitimate—interest his office may pursue. *See Bigelow*, 421 U.S. at 822 & n.7, 827-28. If the interest is preventing *illegal* abortions, the Attorney General has less restrictive tools at his disposal that do not involve suppressing truthful public health information, including enforcing the "pro-life laws" Governor Rhoden identified (Sieff Decl. Ex. 6)—SDCL § 22-17-5.1 and § 36-4-8—against abortion providers who violate them. *See McCullen v. Coakley*,

13

573 U.S. 464, 490-92 (2014) (abortion-related speech regulation failed even intermediate scrutiny when the only conduct it legitimately proscribed was already criminalized by other state laws); *e.g.*, *Brooklyn Branch of NAACP v. Kosinski*, 735 F. Supp. 3d 421, 448 (S.D.N.Y. 2024) (Failla, J.) (same applying strict scrutiny).  His failure to do so is dispositive.

### 2.    The First Amendment also bars retaliation against protected speech.

The First Amendment also "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation omitted).  A violation occurs when a plaintiff (1) has an interest protected by the First Amendment, (2) the government takes adverse action against the plaintiff motivated by, or substantially caused, by the exercise of that right, and (3) the government's actions effectively chilled the exercise of his First Amendment right.  *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).  Once shown, the government "can prevail only by showing that the [action] would have been initiated without respect to retaliation." *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019) (citation omitted). All three elements are established.

*First*, the First Amendment protects Mayday's website, and Mayday's signs publicizing it, because the speech is truthful and on a matter of public concern.  *Supra* § I.A.

*Second*, it is clear the Attorney General threatened Mayday with a sham "deceptive practices" investigation and enforcement action because Mayday published protected speech into South Dakota—the threats literally respond to, and seek to silence, that speech.  Although that alone satisfies the nexus element, *e.g.*, *Holley v. Cnty. of Orange, NY*, 625 F. Supp. 2d 131, 141 (S.D.N.Y. 2009) (retaliatory nexus shown where officer "sought to silence plaintiff" for protected speech, even though officer erroneously believed the speech was not protected), the evidence here is more damning because it shows the Attorney General not only intends to silence Mayday, but do so because *he disagrees with* the ideas Mayday shares and the viewpoint behind it.  *See, e.g.*,

14

*Huminski v. Rutland Cnty.*, 134 F. Supp. 2d 362, 365 (D. Vt. 2001) (retaliation shown where government refused to allow plaintiff to enter public buildings "because they disapproved of the message he had displayed"); *see also Decker Advert. Inc. v. Delaware Cnty., N.Y.*, 765 F. Supp. 3d 128, 142-43 (N.D.N.Y. 2025) (withdrawing newspaper's privilege of printing official county notices was cognizable retaliation for its disfavorable coverage of county officials).

This animus is plain from the "sequence of events leading up to" the Attorney General's demand and threatened lawsuit, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977) (considering this factor to determine whether an impermissible purpose "was a motivating factor" for government action), as well as the fact that the threatened claims are so objectively frivolous that they "must have been undertaken for some improper purpose," *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 338 (2d Cir. 1999). Consider:

- Mayday only came onto the Attorney General's radar because, on **December 8**, it placed signs at South Dakota gas stations inviting readers to "learn more" about their options to terminate a pregnancy. Raisner Decl. ¶ 7.

- The next day, **December 9**, before any investigation, the Governor and Attorney General issued a joint press release announcing the Governor's request to prosecute Mayday under any "pro-life" pretext the Attorney General could devise.  Sieff Decl. Ex. 5; Raisner Decl. ¶ 8.

- On **December 10**, still before an investigation, the Attorney General sent a cease-and-desist letter to Mayday in New York. He threatened Mayday under the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24, even though Mayday's publications are not trade or commerce regulable by that law. Sieff Decl. Ex. 8; Raisner Decl. ¶ 10.

- At some point between **December 15** and **December 22**, the Attorney General's office conducted a perfunctory "investigation" finding that no one had reported being deceived by Mayday's signs or its website. Sieff Decl. Ex. 7. In fact, the Attorney General received only one complaint from one business, Cowboy Country Stores, that objected to Mayday's "abortion media" on leased signs in front of its storefronts—an objection to Mayday's *point of view*, and possibly a contractual matter for Cowboy Country Stores to take up with its media leasing agent, not evidence of consumer deception that would warrant State intervention. *Id.* at ¶ 7.

- On **December 19,** Mayday sent the Attorney General a response explaining that Mayday is a non-profit that does not sell, handle, provide, offer for sale, or benefit from the sale of abortion medication, and that its speech is truthful noncommercial speech protected by the First Amendment and not regulable by the statute the Attorney General cited. *Id.* at Ex. 9; Raisner Decl. ¶¶ 12-13.

- On **December 22**, the Attorney General rushed to file a motion to enjoin Mayday's speech, but in fact initiated no proceedings and even failed to serve Mayday with its defective pleading. Sieff Decl. Ex. 10; Raisner Decl. ¶ 15. The motion makes assertions that ignore Mayday's letter, levies false claims that could have been debunked with minimal research, and focuses almost entirely on *third parties' speech*—not Mayday's.

