# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MAYDAY HEALTH,** | * |
| | * |
| | * |
| *Plaintiff,* | * |
| | *     1:26-cv-00078-KPF |
| v. | * |
| | * |
| **MARTY J. JACKLEY,** Attorney General for the | * |
| State of South Dakota in his official capacity, | * |
| | * |
| *Defendant.* | * |
| | * |

## DEFENDANT'S MEMORANDUM OF LAW RE: *YOUNGER* ABSTENTION

Defendant Marty J. Jackley, *pro se* and by and through his counsel Paul S. Swedlund and

Amanda J. Miiller, hereby files this response to this court's request for a memorandum of law on

*Younger* abstention.

## INDEX

### Table of Contents

Introduction ............................................................................................................................... 3

Mayday Website ........................................................................................................................ 4

Argument .................................................................................................................................. 11

     1. *Younger* Elements Are Satisfied ...................................................................................... 11

     2. Exceptional Circumstances Do Not Exist ..................................................................... 13

        a. No Protected First Amendment Right Is At Stake ...................................................... 15

        b. The Attorney General Is Engaged In A Valid Enforcement Action ........................... 20

Conclusion ............................................................................................................................... 21

Certificate of Compliance ....................................................................................................... 24

### Table of Authorities

*Abott v. Perez,* 138 S.Ct. 2305 (2018) ..................................................................................... 12

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) ................................................................. 16

*Bigelow v. Virginia*, 421 U.S. 809 (1975) ................................................................................. 16

*Central Hudson Gas & Elec. Corp.  v. Public Service Comm'n of New York,*
447 U.S. 557 (1980) ..................................................................................... 15, 16, 18, 20

*Cocroft v. Graham,* 122 F.4th 176 (5th Cir. 2024) ........................................................16

*Cousins v. Wigoda,* 409 U.S. 1201 (1972)......................................................................13

*Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215 (2022) ........................................3

*Gonzales v. Carhart,* 127 S.Ct. 1610 (2007) ...............................................................12

*Hicks v. Miranda,* 422 U.S. 332 (1975)..........................................................................14

*Huffman v. Pursue, Ltd.,* 420 U.S. 592 (1975) ...............................................................21

*Kugler v. Helfant,* 421 U.S. 117 (1975).....................................................................13, 20

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423 (1982).............11, 12, 13

*Moore v. Sims,* 442 U.S. 415 (1979)..........................................................................12, 21

*Nat'l Inst. of Family and Life Advocates v. James,* 160 F.4th 360 (2nd Cir. 2025).............16, 17, 20

*Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447 (1978) .................................................19

*Perez v. Ledsma,* 401 U.S. 82 (1971) ....................................................................14, 17 20

*Pittsburgh Press Co. v. Pittsburgh Human Relations Comm'n,* 413 U.S. 376 (1973).............4, 18

*Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1 (1987)..........................................................12

*Planned Parenthood v. Casey,* 112 S.Ct. 2791 (1992) ...................................................12

*Ryan v. Specter,* 332 F.Supp. 26 (E.D.Pa. 1971) .........................................................13

*Simopoulos v. Virginia Bd. of Med.,* 644 F.2d 321, 325 (4th Cir. 1981)....................3, 4, 13, 14, 23

*South Dakota v. Wayfair,* 585 U.S. 162 (2018) ...........................................................16

*Tang v. Appellate Division of New York Supreme Court,* 487 F.2d 138 (2nd Cir. 1973)..............18

*Younger v. Harris,* 401 U.S. 37 (1971)..............................................................11, 14, 21

*Washington Mercantile Ass'n v. Williams,* 733 F.2d 687 (9th Cir. 1984).....................................16

SDCL 1-11-1..............................................................................................................20

SDCL 22-17-5.1.........................................................................................................22

SDCL 34-27-6............................................................................................................11

SDCL 37-24-16..........................................................................................................12

SDCL 34-27-23..........................................................................................................11

**INTRODUCTION**

Our federal system of government exists to respect the social and cultural differences between states.  Thus, citing the "proper respect for state functions" and the core principle of our federal structure that the nation "will fare best if the states and their institutions are left free to perform their separate functions," the court in *Simopoulos v. Virginia Bd. of Med.,* 644 F.2d 321, 325 (4th Cir. 1981), abstained on *Younger* grounds from hearing a Virginia doctor's 42 U.S.C. § 1983 challenge to his de-licensing for performing an illegal abortion on a minor.  In Mayday's home state of New York, abortion is accepted; in South Dakota it is not.  *Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215, 217 (2022)("the people of the various states may evaluate [abortion] interests differently").

Mayday claims simply to "help" those in search of medical information, which may be true as applied to some of its activities in states where abortion is legal, but Mayday's "help," particularly the means it employs to "help," is something altogether different as applied to states where abortion is illegal.  In a state like South Dakota, which has laws against abortion and abortion pills, Mayday's "help" violates the state's civil and criminal laws.  Which is precisely why Mayday targets its activities toward abortion-illegal states – to aid and abet women[1] and abortionists to skirt South Dakota's laws . . . without telling them that in truth they are being solicited to solicit an illegal act and to engage in medically risky and potentially life-threatening behavior.

