## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MAYDAY HEALTH,** | |
| *Plaintiff,* | |
| v. | 1:26-cv-00078-KPF |
| **MARTY J. JACKLEY,** Attorney General for the State of South Dakota in his official capacity, | |
| *Defendant.* | |

### DEFENDANT'S MEMORANDUM OF LAW RE: ORDER TO SHOW CAUSE

Defendant Marty J. Jackley, *pro se* and by and through his counsel Paul S. Swedlund and Amanda J. Miiller, hereby files this response to this court's order to show cause.

**ARGUMENT**

Before reaching the question of whether Mayday is entitled to a preliminary injunction, the court must first satisfy itself that it has personal and subject-matter jurisdiction and that *Younger* does not require abstention. If there is no personal or subject matter jurisdiction, the court can dismiss without reaching the *Younger* question. If *Younger* requires abstention, the court can dismiss without reaching the preliminary injunction question. Mayday must first overcome these two hurdles before the court need even reach the preliminary injunction question. But even if it does, Mayday cannot demonstrate a "clear" and "substantial" likelihood of success on the merits because its website and messaging are not *Bigelow* or *James* protected. Nor can Mayday demonstrate irreparable harm or that equity and the public interest are in its favor.

**1. Preliminary Injunction Standard**

The standard governing an application for a temporary restraining order is the same as a preliminary injunction. *Murray v. Cuomo*, 460 F.Supp.3d 430, 442 (S.D.N.Y. 2020). Per these

standards, Mayday bears the burden of establishing (1) likelihood of success on the merits, (2) irreparable harm, (3) balance of equities in its favor, and (4) public interest.  *Students for Fair Admissions v. United States Military Acad. at W. Point*, 709 F.Supp.3d 118 (S.D.N.Y. 2024); Murray, 460 F.Supp.3d at 439 (2020).  Where, as here, the government is the opposing party, the final two factors in the analysis merge.  *Coronel v. Decker*, 449 F.Supp.3d 274, 287 (S.D.N.Y. 2020).

Preliminary injunctive relief, including a temporary restraining order, is an "extraordinary and drastic remedy" that is "unavailable except in extraordinary circumstances." *Murray*, 460 F.Supp.3d at 442.  When, as here, the moving party seeks to stay pending civil governmental proceedings in aid of its criminal laws, the relief sought is mandatory in nature and requires a heightened showing of a "clear" or "substantial" likelihood of success on the merits.  *Mgmt. Technologies v. Morris,* 961 F.Supp. 640 (S.D.N.Y. 1997).  Mayday cannot meet these high standards under the circumstances of this case.

2.  **Likelihood Of Success On The Merits**

Mayday is not "clearly" or "substantially" likely to succeed on the merits because its website is at best a mix of commercial and non-commercial speech.  Commercial speech is afforded less protection because it is "more objective and, hence, more verifiable than other varieties of speech" because advertisers typically possess direct knowledge about their products or services.  *Friedman v. Rogers*, 440 U.S. 1, 10 (1979).  Additionally, commercial speech is "more durable than other kinds" of speech.  Because "advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 n. 24 (1976).

Despite heavy protections afforded First Amendment speech – even some speech of a commercial nature – commercial speech that proposes an illegal transaction or is in furtherance of a criminal scheme receives no protection.  Thus, *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973), held that there was "no doubt that a newspaper constitutionally could be forbidden to publish a want ad . . . soliciting prostitutes."  As speech in furtherance of an illegal commercial transaction in South Dakota, *i.e.* purchase of abortion pills, Mayday's speech is unprotected.

Even if Mayday's website is a mix of commercial and non-commercial speech, a state may regulate and enjoin false, deceptive, or misleading sales advertising both civilly and criminally. *Virginia Pharmacy Board*, 425 U.S. at 771-777.  In *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 473-474 (1989), the court addressed speech that proposed commercial transactions but also touched on other subjects, rejecting the argument that such mixed speech must be classified entirely as non-commercial simply because pure speech and commercial speech are "inextricably intertwined."  The court determined that the principal type of expression controls the classification.  *University of New York*, 492 U.S. at 473-474.

As discussed in the state's *Younger* brief, Mayday's advertising is primarily commercial because the principal object of its expression is to push abortion pill sales in South Dakota and other "red states." *University of New York*, 492 U.S. at 474; *South Dakota v. Wayfair*, 585 U.S. 162, 177-178 (2018)(products "transferred electronically, or services for delivery into South Dakota" are sales consummated within the state and "treated as a local transaction" for jurisdictional purposes); *Bates v. State Bar of Arizona*, 433 U.S. 350, 378 (1977)(putting up an advertisement is "penetrating a market").  Unlike *James,* Mayday's promotion of abortion pills is not without economic motivation because Mayday fundraises off its message of making abortion pills available in all 50 states and serving as a conduit for pill providers which it uses to fund its

3

operations and "buy more advertisements." *James*, 160 F.4th at 377, citing *First Resort v. Herrera,* 860 F.3d 1263, 1273 (9th Cir. 2017).

