

**Adam S. Sieff**
adamsieff@dwt.com
tel 213.633.8618

January 27, 2026

**VIA ECF**
The Honorable Katherine Polk Failla
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 618
New York, New York 10007

Re:   *Mayday Health v. Jackley*, 1:26-cv-00078-KPF

Dear Judge Failla:

Plaintiff Mayday Health ("Mayday") submits this opposition to Defendant Marty J. Jackley's Letter Brief Regarding Anticipated Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. 33. As it correctly concluded during the hearing on Mayday's motion for a temporary restraining order, the Court has personal jurisdiction over Defendant for the following reasons.

**I.     The Court Has Specific Personal Jurisdiction Under CPLR § 302(a)(3)**

The Court has jurisdiction under CPLR § 302(a)(3), which applies to parties whose tortious acts outside New York have caused injury within the state. A plaintiff invoking § 302(a)(3) must show that "(1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 302 (2011). All five factors are satisfied. Defendant fails to cite § 302(a)(3), and improperly fixates on whether and when Mayday received physical service of his threats—an issue that has no bearing on the (a)(3) factors.

As to the first two factors, Defendant committed a tortious act outside of New York by retaliating against Mayday's First Amendment-protected speech, both through a threatening cease-and-desist letter and through his attempt to initiate a retaliatory state court action in South Dakota. These instances of retaliation constitute an actionable First Amendment tort under 42 U.S.C. § 1983. *See, e.g.*, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 (1990). Mayday's claims arise directly from those retaliatory actions and seek to enjoin them.

As to the third and fourth factors, the "situs of injury" is New York and Defendant intended—and should have reasonably expected—his actions to have consequences here, where Mayday publishes. Unlike the location of the "initial tort," the "situs of injury" is based on the location of the "original event," defined as where the plaintiff felt "the first effect of the tort." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 83-85 (2d Cir. 2001). Thus in *DiStefano*, although New Jersey was the location of the "initial tort" because the plaintiff was fired there, personal jurisdiction existed in New York under § 302(a)(3) because the plaintiff felt "the first effect" of his termination in New York. *Id.* at 83-85; *see also, e.g.*, *In re Vitamin C Antitrust Litig.*, 2012 WL 12355046, at *7 (E.D.N.Y. Aug. 8, 2012) (personal jurisdiction existed in New York under § 302(a)(3), even though initial tort occurred in China, because first effects on plaintiffs were felt in New York). So too here. Although the initial

DWT.COM

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.

The Hon. Judge Failla
January 27, 2026
Page 2

torts—sending the cease-and-desist letter and attempting a retaliatory lawsuit—occurred in South Dakota, Mayday felt the first effects of those tortious acts in New York, where Defendant reached to prevent Mayday from speaking. *See* ECF No. 17 at ¶¶ 19-20; Compl. ¶¶ 10, 28, 31-38. "[T]he place where [a] plaintiff" is harmed by a defendant's actions is "a forum reasonably foreseeable by a tortfeasor." *Penguin Grp.*, 16 N.Y.3d at 304 (quotation omitted). Defendant should have expected Mayday to suffer injuries in New York, both because his aim was to restrict Mayday's speech there, and because pressuring Mayday to censor its website inherently restricts access to speech "throughout the United States, which necessarily includes New York." *Id.* at 306. This Court has held the third and fourth factors met in similar circumstances. *See Dow Jones & Co., Inc. v. Perplexity AI, Inc.*, 797 F. Supp. 3d 305, 329-30 (S.D.N.Y. 2025) (Failla, J.) (third and fourth § 302(a)(3) factors satisfied where a New York-based plaintiff showed defendant's conduct predictably chilled its "incentive to publish or write" from its New York headquarters) (quoting *Penguin Grp.*, 16 N.Y.3d at 305). Other courts in this District have done the same. *E.g.*, *Sony Music Ent. v. Univ. of S. Cal.*, 2026 WL 96694, at *7 (S.D.N.Y. Jan. 13, 2026) (same where "USC's conduct diminished [New York plaintiff's] incentive to invest in artists and their music" in New York) (cleaned up).

As to the fifth factor, Defendant does not contest that South Dakota derives substantial revenue from interstate commerce and is the type of defendant that the long-arm statute is intended to cover. "The 'interstate commerce' prong . . . requires no direct contact with New York State" and operates merely "as a 'bigness requirement' designed to assure that the defendant is 'economically big enough' to defend suit in New York." *Ingraham v. Carroll*, 90 N.Y.2d 592, 598–99 (1997) (quoting Siegel's N.Y. Prac. § 88 (6th ed. 2024)). South Dakota earns tens of millions of dollars of sales tax revenue from out-of-state businesses each year that more than satisfy this requirement. *See S. Dakota v. Wayfair*, 585 U.S. 162, 169 (2018) (citing record evidence that South Dakota's Department of Revenue estimated the state was, in 2018, eligible to collect "$48 to $58 million annually" from out-of-state businesses); *see also, e.g.*, South Dakota Dept. of Rev., Fiscal Year 2025 Annual Report at 18, https://perma.cc/8HRN-9Q5E ($21.5 million in revenue just from audits of out-of-state entities).