All of this makes plain what was obvious from the start: the Attorney General's aim was to "put[] investigators to work" "searching the law books" "to pin some offense" on Mayday in retaliation for its speech, not to undertake a normal good faith investigation following up on any real suspicion of wrongdoing. *Morrison v. Olson*, 487 U.S. 654, 728 (1988) (Scalia, J., dissenting). (quoting R. Jackson, The Federal Prosecutor, Address Delivered at the Second Annual Conference

of United States Attorneys, April 1, 1940). This is textbook retaliation. When "the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense" it presents "the greatest danger of abuse" known to our judicial system. *Id.* at 728 (Scalia, J., dissenting) (quoting same).

*Third,* and finally, the Attorney General's actions have chilled Mayday's speech, to the extent that element even needs to be established. *See Holley*, 625 F. Supp. 2d at 141 (noting there is "no need" to prove a chilling effect "in a retaliatory prosecution action" where there is no "probable cause" to support the government's asserted violation) (citing cases). Although Mayday has not stopped speaking altogether, it has unwillingly refrained from engaging in protected speech to avoid incurring future charges and legal costs defending that speech. Raisner Decl. ¶¶ 18-21. It has foregone publishing ready-to-post content to its social media channels, refrained from posting new signs in South Dakota, and its leadership has had to restrict what they say to press about Mayday's campaign lest those innocuous protected statements, too, become baseless grounds for further government harassment. *Id.* ¶¶ 19-20. Those "changes in" Mayday's "behavior" is more than enough to establish a chilling effect. *Bartels v. Inc. Vill. of Lloyd*, 751 F. Supp. 2d 387, 401 (E.D.N.Y. 2010) (chilling effect could be proven with evidence that plaintiff "stopped attending" public meetings and "ceased writing" some letters to the village council). Mayday will accordingly prevail on its retaliation theory, as well.

## II.    Mayday Will Suffer Irreparable Harm Absent an Injunction.

Mayday has already and will continue to suffer irreparable injury absent relief. Raisner Decl. ¶¶ 18-21. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because Mayday has shown that it is likely to succeed on the merits of its First Amendment claims, that is enough to establish irreparable harm. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483,

17

486-87 (2d Cir. 2013) (irreparable harm from likelihood of success on First Amendment claim). Additionally, even if Mayday chose *not* to comply with the State's demand, it would face potentially crippling penalties. Raisner Decl. ¶ 21. That choice, too, would result in irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (forcing such a choice threatens irreparable injury); *e.g.*, *Satellite TV of N.Y. Assocs. v. Finneran*, 579 F. Supp. 1546, 1551 (S.D.N.Y. 1984) (choice between complying with law or incurring a fine "readily" satisfied irreparable harm inquiry).

### III.   Mayday Satisfies the Remaining Preliminary Injunction Factors.

The remaining factors—the balance of equity and the public interest—"merge" when the government is the defendant. *New York v. U.S. Dept. of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020). They favor an injunction here. Absent a preliminary injunction, Mayday will suffer a loss of its First Amendment rights and/or substantial civil penalties. Raisner Decl. ¶¶ 18-21. In contrast, the Attorney General "does not have an interest in the enforcement of an unconstitutional" demand. *725 Eatery Corp. v. City of N.Y.*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019). The public interest further supports "securing First Amendment rights," *N.Y. Progress & Prot. PAC*, 733 F.3d at 488, "and it is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy," *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016).

### CONCLUSION

Mayday respectfully requests an order preliminarily enjoining the Attorney General from (1) taking any action, formal or informal, to pressure or force Mayday to take down the truthful public health information on its website, or the signs it has published publicizing that website, and from (2) taking any action, formal or informal, to pressure or force Mayday to refrain from publishing truthful public health information to South Dakotans in the future, both on its website

and in signs and other offline communications publicizing its website.[1]

Dated:  Los Angeles, California
         January 14, 2026

                                    Respectfully submitted,

                                    By: /s/      Adam S. Sieff
                                            Adam S. Sieff

Adam S. Sieff*                              Chelsea T. Kelly (SDNY No. CK2016)
DAVIS WRIGHT TREMAINE LLP                   Laura R. Handman (SDNY No. RH5353)
350 South Grand Avenue, 27th Floor          DAVIS WRIGHT TREMAINE LLP
Los Angeles, California 90071-3487          1301 K Street NW, Suite 500 East
213.663.6800 (tel)                          Washington, D.C. 20005-3317
adamsieff@dwt.com                           202 973.4200 (tel)
                                            chelseakelly@dwt.com
Ambika Kumar*                               laurahandman@dwt.com
Nicole Saad Bembridge*
DAVIS WRIGHT TREMAINE LLP                   *Admitted *pro hac vice*
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
206.622.3150 (tel)
ambikakumar@dwt.com
nicolesaadbembridge@dwt.com

                    *Attorneys for Plaintiff Mayday Health*

---

[1] The Court should not require Mayday to post a bond since the State will not incur any costs or damages if the Court wrongfully enjoins the Act.  *725 Eatery Corp.*, 408 F. Supp. 3d at 470.

## CERTIFICATION OF WORD COUNT

I certify that the qualifying portions of the foregoing memorandum of law contains 5,837 words and therefore complies with Local Rule 7.1(c) and this Court's Individual Rules of Practice in Civil Cases.

*/s/     Adam S. Sieff*
Adam S. Sieff