Abortion is a divisive issue that unavoidably colors one's views of laws which permit or prohibit it.  Americans strongly disagree about abortion.  But almost nobody disagrees that child

---

[1] An assumption underlies Mayday's business model that every woman who makes abortion inquiries wants an abortion.  There is abundant data that in a statistically significant number of cases, women are being pressured into abortions by male partners, family members, or economic circumstances.  But it does not "help" a woman to facilitate an abortion she does not want.  These dynamics in abortion decision making reveal that that Mayday's premise of "helping" all women who log onto its cite is not categorically true.

pornography or sexual intercourse with children is wrong.  So, to put the matter in stark perspective, if Mayday's services were directed toward connecting pedophiles with child pornography or children, nobody could seriously contend it had a First Amendment right to do so. *Pittsburgh Press Co. v. Pittsburgh Human Rel. Comm'n,* 413 U.S. 376, 388 (1973)("no doubt that a newspaper constitutionally could be forbidden to publish a want ad . . . soliciting prostitutes"). Nobody could seriously contend that a state does not have the absolute right to shut down advertising that is a conduit to platforms that supply child pornography or children to pedophiles, or sex-trafficked women to pimps, or contract killers to bitter ex-husbands, or methamphetamine to addicts.  Though Mayday obviously does not see it in such terms, to South Dakota and South Dakotans the state has the same interest in keeping unborn children from the hands of abortionists as it does in keeping born children from the hands of pedophiles.  It is a core social and cultural value which our federal system recognizes and protects through myriad constitutional and legal mechanisms, the *Younger* doctrine among them.  *Simopoulos,* 644 F.2d at 325.

So, it is necessary to scrutinize the means Mayday employs to "help" South Dakota women in order to exercise informed judgment about the laws the state is enforcing here.

**MAYDAY'S WEBSITE**

In early December 2025, Mayday posted this placard at gas stations throughout South Dakota:



KLEMANN AFFIDAVIT, Exhibit A at Exhibits 1, 2.  At a press conference, Mayday crowed that it was targeting South Dakota for this advertisement campaign "due to the state's strict abortion laws."  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 2.

When a consumer accesses the MAYDAY.HEALTH website posted on the placard, a banner question asks "What do you need?"  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 8.  Below this are four clickable links to choose from: abortion, morning after pills, birth control and gender-affirming care.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 9.  If the consumer selects "abortion," they are asked how long it has been since their last period.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 9.  The answer to this question prompts a series of questions that lead to different abortion options depending on the woman's length of pregnancy.  This is likely because the FDA has only approved abortion-inducing pills (medicinal abortion) for pregnant women "through ten weeks gestation."[2]  Abortions performed after the twelfth week of pregnancy necessitate an in-clinic surgical procedure to abort the baby.

If "more than 12 weeks" is selected, consumers are directed to a linked website, ineedana.com (as in "I need an abortion"), where they are told that "No matter what state you live in you still have options."  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 11.  A clickable link prompting consumers to "Search your options now" leads to a page where a consumer is asked what city she lives in, the first day of her last period and her age.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 12.  No matter what combination of information is entered into these fields (*i.e.* South Dakota addresses, date of last period, age) the consumer is always given three options:

---

[2] U.S. Food and Drug Administration, *Information About Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation,* https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/information-about-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation (last visited December 21, 2025).  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 10.

driving directions to the nearest out-of-state abortion clinic that can perform surgical abortion, a link to "order abortion pills online" to self-induce a medicinal abortion at home, and the option to fly to another state that performs surgical abortions.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 13.

The only exception to the options offered is when a consumer identifies as a minor.  The minor will see the same options as adult consumers but they are shown a disclaimer that says "You are a minor.  If you decide to travel for care, you may face additional barriers as a teen.  Learn more in our Guide for Teens."  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 14.

The "Guide for Teens" is deceptive by commission and omission.  Children are advised that "[a]bortion is safe, normal and any reason to have one is a good reason."  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 15.  The website specifically instructs a child to self-induce an abortion at home by having abortion-inducing pills sent to their home "or to a trusted friend or family member" or to travel to a state that does not have parental consent laws so she can obtain an abortion without parental consent or judicial oversight required by South Dakota law.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 16; SDCL 34-23A-7.  But Mayday makes even more deceptive and inaccurate representations to consumers who click on "less than 12 weeks."

Circling back to the fork of the decision tree on MAYDAY.HEALTH's main website, consumers who select "less than 12 weeks" are directed to a screen that asks if the consumer lives in a "red state" which are detailed on a map below the question.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 17.  South Dakota is identified as a "red state."  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 18.  If the "red state" option is selected, the consumer is directed to a page that lists five separate abortion pill providers, four of whom proclaim in all caps that they are willing to "SHIP TO ALL 50 STATES."  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 17.  There is nowhere a

disclaimer, as there is on surgical abortion pages, that medicinal abortions and shipping pills into South Dakota for that purpose are illegal.

SDCL 22-17-5.1 provides that it is illegal to mail abortion-inducing pills into the South Dakota.  Per that statute, "any person who administers to any pregnant female or who prescribes or procures for any pregnant female any medicine, drug, substance . . . to procure an abortion . . . is guilty of a Class 6 felony." MAYDAY.HEALTH's placards and website are the first links in the abortion pill procurement chain.  One of MAYDAY.HEALTH's platforms (Abuzz) tells a consumer that she may perform her own at-home medicinal abortion if she is less than "13 weeks pregnant," which is 91 days since the first day of her last period.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 19.  However, the FDA has only approved the use of medicinal abortion pills "through ten weeks gestation (70 days or less since the first day of a patient's last menstrual period).  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 10.