Even if Mayday's speech is "mixed," the Supreme Court subjects such speech to only intermediate scrutiny for commercial speech regulations. *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). This four-part test requires: (i) the speech concerns lawful activity and is not misleading; (ii) the governmental interest is substantial; (iii) the regulation directly advances that interest; and (iv) the regulation is not more extensive than necessary. As detailed in defendant's *Younger* brief, Mayday's website flunks this test: (i) the sale of abortion pills in South Dakota is illegal and any representation of commission or omission that they are not is misleading, (ii) the state's interest in the life, health and safety of pregnant women and their unborn children is well recognized by the United States Supreme Court, (iii) shutting down advertising for an illegal transaction and in furtherance of a scheme to supply abortion pills directly advances the state's interest, and (iv) the regulation is not more extensive than necessary, *i.e.* is does not demand that Mayday change its website.

According to Mayday's own authorities it is not "clearly" or "substantially" likely to prevail on its claim that its speech is non-commercial. As discussed in the defendant's *Younger* brief, Mayday's speech is not protected under *Bigelow* because it is in furtherance of a transaction that is criminal within the borders of South Dakota which is well within the state's police powers to prevent. *Bigelow v. Virginia*, 421 U.S. 809, 828 (1975); *Cocroft v. Graham,* 122 F.4th 176, 182 (5th Cir. 2024)(no protection for speech advertising illegal transaction within the enforcing state). Mayday's speech is not protected under *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 379 (2025), because the pills at issue in *James* were not illegal in the state of New York and because NIFLA had not monetized its message by fundraising off its advocacy for abortion reversal pills. Nor can Mayday seek refuge in South Dakota's exemption for mere publishers or

4

broadcasters of information because the exemption can be invoked only by those who have published/broadcast "without knowledge that it is an unlawful act or practice." SDCL 37-24-11. The state's cease-and-desist letter placed Mayday on notice that it is perpetrating unlawful acts and practices with respect to illegal pill transactions and illegally false, deceptive and misleading advertisements under South Dakota's civil and criminal laws. Accordingly, Mayday cannot make a "clear" or "substantial" showing that it is likely to succeed on the merits of its claim that its speech is protected.

### 3. Irreparable Harm

While "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Wollschlaeger v. Farmer*, 814 F.Supp.2d 1367, 1383 (2011), courts have clarified that "the assertion of First Amendment rights does not automatically require a finding of irreparable injury." *Time Warner Cable of New York City, L.P. v. City of New York*, 943 F. Supp. 1357, 1384-1385 (1996). Irreparable harm requires Mayday to "show a chilling effect on free expression." *Time Warner*, 943 F.Supp. 1357, 1384-1385 (1996). But this all presupposes a protected First Amendment interest. The abortion pill is illegal in South Dakota. "[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity . . . . [A state] may ban forms of communication . . . related to illegal activity." *Central Hudson,* 447 U.S. at 563.

As discussed above and in defendant's *Younger* brief, Mayday cannot demonstrate irreparable harm for two reasons. First, placards advertising illegal transactions were never entitled to protection in the first place. Second, unlike in *James,* Mayday cannot demonstrate that its placards or website are purely vehicles for "their moral and religious beliefs, not based on any economic motivation." *James,* 160 F.4th at 375. Or, stated another way, Mayday cannot demonstrate that its speech is simply "informational, without any economic motivation." *James,*

5

160 F.4th at 375.  Mayday cannot claim a First Amendment interest in facilitating illegal transactions and illegal misrepresentations so it has not suffered the irreparable loss of any expression or activity to which it has a right.

### 4. Balance Of Equities/Public Interest

Where, as here, a government enforcement proceeding is the target of a temporary restraining order, the final two factors in the analysis – the balance of the equities and the public interest – merge.  *Coronel*, 449 F.Supp.3d at 287.  Courts in the Second Circuit and federal district courts consistently apply the principle that the government's interests are inherently aligned with the public interest.  *Brown v. Maher*, 597 F.Supp.3d 541, 549 (N.D.N.Y. 2022).

Once the state produces evidence that an advertisement is false or misleading, the balance shifts dramatically in favor of the government because commercial speech that is false or misleading is "not protected by the First Amendment at all." *Gordon and Breach Science Publishers S.A. v. American Institute of Physics*, 859 F.Supp. 1521, 1537 (S.D.N.Y. 1994).  Likewise, the state may restrict advertising proposing an illegal transaction – such as the purchase of abortion pills in a jurisdiction where they are illegal – without subjecting the restriction to heightened scrutiny.  *Casbah, Inc. v. Thone*, 651 F.2d 551, 557 (2nd Cir. 1981).