## II.     The Court's Exercise of Personal Jurisdiction Satisfies the Due Process Clause

As this Court and the Second Circuit have recognized, "it would be the 'rare' case where personal jurisdiction was proper under New York's long-arm statute but not under a due process analysis." *Camacho v. Vanderbilt Univ.*, 2019 WL 6528974, at *3 (S.D.N.Y. Dec. 4, 2019) (Failla, J.). This is no such case. To determine whether a defendant has minimum contacts with the forum state, courts consider whether it has "purposefully availed" itself of "the privilege of conducting activities within" the forum state and "could foresee being haled into court there." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010). Minimum contacts also exist "where a defendant takes 'intentional, and allegedly tortious, actions' 'expressly aimed' at a jurisdiction." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 576 (D.C. Cir. 2025) (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013) (articulating *Calder*'s "effects test"). By directing threats to New York-based Mayday to stifle speech it disseminated from New York, Defendant "purposefully established minimum contacts within" New York and should have foreseen being haled to court here. *Licci*, 732 F.3d at 170.

Asserting personal jurisdiction over Defendant in these circumstances "comport[s] with traditional notions of fair play and substantial justice" under each of the five factors the Court must consider. *Chloe*, 616 F.3d at 164. First, while Defendant would bear some burden if he must travel to

The Hon. Judge Failla
January 27, 2026
Page 3

New York, "[t]he inconvenience . . . cuts both ways" because all of Mayday's witnesses would have to travel to South Dakota if the case were brought there. *Id.* at 173.  Second, New York has a "manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985).  The third factor "necessarily favors" Mayday because its "headquarters are in New York" and its witnesses are located here. *Chloe*, 616 F.3d at 173.  The fourth factor favors New York (or is at most neutral) because it would be more efficient to litigate in this forum—where substantive proceedings on interim relief have progressed and the pleadings will soon close—than South Dakota, where a new action would need to be filed.  And the fifth factor favors New York because substantive social policy favors the swift adjudication of First Amendment rights. *Cf. N.Y. Prog. & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[S]ecuring First Amendment rights is in the public interest.").

      Defendant's attempts to distinguish the cases Mayday cites in its Complaint are off the mark.  Defendant claims *Media Matters* is distinguishable because the Texas Attorney General's investigation of Media Matters' reporting activities was aimed at Media Matters' publishing operations at their headquarters in the District of Columbia, while his own actions target Mayday's publication of speech in South Dakota.  This is a distinction without a difference.  Just as the Texas Attorney General sought to suppress First Amendment-protected activity at Media Matters' newsroom in D.C., Defendant is trying to restrict Mayday's protected speech—both the content of its website and the gas station signs it disseminates—that originates in New York.  The effects of Defendant's actions are accordingly felt in New York where Mayday is now forced to self-censor, and where readers are denied access to the information Mayday publishes.  This mirrors *Media Matters*, where the Texas Attorney General's investigation targeted publishing activity in D.C., and the plaintiff was forced to self-censor its D.C.-based activities and also restrict D.C. residents' access to its reporting.  138 F.4th at 577.

      Next, Defendant claims that *Defense Distributed v. Grewal*, 971 F.3d 486 (5th Cir. 2020), is distinguishable because the New Jersey Attorney General there sought to cease publication of the plaintiff's materials in general, whereas he only seeks to enjoin Mayday from publishing in South Dakota.  But *Defense Distributed* rejected that argument, explaining that while the Attorney General argued his action was cabined to New Jersey, the text and tone of his cease-and-desist letter suggested liability based on plaintiff's publishing activities overall. *Id.* at 492 n.6.  So too here: the substance of Defendant's letter is not about the physical signs Mayday displayed in South Dakota, but the content of Mayday's website, including general information about abortion pills and links to third-party websites it publishes everywhere in the world.  Complying with the Defendant's threats would likewise require Mayday to censor its website not just in South Dakota, but for the public at large.

      Finally, Defendant argues *Twitter, Inc. v. Paxton*, 2021 WL 1893140 (N.D. Cal. May 11, 2021), is distinguishable because it does not address the New York long-arm statute.  But as explained above, § 302(a)(3) of that statute *is* satisfied.  Defendant cannot distinguish *Twitter*'s due process analysis.  Against these authorities, Defendant cites *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008).  But *Defense Distributed* rejected *Stroman*'s application in a case like this one, where the plaintiff's claims "are based on injuries stemming solely and directly from [the Attorney General's] cease-and-desist letter," and where the Attorney General's assertion of authority impedes protected activities beyond his state. *Defense Distributed*, 971 F.3d at 492-93.

      Respectfully submitted,

      */s/   Adam Sieff*