If a South Dakota consumer seeks to obtain abortion-inducing pills from Abuzz, a disclaimer purports to provide "information about the potential legal risks of getting abortion pills by mail."  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 20.  But Abuzz does not require a consumer to click on and review the "legal risks" screen so a consumer can order medicinal abortion drugs without ever laying eyes on Abuzz's "disclaimer" or affirming that they have read it.  But if a consumer does click on the "legal risks" link, they are directed to another MAYDAY.HEALTH platform, plancpills.org, which under the heading "Is this legal? Can someone get in trouble for using abortion pills?" deceptively informs consumers that "[r]esearch shows that hundreds of thousands of people have received pills by mail over the past few years with no legal problems."  This, of course, is no answer at all.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 22.  It does not inform a South Dakota consumer that, yes, mailing abortion-inducing pills into South Dakota by mail is illegal.  It does not inform a South Dakota consumer what proportion of

those "hundreds of thousands of people" are from abortion-legal states where mailing abortion pills creates "no legal problems."  It does not inform a South Dakota consumer of any knowledge plancpills.org has of "legal problems" some women have experienced.  Nor does it inform a consumer that, while she herself would not be prosecuted under South Dakota law, "someone" – the pill provider – could be, in which case she could become a witness in criminal proceedings against the pill provider.  Worse, under a link to "How do people get in trouble," plancpills.org confides that it is because:

- They told someone about their abortion and that person reported them.
- They got follow-up medical care and the provider reported them (many people say they are having a miscarriage to avoid this risk, which is medically what is happening to the body).
- They were later in pregnancy than they thought and didn't know what to do with the fetal tissue.

KLEMANN AFFIDAVIT, Exhibit A at Exhibit 23.  The second bullet point reflects that Mayday is aware of risks that could require life-saving follow-up care that it is not telling consumers about. Instead of forthrightly informing a South Dakota consumer that "people get in trouble" when they do something that is illegal in their state or of the risks that make medicinal abortion not entirely "safe," plancpills.org provides a primer on how to conceal their participation in the crime of mailing abortion-inducing pills into the state, even to the point of encouraging inaccurate medical reporting that may misdirect medical treatment at the expense of the woman's health.

Another MAYDAY.HEALTH pill platform, Aid Access, informs consumers that they are eligible to self-induce an at home using medicinal abortion pills in the fourteenth week of their pregnancy, and that this is "very safe."  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 24. However, the FDA has only approved the use of medicinal abortion pills "through ten weeks gestation," meaning that use at up to 12-14 weeks as Mayday suggests is inherently unsafe. KLEMANN AFFIDAVIT, Exhibit A at Exhibit 10.  MAYDAY.HEALTH does not inform

consumers that the FDA has issued warning letters to Aid Access for selling unapproved and misbranded abortion-inducing pills over the internet, nor does Aid Access disclose this information on its website. KLEMANN AFFIDAVIT, Exhibit A at Exhibit 25, 26. Aid Access does not inform South Dakota consumers that it is illegal to mail medicinal abortion pills into South Dakota. Instead, it cites to consumer testimonials collected by the World Health Organization which have no relevance to the legality of shipping medicinal abortion pills into South Dakota. KLEMANN AFFIDAVIT, Exhibit A at Exhibit 27.

Despite a disclaimer on its website that it "do[es] not give legal or medical advice" (even as it dolls out heaping helpings of both), MAYDAY.HEALTH represents to consumers that its "information comes from top clinicians, lawyers and health experts" and "trusted organizations" it consults for legal and medical advice. KLEMANN AFFIDAVIT, Exhibit A at Exhibit 28, 29. This is repeated on MAYDAY.HEALTH's FAQ page where it vouches that the links and platforms on its website "have the best content for a certain aspect of abortion care" and that they "only link to other trusted websites and partners." KLEMANN AFFIDAVIT, Exhibit A at Exhibit 30.

As for MAYDAY.HEALTH's own website, it claims without qualification that "abortion pills are safe and effective during the first 12 weeks" of pregnancy and that "[i]t is safe to do your own abortion at home with abortion pills." KLEMANN AFFIDAVIT, Exhibit A at Exhibit 30. However, the FDA advises that "[i]n about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure" to stop.[3] The FDA's warnings concerning the use of abortion-inducing drugs caution that they carry risks of bacterial infection, rare cases of fatal septic shock, uterine bleeding potentially requiring surgical intervention and that medicinal abortion pills are

---

[3] U.S. Food and Drug Administration, Labeling Information for Mifepristone, https://www.accessdata.fd.gov/drugsatfda_docs/label/2023/0206870rig1s025Lbl.pdf#page=16 (last visited December 21, 2025). KLEMANN AFFIDAVIT, Exhibit A at Exhibit 31.

"available only through a restricted program . . . because of the risks of serious complications." KLEMANN AFFIDAVIT, Exhibit A at Exhibit 31. Medicinal abortion pills also entail adverse side effects such as infection and infestation (endometritis, endomyometritis, parametritis, pelvic inflammation or infection, salpingitis) and reproductive system and breast disorders (uterine rupture, ruptured ectopic pregnancy, hemotometra, leukorrhea), as well as risks of birth defects and abnormalities for unborn children should the pills fail to induce abortion. A recent study of "real-world insurance claims data for 865,727 prescribed mifepristone abortions" revealed a "serious adverse event rate of 10.93 percent."[4] But neither the FDA's warnings nor the adverse effects of these drugs on women or unborn children are mentioned on MAYDAY.HEALTH's website.