South Dakota's experience with abortion pill importation evidences that Mayday's website is false and misleading and, as such, is a threat to public health.  Alpha Center in South Dakota is a non-profit, pro-life medical care facility that provides pregnancy testing, limited ultrasounds, and STD testing for pregnant women who are experiencing an unexpected pregnancy.  RIDDER AFFIDAVIT, Exhibit 1 at ¶ 6.  Alpha Center also provides post-abortion care for women who have complications from surgical and medicinal abortion, as well as abortion pill reversal treatment for women who have consciously taken, or been tricked into taking, mifepristone but

wish to have their abortion halted. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 7. Alpha Center's experience challenges Mayday's unqualified message that medicinal abortion is safe.

  a. One case involved a male who had impregnated a patient and ordered abortion pills online. This individual slipped the pills into the patient's drink without her knowledge. The patient sought abortion pill reversal treatment after ingesting the mifepristone. The abortion pill reversal procedure was successful and the child is alive and thriving today. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.a.

  b. In another case, a male ordered abortion pills online on behalf of a patient. This individual entered all the information required by the website and ordered the abortion pills, then gave them to the patient, who took them consensually. The patient sought post-abortion care at Alpha Center due to excessive blood loss. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.b.

  c. In another case, a patient purchased abortion pills through Aid Access, a pill merchant hosted on [mayday.health](mayday.health). The pills were sent to the patient's address in South Dakota. The patient contacted Alpha Center with questions about the pills before taking them. After consulting with Alpha Center medical staff, the patient opted not to take the pills. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.c.

  d. In another case, a minor patient who obtained abortion pills online without parental knowledge or consent took the pills and had to seek emergency medical care due to excessive blood loss. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.d.

  e. In another case, a patient ordered abortion pills from the [mayday.health](mayday.health)-hosted provider Aid Access while 15 weeks pregnant. The FDA has not approved abortion pills for safe usage in pregnancies past 10 weeks gestation. This patient ultimately elected to not take the abortion pills. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.e.

 f. In another case, a 12-weeks pregnant patient took abortion pills acquired online and expelled the fetal tissue at home. One of the patient's relatives called with concerns about the patient's excessive blood loss. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.f.

 g. In another case, a patient was told by an abortion pill merchant to falsely report to medical staff that she was experiencing a miscarriage if the patient needed emergency post-abortion medical care. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.g.

 h. In another case, a patient was told by an abortion pill provider to lie about her condition if she sought emergency abortion aftercare by claiming to be experiencing a miscarriage. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.h.

 i. In another case, a patient was given instructions by Aid Access to lie and say she was having a miscarriage in the event she sought emergency medical care after taking medicinal abortion pills. RIDDER AFFIDAVIT, Exhibit 1 at ¶ 13.i.

These cases show that the number of patients seeking emergency care at the Alpha Center for adverse medical events related to abortion pills is increasing in South Dakota. These cases also show that abortion pills are increasingly being shipped into South Dakota via mail services, and this is made possible due in part to Mayday advertising on behalf of the pill merchants. Of particular concern is Mayday's advice to women and teenaged girls to conceal that they have ingested the abortion pill if they need follow-up care for abortion complications. Misrepresenting to a physician that the patient is experiencing a miscarriage when in fact she is having a medical emergency secondary to abortion pill ingestion can lead to complications in treatment such as delayed surgical intervention, incorrect surgical procedures, and inadequate monitoring for potentially fatal clostridial infections associated with mifepristone. RIDDER AFFIDAVIT,

Exhibit 1 at ¶ 13.j.  In the face of these facts, Mayday cannot claim that the equities or public interest favor its misleading and life-threatening medical advice.

**CONCLUSION**

Applying the facts detailed in the state's *Younger* brief to the standards outlined here, Mayday's request for a preliminary injunction must be denied.

Dated this 26th day of January 2026.

                                **MARTY J. JACKLEY**
                                **ATTORNEY GENERAL**

                                *Paul S. Swedlund*
                                Paul S. Swedlund
                                SOLICITOR GENERAL
                                Amanda J. Miiller
                                DEPUTY ATTORNEY GENERAL
                                1302 East Highway 14, Suite 1
                                Pierre, South Dakota 57501-8501
                                Telephone: 605-773-3215
                                paul.swedlund@state.sd.us

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel for the Defendant hereby certifies that this Memorandum of Law was prepared using the Microsoft Word Version 2010 word-processing program and contains 2,394 words in compliance with the Individual Rules of Practice in Civil Cases of the Honorable Katherine Polk Failla.

                                **MARTY J. JACKLEY**
                                **ATTORNEY GENERAL**

                                *Paul S. Swedlund*
                                Paul S. Swedlund
                                SOLICITOR GENERAL
                                1302 East Highway 14, Suite 1
                                Pierre, South Dakota 57501-8501
                                Telephone: 605-773-3215
                                paul.swedlund@state.sd.us