These facts reveal that MAYDAY.HEALTH, with the active assistance of its platform affiliates, engages in deceptive trade practices and acts in violation of SDCL 37-24-6(1), including but not limited to:

- Claiming that medicinal abortion is safe yet linking to websites that provide abortion-inducing pills well beyond the FDA-recommended gestational period.

- Instructing women and teenaged girls in how to obtain abortion-inducing pills without warning them that the pills are illegal in this state.

- Instructing teenaged girls how to leave the state for an abortion and obtain abortion pills without their parent's knowledge or consent.

- Informing teenaged girls that abortions are "safe" and "normal" for "any reason" without warning that there is a 1 in 10 risk of severe complications associated with medicinal abortions.

- Counseling women and teenaged girls to conceal their abortions and not seek follow-up medical care relating to abortion complications so that they or "someone," such as Mayday and its affiliates, does not "get in trouble," thereby putting females at risk of adverse reactions, side effects, hemorrhaging, infections, septic shock or even death.

---

[4] Hall & Anderson, *The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event,* Ethics and Public Policy Center (April 28, 2025) https://tinyurl.com/wxhfswdf.

- Omitting any of the FDA's warnings while claiming that "abortion pills are safe [and] effective" and that "[i]t is safe to do your own abortion at home" with abortion pills.

**ARGUMENT**

Per *Younger v. Harris*, 401 U.S. 37 (1971), a federal court must abstain from enjoining a state civil or criminal judicial proceeding if (1) there is an ongoing state judicial proceeding to (2) enforce an important state interest and (3) the pending state proceeding provides an adequate opportunity to litigate a federal plaintiff's constitutional rights. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432-36 (1982).

### 1. *Younger* Elements Are Satisfied

The record supports this court's finding that the three *Younger* abstention elements are met here. First, under the authority to enjoin deceptive advertising and solicitations for charitable contributions granted to him per SDCL 37-24-6(1),[5] on December 22, 2025, the South Dakota Attorney General instituted a civil enforcement action in South Dakota state court under SDCL § 37-24-23.[6] But before resorting to legal action, in response to complaints from gas station owners objecting to Mayday's placards, 657 complaints to the office's Consumer Protection Division, and a request from Governor Larry Rhoden to investigate, the Attorney General sent Mayday a letter demanding that it cease and desist from the deceptive advertising on its placards. KLEMANN

---

[5] SDCL 37-24-6(1) provides that "it is a deceptive act or practice for any person to . . . [k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby."

[6] SDCL 37-24-23 provides that "[i]f the attorney general has reason to believe that any person is using, has used, or is about to use any act or practice declared to be unlawful by § 37-24-6 and that proceedings would be in the public interest, the attorney general may bring an action in the name of the state against the person to restrain by temporary or permanent injunction the use of the act or practice, upon the giving of appropriate notice to that person. The notice shall state generally the relief sought and be served in accordance with § 37-24-16 and at least three days before any hearing in the action. The attorney general, if the prevailing plaintiff, may also recover reasonable attorney's fees and costs."

AFFIDAVIT, Exhibit A at Exhibit G. The letter did not demand that Mayday change the content of its website, only that it take its advertisements down. Mayday refused to take the advertisements down on the ground that it allegedly does "not sell, handle, provide, offer for sale, or benefit from the sale of abortion medication, and it has no customers." KLEMANN AFFIDAVIT, Exhibit A at Exhibit 4. The South Dakota Attorney General served proper notice to Mayday for the civil enforcement action on January 10, 2026, under service rules outlined in SDCL 37-24-16. Mayday's South Dakota counsel, Jim Leach, has also accepted service of the Attorney General's pleadings and has entered his appearance in the case. That action is currently set for a hearing in South Dakota state court on February 20, 2026.

Second, the ongoing state proceeding undeniably implicates the state's important interests in the health and safety of pregnant women, the life or potential life of the unborn, and promoting respect for human life at all stages of a pregnancy. *Planned Parenthood v. Casey,* 112 S.Ct. 2791, 2817 (1992); *Gonzales v. Carhart,* 127 S.Ct. 1610, 1626, 1643 (2007). In furtherance of these interests a "state may take measures to ensure that the woman's choice is informed" and adopt policies to encourage women "to choose childbirth over abortion." *Casey,* 112 S.Ct. at 2821, 2825. The ongoing state proceeding implicates the state's interest in enforcing duly enacted measures to achieve the ends of its pro-life statutes. *Abott v. Perez,* 138 S.Ct. 2305, 2324 n. 17 (2018).

Third, the pending state proceeding affords Mayday an adequate opportunity to litigate arguments concerning its First Amendment rights. Basic "respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights." *Middlesex Ethics Comm.*, 457 U.S. at 431. And "the burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [its] claims.'" *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987), quoting *Moore v. Sims*, 442 U.S. 415, 432 (1979). Mayday has not and cannot show any barrier to adjudication of its First Amendment arguments in the state

court. Abstention is appropriate when, as here, "every substantial constitutional issue raised or which can be raised by [federal] plaintiffs . . . can be adjudicated by the" state court. *Ryan v. Specter,* 332 F.Supp. 26 (E.D.Pa. 1971)(abstaining from action to enjoin enforcement of state abortion statutes when constitutional challenges to those statutes were pending in state court). Thus, this court correctly ruled that the *Younger* abstention elements are met here. *Middlesex Ethics Comm.*, 457 U.S. at 432-36.

### 2. Exceptional Circumstances Do Not Exist

Even though this court found the *Younger* abstention elements met, the court entered a temporary restraining order and requested briefing from the state regarding whether extraordinary circumstances existed to refrain from abstention. Extraordinary circumstances are not present here because (1) the Attorney General's enforcement action does not actually implicate or infringe on protected First Amendment interests and (2) the Attorney General is properly seeking to enforce state consumer laws protecting residents from deceptive advertising and solicitations and in aid of state criminal prohibitions on the importation of illegal and dangerous drugs. Accordingly, abstention is appropriate – indeed mandated – by binding principles of federalism and comity.

A federal court must not "casually enjoin the conduct of pending state court proceedings of either (criminal or civil) type." *Simopoulos,* 544 F.2d at 325, quoting *Cousins v. Wigoda,* 409 U.S. 1201, 1206 (1972). *Younger* exists to "allow the state an opportunity to 'set its own house in order' when the federal issue is already before a state tribunal." *Simopoulos,* 544 F.2d at 326. "Only if 'extraordinary circumstance' render the state court incapable of fairly and fully adjudicating the federal issues before it can there be any relaxation of the deference to be accorded to the state (civil, quasi-criminal or) criminal process." *Simopoulos,* 544 F.2d at 327-328, quoting *Kugler v. Helfant,* 421 U.S. 117, 124 (1975). Allegations of circumstances of "bad faith," "harassment" or "official lawlessness" are extraordinary only if a "federal plaintiff's claim for

13

federal relief was not such as could be resolved in a pending state proceeding." *Simopoulos,* 544 F.2d at 328. Thus, "'the centerpiece of a test for the application of *Younger*' is always the adequacy of the state forum in providing the federal plaintiff an opportunity to raise his constitutional claim and, if there is, comity commands abstention by the federal court." *Simopoulos,* 544 F.2d at 329. Thus, the bad faith exception is limited and should not be readily invoked. *Hicks v. Miranda,* 422 U.S. 332, 350 (1975).

In the free speech context, federal injunctive relief against valid, pending state enforcement actions is appropriate only when they are brought without reasonable hope of success. *Perez v. Ledsma,* 401 U.S. 82, 84 (1971). The "chilling effect" of state enforcement actions does "not by itself justify federal intervention" in state proceedings. *Younger,* 401 U.S. at 50. "[T]he existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action." *Younger,* 401 U.S. at 51. Interference in state proceedings is not justified when "a statute does not directly abridge free speech, but – while regulating a subject within the State's power – tends to have the incidental effect of inhibiting First Amendment rights." *Younger,* 401 U.S. at 51. Just as "the chilling effect that admittedly can result from the very existence of certain laws on the statute books does not in itself justify prohibiting the state from carrying out the important and necessary task of enforcing these laws," the incidental "'chilling effect' of [a state enforcement action] does not automatically render [it] unconstitutional." *Younger,* 401 U.S. at 52. If it did, any First Amendment impact would *ipso facto* be bad faith and *Younger* would be "swallowed up by its exception." *Hicks,* 422 U.S. at 352. So, even if South Dakota's enforcement action infringes core, non-commercial speech, a federal court must abstain because the pending state action provides an adequate forum to Mayday to assert its First Amendment rights. But Mayday's advertisements are not core, non-commercial speech.

### a. No Protected First Amendment Right Is At Stake

The constitution affords commercial speech less protection than other forms of expression. *Central Hudson Gas & Elec. Corp.  v. Public Service Comm'n of New York,* 447 U.S. 557, 563 (1980).  While commercial speech in general is not entirely denied protection, "commercial speech related to illegal activity," commercial speech regarding lawful activity that "do[es] not accurately inform the public," or commercial speech that is "more likely to deceive the public than to inform it" are entitled to no protection.  *Central Hudson,* 447 U.S. at 563-564.  To receive constitutional protection, commercial speech "must concern lawful activity and not be misleading."  *Central Hudson,* 447 U.S. at 564.  MAYDAY.HEALTH's website and subsidiary platforms facially flunk this test.

The Attorney General has not formally investigated the potential criminal implications of the statements and representations on Mayday's website and has no intention of doing so provided Mayday ceases and desists from targeting South Dakota consumers with deceptive advertising and soliciting charitable contributions off these deceptive representations.  However, as described above, there is no doubt that MAYDAY.HEALTH's website messaging "relate[s] to illegal activity" in connection with soliciting consumers to solicit the importation of illegal abortion drugs into South Dakota for the facilitation of illegal abortions and is "more likely to deceive the public than to inform it" in connection with unqualified representations about abortion being "safe," promoting dangerous off-label usage of abortion pills, encouraging teenaged girls to ingest abortion pills or travel to abortion destinations for the purpose of obtaining an abortion without parental knowledge or consent, and encouraging women and teenaged girls to not seek medical care for post-abortion complications in order to conceal the role of MAYDAY.HEALTH and its affiliates in procuring illegal abortion drugs.

Mayday argues that *Bigelow v. Virginia*, 421 U.S. 809, 826 (1975), "is controlling" and proves that South Dakota has "no legitimate interest" in regulating or suppressing elements of the MAYDAY.HEALTH's website's messaging. If *Bigelow* is the best Mayday can come up with, then it has effectively conceded that there is no bad faith or harassment here. All that *Bigelow* says is that Virginia law enforcement could not exercise its "internal police powers" to enjoin a Virginia newspaper from advertising that abortion was legal in New York. *Bigelow*, 421 U.S. at 824-825. If Mayday's message was simply "Abortion is legal in Minnesota and here is a list of clinics who provide it," then *Bigelow* would be controlling.[7] But read in connection with *Central Hudson,* the *Bigelow* rule only extends to an "advertiser who proposes a transaction in a state where the transaction is legal." *Washington Mercantile Ass'n v. Williams,* 733 F.2d 687, 691 (9th Cir. 1984). Here, however, Mayday is advertising and proposing a transaction in a state where the transaction is not legal.[8] *Bigelow* does not afford First Amendment protection to Mayday for proposing a transaction that is illegal in South Dakota. *Cocroft v. Graham,* 122 F.4th 176, 182 (5th Cir. 2024).

Like *Bigelow, Nat'l Inst. of Family and Life Advocates (NIFLA) v. James,* 160 F.4th 360 (2nd Cir. 2025), does not help Mayday's cause here despite some surface similarities. In *James,* the New York Attorney General brought an enforcement action against Heartbeat International (HBI) to enjoin allegedly misleading statements concerning the efficacy of so-called abortion

---

[7] In fact, back when abortion was legal in South Dakota but subject to more restrictions than in Minnesota, pro-abortion groups spread this very message in South Dakota for years unrestrained by the Attorney General. They continue to do so today. The Justice Empowerment Network (JEN), like the advertisement in *Bigelow,* informs women where abortion is legal and even assists them with travel. https://www.jensd.org/. Unlike Mayday, so far as the Attorney General is aware JEN does not promote abortion pill usage in South Dakota or provide links to abortion pill providers or otherwise propose or facilitate an activity within South Dakota's borders that is illegal in South Dakota. The South Dakota Attorney General has taken no steps to enjoin JEN's *Bigelow*-protected activity. Unlike JEN, Mayday's activity is not *Bigelow*-protected.

[8] Products that are "transferred electronically, or services for delivery into South Dakota" are sales consummated within the State of South Dakota and "treated as a local transaction" for jurisdictional purposes. *South Dakota v. Wayfair,* 585 U.S. 162, 177-178 (2018); *Bates v. State Bar of Arizona*, 433 U.S. 350, 378 (1977)(putting up an advertisement is "penetrating a market").

reversal pills. *James,* 160 F.4th at 365. Like Mayday, HBI's website provided links to abortion reversal pill providers. NIFLA brought suit to enjoin James from similarly targeting it. The *James* court ruled that NIFLA's suit was not subject to the restrictions of *Younger* for the obvious reason that the state's enforcement action was not against NIFLA but HBI. *James,* 160 F.4th at 369.

Also, NIFLA's activities, though similar, were materially different from Mayday's activities here. For one thing – and it is a big thing – the abortion reversal pill is not illegal in New York. For another, NIFLA did not fundraise off its abortion reversal pill message, taking its message out of the realm of speech motivated by direct or indirect economic gain. *James,* 160 F.4th at 377. If Mayday's message was simply about a *legal* medication and it was not fundraising off that message, then *James* would be controlling. But, per *James,* since Mayday, unlike NIFLA, is a party in a state enforcement proceeding, this case is "squarely controlled by *Younger.*" *James,* 160 F.4th at 369. So, to the extent *Bigelow* or *James* are "controlling," they are not controlling for any proposition that helps Mayday prove bad faith or harassment.

To the extent Mayday's First Amendment defense enters into the *Younger* bad faith analysis, it must be analyzed in accordance with *Younger's* deferential bad faith standard, namely was the enforcement action brought without any expectation that it could overcome a First Amendment defense. *Perez,* 401 U.S. at 84. A federal court's function at this stage is not to adjudicate the actual merits of the First Amendment defense because the federal court does not have the evidence and record that the state court will have. A federal court's function at this stage is simply to evaluate whether the state brought its enforcement action without any expectation of overcoming Mayday's First Amendment defense. If not, then it is up to the state court to adjudicate the merits of Mayday's First Amendment defense. Like New York's, South Dakota's state circuit courts adjudicate constitutional defenses – First Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment – all day long and so "are of course competent to adjudicate

questions of federal constitutional rights." *Tang v. Appellate Division of New York Supreme Court,* 487 F.2d 138, 141 n. 3 (2nd Cir. 1973).

Mayday's own authorities – *Bigelow* and *James* – support the state's position that Mayday's website is commercial, non-protected speech.  Unlike in *Bigelow,* Mayday's website "further[s] a criminal scheme in" South Dakota that is well within the reach of the state's "internal police powers."  *Bigelow*, 421 U.S. at 822, 824.  Unlike in *James,* the pills Mayday peddles are illegal, Mayday *is* the target of the subject state enforcement action and, unlike NIFLA, Mayday fundraises off its message of providing abortion pills to states where they are illegal.  *James,* 160 F.4th at 377.

Thus, both *Bigelow* and *James* soundly support South Dakota's expectation of prevailing in its enforcement action.  As a platform for procuring illegal abortion pill transactions in South Dakota, soliciting charitable contributions off deceptive representations concerning its mission in South Dakota, and providing bogus, ideology-driven medical and legal advice to South Dakotans, Mayday's "speech" is far out to sea from the safe harbor of non-economic, commercial expression that "concern[s] lawful activity and [is] not . . . misleading."  *Central Hudson,* 447 U.S. at 564; *Pittsburgh Press Co.*, 413 U.S. at 389 (First Amendment protection "is altogether absent when the commercial activity itself is illegal").

While Mayday claims it is just a conduit to other platforms, for First Amendment purpose a middleman in a transaction is still part of the transaction.  Mayday is no different than the newspaper that publishes a want ad for prostitution whom the state can readily enjoin from printing without at all offending the First Amendment.  *Pittsburgh Press Co.*, 413 U.S. 376 at 388.  But Mayday is no mere middleman, it is not a newspaper that passively accepts and prints ads.  It is an active market force that admittedly "exists to provide information about how people can get mail-

order abortion pills . . . in all 50 states, regardless of harmful state restrictions."  KLEMANN

AFFIDAVIT, Exhibit A at Exhibit 6.  Like a real estate agent, Mayday hustles to connect sellers

with buyers, to "reach more people," to solicit contributions to fund the advertising in states with

"abortion bans" for the admitted purpose of illegally supplying mail order abortion pills to people

"regardless" of the legality of such transactions in those states.  KLEMANN AFFIDAVIT, Exhibit

A at Exhibits 6, 18.  In addition, Mayday itself supplies terms of sales to consumers such as price

quotes and product delivery times.  KLEMANN AFFIDAVIT, Exhibit A at Exhibit 18.

Nor do the facts that Mayday allegedly does not directly "profit" from the sale of any pills

through commissions or fees for such sales, or physically handle or distribute them, give its

commercial speech protected status.  An advertiser of illegal activity cannot render state laws or

*Younger* or the First Amendment toothless simply by not "profiting" from its otherwise

unprotected activities.  The test for unprotected commercial speech is not whether the advertiser

profits from or handles contraband, it is whether it proposes an illegal transaction or is misleading.

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978); *Cocroft,* 122 F.4th at 182

(advertisements for illegal transactions not protected).  And, in any event, Mayday *does* profit by

being the mouthpiece and platform for abortion pill providers.  Being a non-profit corporation does

not mean that Mayday runs a non-profit website.  Mayday admits that its "exist[ence]" depends on

donations raised from its mission to supply "abortion pills in all 50 states" regardless of legality.

KLEMANN AFFIDAVIT, Exhibit A at Exhibit 7.  Donated funds pay overhead costs and salaries

of Mayday's officers and directors (which can be handsome in "non-profit" organizations) which

ensures the organization's continued existence, which is a form of profiting from the activities it

promotes.  Mayday also sells merchandise directly espousing the illegal activity it facilitates.

Whether or not Mayday "profits" (in whatever sense Mayday uses the word), it certainly

benefits financially from being a megaphone for abortion pill merchants and illegally procuring

abortion pills for consumers in abortion-illegal states. As noted in *James,* such indirect economic motives bring a message within the scope of commercial speech. *James,* 160 F.4th at 377. There can be no bad faith or harassment on the part of the Attorney General in connection with enjoining deceptive and misleading commercial speech that proposes, facilitates and solicits financial contributions by promoting illegal transactions in the State of South Dakota. *Central Hudson,* 447 U.S. at 564; *James,* 160 F.4th at 377.

    **b. The Attorney General Is Engaged In A Valid Enforcement Action**

    The subject enforcement action was not instigated by the Attorney General but by South Dakota Governor Larry Rhoden per his authority under SDCL 1-11-1 to request the Attorney General to prosecute any civil or criminal matter on behalf of the state in which the state may be a party or interested, by a written formal complaint by a gas station owner who asked for his help to remove the placards that Mayday installed though an advertising vendor without the station owners' permission, and by 657 calls to the Consumer Protection Division complaining about the signs. KLEMANN AFFIDAVIT, Exhibit A at Exhibit 5. Mayday's advertising and donor solicitations violate SDCL 37-24-6(1) in at least the following ways: omitting the material fact that it cannot legally provide "abortion pills in all 50 states," misrepresenting that medicinal abortion is "safe" beyond the FDA-recommended gestational period, counseling against follow-up medical care in order to conceal its role in illegally trafficking in abortion-inducing pills, enticing minors to ingest illegal drugs to induce an illegal abortion without parental knowledge or consent, and omitting material information regarding the actual risks associated with abortion generally and abortions performed contrary to FDA guidance in particular. Mayday cannot realistically argue that an action to restrain concrete violations of state law such as these was "brought without a reasonable expectation" of success. *Kugler,* 421 U.S. at 124; *Perez,* 401 U.S. at 84.

Like the Virginia statute in *Simopoulos,* since SDCL 22-17-5.1's ban on the sale and importation of abortion pills in South Dakota "was clearly enacted in aid of and for the purpose of facilitating the standards established in the state abortion statute, it unquestionably qualifie[s] for abstention under the 'quasi-criminal' standard in *Huffman* [*v. Pursue, Ltd.,* 420 U.S. 592, 610-611 (1975)]." SDCL 37-24-23 just as clearly authorizes the Attorney General to act "in the public interest" to "restrain . . . the use of [an] act or practice" that is "unlawful [under SDCL] 37-24-6." The chilling effect of the Attorney General's enforcement action is less than that of SDCL 22-17-5.1 itself because it is civil in nature and thus "does not . . . justify prohibiting the state from carrying out the important and necessary task of enforcing [its] laws." *Younger,* 401 U.S. at 52. This task outweighs any "incidental 'chilling effect'" on Mayday's alleged protected speech. Per *Bigelow* and *James,* the Attorney General's position that Mayday's speech crosses the line from non-commercial to commercial is facially not in bad faith but, if Mayday believes otherwise, "the state proceedings afford an adequate opportunity to raise the constitutional claims." *Younger,* 401 U.S. at 52; *Moore,* 442 U.S. at 430. *Younger* is a dead letter if it does not apply in circumstances such as these.

**CONCLUSION**

Mayday has not adjusted to the current reality that there is no longer a uniform, national body of law around abortion and that it now must tailor its messaging to conform to the laws of each state they operate in. As its name implies, Mayday fancies itself as a cyber resistance movement, courageously manning the virtual barricades of web pages, defiantly thrusting its emoji fist skyward, tossing digital Molotov cocktails of abortion disinformation, and running online cells cacheing stores of "abortion pills . . . in all 50 states regardless of . . . state restrictions." KLEMANN AFFIDAVIT, Exhibit A at Exhibits 2, 6. But Mayday is no more privileged to "resist" in this fashion in South Dakota than some other website would be in connecting customers

21

with child pornography or methamphetamine, which the Attorney General would shut down just as fast as Mayday.

Despite the dissident fervor of Mayday's emergency complaint for TRO, the Attorney General has acted with restraint here. The Attorney General first asked Mayday nicely to stop breaking South Dakota's law. Then, when Mayday refused, the Attorney General brought a civil enforcement action which sought no penalties, fines or attorney fees for Mayday's past violations. The Attorney General did not come out swinging the club of criminal prosecution. Only Mayday's agitated movement mentality would see "bad faith" and "harassment" in the Attorney General's measured response.

But Mayday's self-styled resistance activities in South Dakota must stop. Its proposition to supply abortion pills to South Dakotans is patently illegal and places 1 in 10 South Dakota women and teenaged girls in danger of severe complications from medicinal abortion, doubly so those who heed Mayday's admonition to not seek medical care in order to conceal Mayday's illegal activities. Were a South Dakota woman or girl to die from abortion pills supplied by Mayday, the criminal consequences would not stop at SDCL 22-17-5.1.

This case really is not even about abortion. Because no matter where a person stands on abortion it is wrong to run a website that propositions women to engage in a criminal scheme (*Bigelow*) and solicits charitable contributions off that illegal scheme (*Bigelow, James*), it is wrong to solicit charitable contributions off telling women to not set seek medical care due to complications from medicinal abortion in order to conceal that illegal scheme (*James*), it is wrong to solicit charitable contributions off telling teenaged girls that medicinal abortion is perfectly safe when medical insurance claims data reflects a 1 in 10 probability that she will suffer severe complications from such an abortion (*James*), and it is wrong to tell teenaged girls to travel across

state lines to procure an abortion without her parents' knowledge, consent or protection. Such practices are illegal, deceptive, misleading and a danger to public health.

Mayday's economically motivated propositions to illegally supply abortion pills to South Dakota women and girls are not protected by the First Amendment. Indeed, the ultimate merits of Mayday's First Amendment defense is irrelevant to the *Younger* analysis, which is concerned only with whether there is any expectation that the state's enforcement action can survive Mayday's First Amendment defense and whether the pending civil action provides an adequate forum to assert the defense, which it clearly does.

There is no abortion exception to *Younger*. If *Younger* could be defeated simply by invoking the First Amendment, the extraordinary circumstances exception would swallow the abstention rule. As detailed herein, the pending South Dakota civil enforcement action is far from having no legal basis or probability of success and Mayday's own authorities – *Bigelow* and *James* – do not support its First Amendment defense. But if Mayday thinks its activities are protected by the First Amendment the pending civil enforcement action provides a perfectly adequate forum for it to do so. Under these circumstances, the *Younger* doctrine "commands" federal court abstention. *Simopoulos,* 544 F.2d at 329. Accordingly, the Attorney General asks that the above-captioned matter be dismissed.

Dated this 26th day of January 2026.

**MARTY J. JACKLEY**
**ATTORNEY GENERAL**

*Marty J. Jackley*

Paul S. Swedlund
SOLICITOR GENERAL
Amanda J. Miiller
DEPUTY ATTORNEY GENERAL
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Telephone: 605-773-3215
paul.swedlund@state.sd.us

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel for the Defendant hereby certifies that this Memorandum of Law was prepared using the Microsoft Word Version 2010 word-processing program and contains 7,330 words in compliance with the Individual Rules of Practice in Civil Cases of the Honorable Katherine Polk Failla.

> **MARTY J. JACKLEY**
> **ATTORNEY GENERAL**
>
> *Paul S. Swedlund*
>
> Paul S. Swedlund
> SOLICITOR GENERAL
> 1302 East Highway 14, Suite 1
> Pierre, South Dakota 57501-8501
> Telephone: 605-773-3215
> paul.swedlund@state.sd.us