Q1TKMAYO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

MAYDAY HEALTH,

                    Plaintiff,

          v.                              26 CV 78 (KPF)

MARTY J. JACKLEY, Attorney
General of South Dakota,
                                          Oral Argument

                    Defendant.

-------------------------------x
                                          New York, N.Y.
                                          January 29, 2026
                                          4:00 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                          District Judge

                         APPEARANCES

DAVIS WRIGHT TREMAINE LLP
      Attorneys for Plaintiff
BY:  ADAM SIEFF
     CHELSEA KELLY

OFFICE OF THE ATTORNEY GENERAL SOUTH DAKOTA
      Attorneys for Defendant
BY:  MARTY J. JACKLEY
     PAUL SWEDLUND

Q1TKMAYO

(Case called)

MR. SIEFF:  Good afternoon, your Honor.  Adam Sieff, of Davis Wright Tremaine, for Plaintiff Mayday Health, and I am joined --

THE COURT:  If you're able to, I'll ask you to stand because I have a monitor blocking my view of you.  Thank you.

MR. SIEFF:  Good morning, your Honor.  Adam Sieff, of Davis Wright Tremaine, for Plaintiff Mayday Health, and I am joined by my colleague, Chelsea Kelly.

THE COURT:  Thank you very much.  And good afternoon.

MR. JACKLEY:  Good afternoon, your Honor. Marty Jackley, South Dakota Attorney General.  With me is South Dakota Solicitor General Paul Swedlund.

THE COURT:  Thank you very much.

Mr. Sieff, are you taking the lead for your client?

MR. SIEFF:  I am, your Honor.

THE COURT:  And, Mr. Jackley, you'll be taking the lead as well, I understand?

MR. JACKLEY:  Yes, your Honor.

THE COURT:  Thank you so much.

I appreciate everyone's efforts in preparation for this proceeding.  I appreciate, as well, the submissions, which I have read.

I have questions for the parties, but to the extent possible, I would like to be strategic in the questions that

I'm asking.  Here's what I mean:  I will accept the written submissions on things such as personal jurisdiction.  I'm not sure that there's anything else to argue there.  But just so that I can be completely transparent with the parties, where I am right now is that I do believe that I have personal jurisdiction to consider this case, although I understand Mr. Jackley's arguments, and he will certainly repeat them as he thinks appropriate, but I've seen them.

I really am questioning how *Younger* abstention applies in this case.  What I mean by that specifically is it seems to me that the proceeding in South Dakota state court is an action, and it seems to me that it fulfills the three criteria of *Younger* abstention.  Where I am now, and where I have been for a substantial period of time, is with the arguments of plaintiff regarding what I've known as the bad-faith exception.  By using that term, I'm not ascribing bad motives to anyone — that's just what they call it — but I am trying to really make sense of Second Circuit case law on the bad-faith exception.

So, Mr. Sieff, let me explain what I mean in particular, sir.  In the *Cullen* case that you cite to me, the suggestion there is that bad-faith might be found in a situation where the party bringing the action has no reasonable expectation of obtaining a favorable outcome.  And then it says but it's also possible -- it may also be justified — where a

prosecution or a proceeding has been brought to retaliate for or to deter constitutionally protected conduct or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass.

I did not think that you were arguing here that Mr. Jackley's institution of this civil enforcement action was actually designed in bad faith or for the purpose to harass, but it may be that you're suggesting that it is to retaliate or to deter what you argue to be constitutionally protected conduct.

Why this matters to me is because in subsequent cases, the Second Circuit has not been perfectly consistent, and there is a suggestion that the subjective intent of the person or entity instituting the action matters.  And there is also some suggestion that even in those cases in which I'm looking at the subjective component, I must also consider whether the person bringing the action has, or has not, a reasonable expectation of obtaining a favorable outcome.

So it may be that you tell me, when all of this questioning is done, that you did not appreciate that that's where my head was at, and that you need additional time to review and harmonize, if you can, Second Circuit case law on the bad-faith exception, but that is an issue with which I'm confronted, and that's what I've been spending my time thinking about.

Q1TKMAYO

Do you want to begin the process?  And I can ask you questions as we go on.

MR. SIEFF:  Thank you, your Honor.  Can you hear me?

THE COURT:  I can, sir.  Thank you.  And that microphone does adjust if you find it easier for you.

MR. SIEFF:  Thank you.

Adam Sieff, for plaintiff, your Honor.

Our understanding is that subjective intent is the touchstone of what you referred to as the bad-faith exception to *Younger* in the Second Circuit.  The *Diamond "D" Construction Corporation* case, which we cite in our reply brief at page 40, I think makes that clear.

We believe — and I can discuss the reasons in a moment — that there are three reasons why the record in this case evidences that the action was initiated for the purpose of retaliating.  The subjective intent was to retaliate and shut down objectionable speech.  One of those reasons is the objectively meritless basis for the action.  That's an indicator of the subjective bad-faith intent.  It's neither necessary nor sufficient, in our view, but we think that it exists here, and it supports a conclusion that the action — in our view, an attempted action, and we understand the Court might disagree — but the attempted proceedings in South Dakota were initiated for the purpose to retaliate against speech and a speaker, I will add, that the government in South Dakota bore

Q1TKMAYO

some animosity to.  The ideas expressed the way that they were expressed and what people might do with the information provided.

THE COURT:  I'm going to ask you to pause for a moment.

You mentioned the *Diamond "D"* case, but, actually, the *Diamond "D"* case is where I've been spending the most time, because that case suggested both that there needed to be an objective no reasonable expectation of obtaining a favorable outcome and subjective intent, some showing of bad faith or retaliatory conduct.

Are you agreeing that that's the standard, that there is both a subjective and an objective component, or are you suggesting that I need not worry myself over that issue because you're going to argue to me that all exist?

MR. SIEFF:  The latter, your Honor.  I will argue that we might disagree about whether both are necessary components, but it ultimately makes no difference because we think that they both exist here.

Again, our view is that the test from *Diamond "D,"* what we understand to be the key factor, is the intent behind initiating the action.  And one way you can discern that the intent was improper was by looking to whether the asserted basis on the merits for that action would be reasonably likely to obtain a favorable outcome for the government.

Q1TKMAYO

THE COURT:  All right.

Let me hear your other two, and then we'll go back to this one, please.

MR. SIEFF:  So our brief discusses all three, so I'm going to start with the first.

I think that the clearest evidence that this proceeding or the attempted proceeding in South Dakota was initiated --

THE COURT:  Let's do this:  I'm going to call it an action.  I will appreciate that you believe it's an attempted action, and that your friends at the back table believe it is a completed action.  I am not going to be deciding the issue on an attempt theory.  I am finding, for purposes of this proceeding, it is an action.

MR. SIEFF:  Understood.

THE COURT:  Thank you.

MR. SIEFF:  The action in South Dakota, we believe — and we believe the evidence shows demonstrably — was brought with the intent to shut down speech that the government found objectionable.  The evidence of this is most clearly established by the South Dakota governor's joint press release orchestrated with the Attorney General prior to conducting any investigation based on news reports and complaints, not about the speech being misleading or actually harming consumers, but because the ideas expressed, the viewpoints expressed, were, in

Q1TKMAYO

the governor's view, in conflict with South Dakota's proud
pro-life stance.

THE COURT:  But it's more than that.  It's in conflict
with their laws.  For example, if the U.S. Attorney here were
to arrest someone for fraud, they might issue a press release
and say, we have arrested someone for fraud.  That doesn't seem
to me to -- that's not retaliatory.  They have the right, if
not the obligation, to pursue conduct that they believe is
violative of federal statutes.

Why isn't that the same here?  Mr. Jackley is telling
me that the conduct at issue here, as he perceives it, violates
South Dakota law.

MR. SIEFF:  Well, the speech at issue doesn't violate
South Dakota law.  It clearly doesn't violate the law that he
invoked when he brought the action against Mayday in
South Dakota.  This goes to the second reason, the objectively
meritless basis for the enforcement action, but, in our view,
the objectively meritless basis for the action informs a
determination that it was initiated to retaliate.

Again, I advise the Court again to the *Brooklyn
Institute* case, which we discussed at the temporary restraining
order hearing.  In that case, too, what you had was
Mayor Giuliani discovering that there is an exhibition in
Brooklyn that expressed a point of view that he found
objectionable, and after learning about it, he directed his

Q1TKMAYO

office to, quote, find a basis in the pertinent legal instruments to justify shutting it down.

That's the same act that your Honor was just describing. You could discern an activity that you wished to retaliate against, and then search for a plausible basis in the law books to bring an action. We quoted Justice Jackson's book, before he was Justice Jackson, admonition to federal prosecutors in 1940 in his speech that searching the law books to pin a crime on a disfavored defendant is the type of conduct that goes beyond legitimate prosecutorial activities. That's the type of thing that we have here. There was a defendant — in this context, I'm talking about a state defendant — who expressed ideas and perhaps did so in a way that the government in South Dakota found objectionable. And so agents of the state were dispatched to find a plausible basis to justify shutting the speech down, just as in the Eastern District of New York, Mayor Giuliani dispatched his office to search the law books to find a plausible basis to shut down the objectionable, in his view, anti-Catholic art exhibition, and they did so under an ejectment proceeding in order to bring an end to the speech that was so offensive.

That's the same type of thing that exists here. I think that if all a prosecutor had to do was concoct a cause of action that he says, well, I think that the defendant is liable under this cause of action and could, on that basis, say my

Q1TKMAYO

intent was legitimate, it would disserve the purpose of the bad-faith exception to the *Younger* doctrine.  Remember, *Younger* is itself an exception to this Court's unflagging obligation, virtually unflagging obligation, to decide federal cases of controversies.  And so if what we have is a prosecutor who can say, well, look, I was told to prosecute under the pro-life laws of the State of South Dakota, I couldn't find a cause of action under those laws, and so I'm bringing a consumer deceptive practices action, even though you've told me that it is undisputed that you engage in no commerce or trade, that you're an informational resource nonprofit.

THE COURT:  But isn't that the point, sir?  Your friends at the back table are adamant that the speech is commercial, and that it is not that your client cannot insulate itself from liability simply by being a clearinghouse for information.

MR. SIEFF:  That position, first of all, is unmeritorious.  It was rejected by the Second Circuit.  And there's no case law to support the position that anything that we've published is commercial speech.

I understand that the issues are merging here, but there is a degree to which in order to reach and adjudicate the *Younger* issue, the Court has to — I don't know whether you'd describe it as taking a peek or reaching the merits — you have to assess some of these merits issues in order to decide the

Q1TKMAYO

issue of abstention, or at least take some understanding --

understood.

THE COURT:  The point, sir, is I want to understand the degree to which I'm considering the First Amendment issues at this stage, at the stage of *Younger* abstention exceptions, because what you're trying to argue to me is that the proceeding is objectively meritless, the proceeding in South Dakota.  And we'll talk about that momentarily because I presume you've looked at the statutes as I have and you've looked at the case law and you will be able to make the argument.  It can't just be that because it's under Deceptive Trade Practices that that is what renders it objectively baseless.  I want to talk to you about whether these facts find their way within the particular cause of action that's been alleged.

But what I'm worried about is a situation where what you're telling me is, we have a First Amendment violation, and we're very confident that we have alleged one, and, as a result, not only should you be considering that at this stage of the preliminary injunction application where I'm considering likelihood of success on the merits, but we also want you to use it as a basis for the exception to *Younger* abstention.

Do you understand the point I've just made?

MR. SIEFF:  I think I do, your Honor.

THE COURT:  Okay.  I can try again if you don't.

Q1TKMAYO

MR. SIEFF:  I understand the Court to be asking whether, at the threshold point of applying the *Younger* exception analysis, it is able to, or permitted to, consider the merits of either the underlying First Amendment claim in this action or the underlying defenses to the action in South Dakota.

Is that the Court's question?

THE COURT:  Basically.  I mean, when I'm being asked to consider the objective reasonableness or the belief -- I want to get the language correct — no reasonable expectation of obtaining a favorable outcome, it would seem to me that I can look at the proceeding itself and the laws under which it is brought — and I will talk to you about that momentarily — and if I found, let's just say counterfactually, that this proceeding were brought under a statute that obviously, by its terms, did not apply, yes, I could say, okay, there's no reasonable expectation of obtaining a favorable outcome.  But if I were to find that the conduct at issue could be construed in a way to fit within the South Dakota statute that's been cited to me, would you then say, but, Failla, you still have to consider the First Amendment issue?

MR. SIEFF:  I think, your Honor, that to reach the predicate determination that you were describing --

THE COURT:  Yes.

MR. SIEFF:  -- that the cause of action in

Q1TKMAYO

South Dakota could reasonably sound like maybe there's a claim there --

THE COURT:  Yes.

MR. SIEFF:  -- that requires you to consider the First Amendment because the First Amendment is a guardrail.  It sets the outer boundary of what any statute can be, what any cause of action could be, a common-law tort, of what, in this case, is a civil enforcement action.  But, yes, you do have to consider First Amendment at that point because the First Amendment imposes a boundary on the legitimate exercise of state authority, whether it's to enforce a statute or to take any other action.

So to state a claim under a state civil statute, and to have a reasonable basis to prevail, it's not enough to say, well, look, the elements are met.  You have to construe the extent to which the elements are being met in a way that it comports with the limitations that the First Amendment imposes, which is a defamation case that you could meet, the strict elements of defamation, but the First Amendment requires an actual malice determination.

So, here, for the same reasons that if we were forced to proceed in South Dakota, one of the defenses we would make -- and, again, your Honor, I know South Dakota argues that the availability of making this argument in South Dakota is dispositive.  I don't agree with that; I don't think the law

Q1TKMAYO

supports that conclusion.  But if we were forced to make this argument in South Dakota, we would argue that the state is precluded from imposing civil liability upon us for speech that is truthful and of public concern and is not integral, far from integral, to any type of criminal conduct.

So that type of analysis needs to be something that a prosecutor vested with the sovereign authority to punish must consider before they can have a reasonable expectation of prevailing.  If there's a law-free zone in South Dakota that says I can disregard the United States Constitution, bring an action under a statute that provides me with authority to bring an action that's enough to show that I have some basis of prevailing, it would read this type of exception to *Younger* out of the Second Circuit and other circuits' bodies of law.

THE COURT:  I do want to go back, though.  As you're getting into these things, you said to me there were three bases.  I wanted to have those listed before you return to go through them.

MR. SIEFF:  Absolutely, your Honor.

Just to be clear, the first is that we believe there's evidence, from the sequence of events leading up to the initiation of the state action, that it was initiated for the purpose of retaliation.  We discuss that at page 8 and 9 of our reply brief and essentially at pages 14 through 17 of our motion, which describes the basis for a retaliation claim.

Q1TKMAYO

Second, as we've been discussing, we think that the subjective bad faith is also demonstrated by the fact that objectively the state action is being pursued despite its futility.  An interesting case that we cite on page 9, your Honor, is a *Word of Faith World Outreach Center Church v. Morales* case from the Western District of Texas where one of the reasons why the district court in that case declined to abstain was that it found an improper retaliatory motive evidenced by a meritless attempt to bring a deceptive trade action under a statute much like South Dakota's against a church which was, quote, not engaged in trade or commerce or to whom the relevant statute, quote, has no applicability.

That was reversed for other reasons unrelated to that decision, but I think the analysis is on point.  It's essentially the same fact pattern.

The third reason, which we haven't gotten to yet — this is on pages 9 through 11 of our reply brief — is that there's evidence from the way that this proceeding has been conducted — by this proceeding, I'm referring to the proceeding in this court, before your Honor — which indicates, and in fact confirms, that the state court proceedings and everything that we're here to talk about was initiated for the purpose of harassing.  And let me describe to you the evidence that I'm looking at.

THE COURT:  I wanted to have them at the outset, but I

Q1TKMAYO

do want to go through them a little bit more methodically.

MR. SIEFF:  Sure.

THE COURT:  Perhaps you've given me all that you're going to give me on the issue of initiated for the purpose of retaliating.

Is there anything you've omitted?

MR. SIEFF:  Well, I think what I was about to discuss with you was further evidence that it was initiated for the purpose of retaliating.

THE COURT:  Right, I understand, which is your third point, but, again, I'm taking them in sequence.  So I appreciate that.

If you want to go there, go ahead, but I do want to go back to the baselessness or not of the proceeding in South Dakota.

MR. SIEFF:  Yes, we can start there, your Honor.

THE COURT:  Let me get to the statute itself, sir.

So, it is Section 37-24-6, paragraph 1.  The parties are aware of it, I'm not going to quote it into the record, but it seems to me that there are three things where perhaps this particular action could fall.  One would be on the issue of the falsity or not, or the deceptiveness or not, of the practice that is issued.  The second is whether it can be said to involve the sale or advertisement of something.  And the third, whether it implicates merchandise.

Q1TKMAYO

It seems to me that — and excuse me for working backwards — I don't think the provision of information about service providers in that state or other states is merchandise, but the pills at issue may qualify as a good.

So I'm left with whether it can be said that Mayday was involved in the sale or advertisement and what to do with the issue of falsity. So you can take those in whatever order you want, but you will acknowledge, sir, that in the defendant's brief on the *Younger* issue and then on some of the other briefing — because there were several briefs — there is a list of putative false statements.

Now, your response is that for most of those false statements, those are from the third parties to which the Mayday website links, but that suggests to me that there might be something that your client has to own up to. So of the proffered falsities, is any of them in your client's website before having to click on a link?

MR. SIEFF: I will represent to the Court that my best understanding is that in what is Exhibit 18 to the Klemann declaration, which is the government's investigator, there was an image of our website on a page that lists third-party providers, and on that page, some of those providers are accurately represented to have said that they will ship pills to all 50 states. And my understanding is that — and I want to come back to whether or not this is even the type of speech the

Q1TKMAYO

statute reaches — but my understanding is that the government claims that those statements are false and commercial because, in fact, it is not lawful to ship pills into South Dakota.

THE COURT:  Yes.  Although I guess you'd say that's not the representation being made; the representation being made is that they will ship.

MR. SIEFF:  And that's right, your Honor, there's two layers to this.  There's a few layers, but I think that the first layer, if I can start there, is that the Constitution protects falsity if it's not commercial.  The Supreme Court, in a case involving Stolen Valor, permitted people to lie.  It was permissible because it wasn't lying about a transaction or merchandise or any type of sale.  You could lie about being a medal of honor winner.  I think it's *United States v. Alvarez*. What matters is if it's a commercial speech.

And, again, this isn't commercial speech, so because it isn't commercial speech, even if the speech at issue is not truthful — and I'm about to tell you why it is truthful — but even if it were untruthful, the statute at issue wouldn't reach it because you could make misrepresentations, even knowing misrepresentations, about different existing facts if it's not in a commercial context.  But that's not really before the Court because -- well, I would submit it actually is before the Court, but you don't need to reach the second step.  But if you reach the second step and ask, well, let's assume that the

Q1TKMAYO

speech might be commercial — and there's no basis to do that — but if you did, and you asked, well, is the speech truthful, as your Honor recognized, yes, my response is that it is truthful, it's a literally true, accurate representation of what these people say they will do, much as if you go on to Yelp or Google and look up the prices and terms of items sold by third parties on marketplaces will accurately represent what those people are selling, where they will ship, or how long it will take for it to arrive.  That's the information.  It's literally true.

THE COURT:  You are suggesting that I am to analogize this case to a Google search, but I'm not sure that's entirely analogous because this website is quite focused, as are the ads that suggest that people should go to that website, and there are a series of questions that are asked that get you to the list of providers and list of folks who would sell the pills.

So I'm not sure that this is on all fours with simply saying this is Google, nor am I sure that this is akin to -- I think at another point, you're suggesting it's like Consumer Reports where it's providing information, but it's not telling you to buy something.

So let me have you engage on that, sir.

MR. SIEFF:  Well, I would not suggest, and I don't think that the record supports, an inference that we are telling anyone to buy or do anything.  We are providing

information with, as the record shows — I'll read from our mission statement — we hope to empower people to make their own informed decisions about their own bodies, we do not give medical or legal advice, we just want people to know their options.  We also have -- there's an advocacy component of the speech that relates to destigmatizing the act or choice to obtain an abortion, and in that respect, the government grasps onto that and suggests that when I read your website in totality, I come away with the impression that you are encouraging people to obtain abortion pills, and it is possible that they might do so in ways that break the law.  That type of concern, first of all, does not implicate or diminish the First Amendment protection for the speech at issue.  We can discuss this as well, but that type of just generalized positive messaging and encouragement, which has lawful purposes — the information has numerous lawful uses — cannot be punished or criminalized, even under a civil statute, even if you could somehow conclude that it were commercial, on the basis that some people might use the information at some indefinite point in the future to commit some type of -- or solicit someone else to commit an illegal act.

So I agree with the Court, I don't mean to suggest that our website is the same as Yelp or Google — I'm using these as examples — but I will alert the Court to what the Attorney General says, which is that his theory is that he can

Q1TKMAYO

go after anyone in what he calls the procurement chain or the procurement process, and that would reach Google, and that would reach, as we say in our brief, The New York Times.  I mean, the procurement chain, there's no suggested limitation to where the causal chain ends.  But it certainly doesn't reach as far as where Mayday sits in just providing general information to the public to make their own choices.

THE COURT:  If I refer to the South Dakota statute I cited earlier as the South Dakota statute, you will understand what I'm speaking of, sir?

MR. SIEFF:  Yes.  37-24-6?

THE COURT:  Yes.

Is it your argument that the speech at issue here, inasmuch as you argue that it is noncommercial — I haven't accepted that point yet — but as much as it is noncommercial, it cannot be considered in any way a deceptive act or practice, it simply falls at the first hurdle because it is noncommercial speech?

MR. SIEFF:  That's right — it falls at the first hurdle because it's not commercial speech.

THE COURT:  But there is then the criterion that it might be in connection with the sale or advertisement.  So do you want to speak about that, or is there nothing more for you to add?  I've looked at how South Dakota courts define sale and advertisement.  There is this interesting discussion about

inducing, directly or indirectly. Perhaps your view is, look, Failla, it's not commercial, so don't think about it. But I'm wondering, as well, if you're going to engage with the requirement of advertisement or sale.

MR. SIEFF: I think that to construe the statute to reach the inducement to advertise or sell some unlawful product would reach something like a Consumer Reports magazine. And so, again, the limitations on how the statute can be enforced are imposed by the First Amendment. That's where the commercial speech doctrine comes in.

I think that the statute is termed in ways that allow the state to prosecute deceptive commercial acts, which include inducing the sale or purchase of unlawful goods or services or merchandise. But if you are not engaging in -- and, again, the statute needs to be interpreted in the context of the First Amendment. If you are not engaging in a commercial exercise, if someone simply says, as we discuss in the brief — and this is a particularly repugnant example — but I encourage you to obtain child pornography, Justice Scalia, in the *Williams* case, said that statement would be protected even though under the South Dakota statute, it would be inducing someone to obtain an illegal material. The reason it's protected is because in the context in which Justice Scalia was describing, it's not commercial speech. There's no sale of that material — you're not offering it or providing it — you're just, in that case,

Q1TKMAYO

encouraging someone to do something.

Our view is that we're not even encouraging.  The government draws an inference that there is encouragement.  The point is even if there is encouragement, it's still protected.  Even with encouragement, it's still protected because we could advocate -- to be clear, we do not advocate for abstract illegality or illegality in the abstract, but if we did, if someone said that we did, that's still not a basis to prosecute.  That is not something that the state has authority, under any statute that it could enact, to bring an action under.

THE COURT:  So looking at the definition of advertisement at a different point in the South Dakota statute, it is defined to include the attempt by a publication, dissemination, solicitation, or circulation, whether oral, visual, written, or otherwise, and whether in person, by telephone or by any other means, to induce, directly or indirectly, any person to enter into any obligation or to acquire any title or interest in any merchandise.

Your client's work is dissemination.  It is a clearinghouse of information, is it not?

MR. SIEFF:  What we do is we engage in activities that, in the common definition of the word advertisement, could be deemed advertising, much in the way that a political advertisement to be able to sell a product is advertising.  It

Q1TKMAYO

is an appeal to the public to alert them to some type of information.

THE COURT:  It may be, sir, that you think I'm getting too deep in the weeds, but my question is:  If indeed what your clients are doing is gathering together information and, perhaps by having it on the website, disseminating it, are you arguing, then, that you are not inducing, directly or indirectly, any person to enter into any obligation?

MR. SIEFF:  To the extent that statute were construed to say that what we're engaged in is inducing someone to indirectly engage in an obligation, it could not be enforced against us, again, because we are not engaged in commercial speech.  If I stood on a street corner --

THE COURT:  Sorry, I don't know if you know that I can hear you as if you're right here next to me.

MR. SWEDLUND:  Oh, I'm sorry.

THE COURT:  Thank you.

So more of a poker face next time, or perhaps a little quieter, because, shockingly, the sound travels.  I know you didn't mean to interrupt the oralist, so I'll let you continue.

MR. SIEFF:  I thought it was a good answer, your Honor.

THE COURT:  Well, okay, why don't you restate it, sir. Go ahead.

MR. SIEFF:  I think if I were to stand on the street

Q1TKMAYO

and tell people, you have a right to know your options for reproductive healthcare, and I handed out flyers that said, here are resources, you can go to these websites and learn about them, am I indirectly inducing someone to engage in some type of transaction?  Perhaps.  But what we know from the First Amendment is that that statute cannot be enforced if what I'm doing is not attempting, with a financial incentive under the *Bolger* factors with an economic motivation, to have people consummate a commercial transaction.  That may be the effect of my speech.

Just thinking on the spot, your Honor, think of a boycott.  There are people on the street who are urging people not to go in to work tomorrow because there's a national protest, a national general strike.  They are inducing people not to engage in certain commercial transactions tomorrow.  Is their speech regulable as inducing some type of -- assuming there was a deceptive practice involved, is that type of advertisement that induces people to take a subsequent action punishable as a civil violation?  It's not.  Because the First Amendment protects your right to make appeals to people to engage in commercial transactions.

Maybe the converse is a better example.  In some cases, in the aftermath of civil unrest, people go out on the street and advocate for people to support certain businesses not because they have an economic motivation, not because

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

they're advertising their wares, but because those businesses may have been harmed or put in a bad position by what happened and we want to support our community.  That type of inducement is not the type of speech that the statute reaches.  Suppose the speaker misconstrued what was being sold somewhere.  They said you should go to John Smith's store, he was harmed by the events of this past weekend, I encourage you to patronize what he's selling, he's an honest broker, I trust him, he only sells things that are legal.  It turns out he's not an honest broker, he's not selling things that are legal.  Have I induced someone to be defrauded?  Have I induced someone to participate — if that were part of a criminal racquet — to participate in criminal activity?  No.  I've not spoken with any type of economic motivation.  I haven't advertised the sale of any particular product.  I have induced someone to engage in a commercial transaction, but it's not the type of thing that the government can regulate under the statute because the First Amendment imposed a boundary on how these terms must be interpreted and applied.

THE COURT:  If your client's website were obtaining a cut — for example, let's imagine that if they were to click on one of the websites, either for service providers or for pills, and then obtained those services or those pills — or maybe there's just a cut for clicking through, you know, just by direction to the site, would you still be making the argument?

Q1TKMAYO

MR. SIEFF:  I think that would be a much more difficult argument for me to make.  Because if you're getting a kickback, if there was some type of direct financial incentive — I think the analogy that the government gives was like a real estate brokers bringing buyers and sellers together, which is factually inaccurate — but if that were the case, I think that would present a closer call.

THE COURT:  Let me try it differently.  I have been told that on certain websites, if I -- let's imagine that the website lists the best offerings of Amazon Prime Day, and if I click on them and purchase through there, that website, which referred me, might get a cut.  If your client did that, you wouldn't be making these arguments; it would then be, at least in part, commercial speech.  Would it not?

MR. SIEFF:  I agree, I agree.  I think that it would at least be in part commercial speech.  I think there's a difference between, to use your example, an advertiser who — there's a term for this, and I'm forgetting it — but if there's a web advertiser who's getting a cut or an Instagram personality who's getting a cut of sales that they refer out, their speech is regulable, and, in fact, the FTC has regulations that reach that conduct precisely because it's commercial speech.  But that's not this case.  There's nothing that we do that is monetized.  The government says, well, you raise money from donors.

THE COURT:  Yes, that's what they say.

MR. SIEFF:  That is what they say, but that's not the same thing.  If that logic were granted and credited, the example we use in the brief, then any newsletter from a community association, YMCA, synagogue, or church would be commercial because in some way the acts of the nonprofit are being promoted as reasons to say, look at all the good work we're doing, please support our good work.  If the ACLU brings lawsuits, would that be commercial petitioning of the government because the ACLU will issue appeals to fund raise to support those lawsuits?  That can't be right.  There's not support for that.  The cases they cite don't support that.

THE COURT:  Well, the *NIFLA* case of which we speak*, NIFLA v. James*, I suppose if I went to that website, you would tell me that they were fundraising off of that — *NIFLA* was — and in the case cited by the government, the Heartbeat International was fundraising off the sites.

MR. SIEFF:  If you haven't had a chance to look, we submitted as exhibits to the Kelly declaration --

THE COURT:  Yes.

MR. SIEFF:  -- the donation pages for those websites.

THE COURT:  I did see them, yes.

MR. SIEFF:  The other case they cite is the *Herrera* case from the Ninth Circuit.  It's a different case.  What you had there was a clinic that offered free services, and then it

Q1TKMAYO

advertised those free services, and it made money in other ways.

What the court held in the Ninth Circuit was that that was commercial speech because you were promoting a service that you yourself offer, and even though you don't monetize the provision of the service, you derive income from it indirectly. It's much in the same way that there are advertisements on the subway for Claude and OpenAI. Well, those are free services, but those are commercial advertisements because they're inducing you to engage in a transaction with them which they will monetize. The price that the user pays is zero, but you are providing them with other valuable consideration — personal data and what have you — which they then use to generate revenue.

So that case is distinguishable. There simply isn't support for the idea, well, the fact that you are a nonprofit organization that seeks donor support renders any of your programmatic activities commercial speech.

THE COURT: I thought I heard you say earlier that the state proceeding actually would not qualify for *Younger* abstention under the first set of -- the first three-factor inquiry. And perhaps I misheard that. But I know you believe there isn't -- the state proceeding is nascent, but not actual, and you and I are going to disagree on that, and, at the moment, I control. The second one is whether the important

Q1TKMAYO

state interest is implicated in that proceeding, and I wouldn't, if I were you, spend much time debating that.

Are you suggesting that the state proceeding would not afford your client an adequate opportunity for judicial review of the federal constitutional claims?

MR. SIEFF:  The answer is, yes, we are arguing that. The reason is because, as a matter of law, courts in the Second Circuit, and elsewhere, including the *Simopoulos* decision from the Fourth Circuit that the government cites, hold that where an action is initiated for an improper purpose, the availability of the state forum is, by definition, insufficient.  So we argue that, but it's by virtue of the exception.

Now, I will tell you that we have reservations about whether we could obtain a fair hearing in South Dakota.  That's why we brought a federal action in New York where we are based.

THE COURT:  But I have to assume that you can.

MR. SIEFF:  And I don't disagree with you that as a matter of can we go to the South Dakota court and make a First Amendment defense, yes, we can, but, again, the way that we get there, under the law, under the way that the *Younger* exception test works in this circuit and in others, including under the cases that the government cites, is that where there's a showing of an improper motivation, that factor, the availability of an alternative forum, is deemed inadequate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q1TKMAYO

because of the taint from the improper initiation.  That's --
again, I think we discuss -- when we were the discussing the
*Simopoulos* case in our reply brief, we explain why that case,
which isn't about the First Amendment, nevertheless on this
point that we're discussing right now supports the position
I've just described.

THE COURT:  All right.

I do want to hear about your third basis, which is, I
suppose, the discussions you've had with your adversary
regarding the scope of relief I may or may not be able to
afford and things of that nature.  But I'll let you do that
now.

MR. SIEFF:  Thanks, your Honor.

Yes, I think that it's material, and the case law
recognizes that it's material, that the type of recalcitrance
that we've observed in these proceedings suggests that there is
some type of motivation behind the action which is less than
proper.  In short, after the Court issued its temporary
restraining order, defendant indicated that the temporary
restraining order didn't effectively restrain anything because
it only restrained truthful speech, it restrained his ability
to bring a proceeding against truthful speech.

THE COURT:  Just to be clear, that is wrong.  You may
think that.  That is not in fact -- that would be a perversion
of the order that I issued.  But, by the same token, what has

Q1TKMAYO

happened in the South Dakota case?  Was there a hearing, was there a discussion, or is that on hold pending the resolution of this motion?

MR. SIEFF:  I wouldn't say it's on hold.  We asked the defendant if he would agree not to dismiss the action.

THE COURT:  Of course.

MR. SIEFF:  We asked if he would permit us to vacate all dates and deadlines until the Court had an opportunity to decide the motion that we're here discussing right now.  There was a refusal.

THE COURT:  Okay.

MR. SIEFF:  And so we have been, and my colleague sitting in the gallery has been working very hard to prepare a brief for an evidentiary hearing that will take place in South Dakota.

THE COURT:  Wow.  In contravention of my order.

MR. SIEFF:  And that's scheduled to take place --

Chelsea?

MS. KELLY:  February 20th.

MR. SIEFF:  -- February 20th.

And that is a hearing -- we have asked -- unable to obtain the agreement of the Attorney General, we have asked the South Dakota court if it would agree to have that hearing be limited to issues of jurisdiction in the first instance.  That request has been opposed.  And --

THE COURT:  It hasn't been resolved yet by the Court?

MR. SIEFF:  To my knowledge, as of last I checked this morning, South Dakota counsel has not indicated it was resolved.  So we are preparing as if we're going to have to have an evidentiary hearing.

THE COURT:  On the 20th of February?

MR. SIEFF:  On the 20th, which I'm hopeful the Court will be able to rule by then, but I don't know.  And so we may have to, if I can obtain consent, move for a continuance.

THE COURT:  No, I think I have to rule by then anyway, because the most that you've given me in your transmittal letter with the schedule is a reasonable period of time afterward if I need it.  And I don't think "reasonable" is three weeks, but that's just me.

All right.  Go ahead, continue.

MR. SIEFF:  Two other points, your Honor.

On the same thread of conduct during this proceeding that suggests less than good faith:  The government has taken the position that even should the Court issue a preliminary injunction, it would not prevent the government from going to a South Dakota court and asking that court to assess its own jurisdiction, and, in so doing, it could ask that court — and this was stated to us in the same teleconference — it could ask that court to reconsider the findings of fact and legal conclusions that this court made.  I believe the quote was that

Q1TKMAYO

if this court made an out-of-bounds determination, the South Dakota court would have the ability to assess its own jurisdiction.

The last thing I would mention --

THE COURT: One moment, please.

And not the Second Circuit? Going straight to another court, and not to the court that would govern me, and tell me that I'm wrong? Okay, that's fine. Go ahead.

MR. SIEFF: The Attorney General may have -- I don't know if his position has changed, now that we've had this colloquy, but, no, the representation would be to go to Judge Northrup in South Dakota, where the action that he lodged is, and ask her to assess her jurisdiction.

THE COURT: Okay.

MR. SIEFF: The last point, your Honor, is — and I regret mentioning it, and ordinarily wouldn't do so, but because I think it sheds light on the types of issues I think we're describing, I will — but in the brief that the defendant himself signed, not the brief that his Solicitor General signed, there's an unusual concluding section that reads somewhat like a speech.

THE COURT: I know.

MR. SIEFF: And it just struck me, and I think it might strike an objective reader, as mocking or ridiculing my client for their activism, not just the viewpoint that they

Q1TKMAYO

express or the motivation they have for expressing the speech that they do, but the manner in which they choose to exercise their First Amendment rights by defiantly thrusting its emoji fists skyward and tossing digital Molotov cocktails, running online --

THE COURT:  Counsel.  I've read the paragraph, sir.

Let me just end my discussions with you for the moment with just some engagement on the First Amendment issues. Again, obviously the parties vehemently disagree about what's at issue here and have very different views of the matter.  And I will thank both of you to refrain from inflammatory conversation or arguments because that's, from my perspective, what everyone's position is on the ultimate issue.  I'm just here on the constitutional issues and my jurisdictional issues. That's what I care about.

However, there is a suggestion from your adversaries that your client is linking to or providing or being a clearinghouse for incomplete information.  Why isn't that something that they should -- let me say that differently. There were too many negatives.  Why they shouldn't be concerned about that?

MR. SIEFF:  I think if the concern is incomplete information as opposed to inducing a criminal act — I think they make both suggestions — but with respect to providing incomplete information, again, the threshold inquiry — and I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q1TKMAYO

keep going back to it because it's important — is whether the speech at issue is commercial or not.  If a newspaper -- if the President of the United States sues 60 Minutes because it omitted portions of an interview with the presidential candidate running against him, that could be incomplete information.  That's not a deceptive practice.  That's an editorial choice.  In our advocacy, we don't provide legal advice.  We link to legal resources.  We don't tell people that there are organizations like *NIFLA* and others who think that what they may choose to do with the information we provide is immoral and objectionable and, maybe even if they choose to do it in a way that we don't advocate, could be illegal.  We provide them resources for them to make those determinations themselves.

The fact that our speech is incomplete, the fact that there may be an omission, is not pertinent if what you're talking about is editorial viewpoint -- excuse me, editorial expression that is a noncommercial point of view.  When a political candidate makes an appeal to vote for them, he might not tell you that he cheated on his wife.  That's an omission that I would deem material to casting my vote, but I can't sue him for misleading me, nor could the attorney general of the state in which he makes it.  So I don't think that their concern about, well, this is an incomplete submission of information bears any weight.  In fact, if you look at the

Q1TKMAYO

substantive duty that that type of argument would impose upon us or anyone else, it would compel us to speak about something that we disagree with, which, outside of the commercial context, we know is essentially *per se* impermissible.  The Supreme Court repeatedly, in cases like *Tornillo v. Miami Herald*, the *Hurley* case, the case about a parade in Boston, I mean, these are cases in which -- another case involves the California Public Utilities Commission, and I can give you the citation, if you would like it, but — and these are not in our briefing because it didn't come up directly — but these are cases which hold that when the government seeks to balance the perspective offered in editorial content, it violates the First Amendment.  You cannot force someone to provide additional information.  Again, going back to the obligation that that argument would impose upon us, it would obligate us to speak a message and provide perhaps factual information that is not part of the mosaic of expression we wish to convey.

And so, for that reason, because it's not commercial, we're not in a world where something like *Zauderer* scrutiny applies*, Zauderer v. Office of the Disciplinary Counsel*, where, in those contexts, there's broader discretion for the government to compel a commercial speaker to include complete information.  That doesn't exist in the editorial context.

THE COURT:  Thank you.

I have not asked questions about things like the

Q1TKMAYO

standard for a preliminary injunction or really the -- except as I did the minutia of the *Younger* abstention, because I assume we talked about that, and I covered it with my last decision. If you think I used the wrong law, you can tell me, but I didn't think that's where we were at.

MR. SIEFF: No, your Honor. I think that -- I think everyone agrees on the standard for the Court.

THE COURT: Okay. Then let me hear from Mr. Jackley. Thank you very much, sir.

MR. SIEFF: Thank you, your Honor.

Would it be possible to reserve an opportunity for rebuttal?

THE COURT: I'll give both sides, but I'm hoping it would be extremely brief.

MR. SIEFF: Absolutely, your Honor. Thank you for your time.

THE COURT: Thank you very much.

Mr. Jackley, thank you very much for your patience, sir.

MR. JACKLEY: May -- may it please the Court?

THE COURT: Yes, sir. Thank you.

Now, as I began, I indicated to you that I wasn't spending a lot of time or I was really accepting your written submissions on the personal jurisdiction issue, and, as a result, I was going to proceed to *Younger* abstention, but just

Q1TKMAYO

as I did with your adversary, if there's something you're desperate to let me know about personal jurisdiction, please do, sir.

MR. JACKLEY:  I would just ask to be able to preserve those arguments that have been already made in the briefings at the hearing.

THE COURT:  Of course, of course.  Thank you.

Then let's, please, talk about *Younger* abstention, sir.  From my perspective, as I'm looking at this, it would seem to me that the action in South Dakota does meet the first criteria.  You've obviously heard me discussing with Mr. Sieff his disagreements as to criteria one and three.  But if you, if you will, won that battle, perhaps we can then move to the point of the exception, sir.

So I would like to engage with you on the discussion that I was having with Mr. Sieff, which is the idea of a subjective and an objective component to what I am calling, because that's what the law calls it, the bad-faith exception.

MR. JACKLEY:  Thank you, your Honor.

And maybe in addressing that, I can go to how this started, the facts that are before the Court.  You've got some of that information in the filings, in the briefing.

THE COURT:  Right.  I am limited to the record I have. So, yes.

MR. JACKLEY:  This enforcement action started really

Q1TKMAYO

with a variety of things.  It really began, at least in my mind, with a gas station complaint.  They'd contacted me, I said put it in writing, and that writing is in the record conversation.  And the concern was more, in my mind, of a contract dispute than necessarily consumer dispute.  It was a concern that a company was indicating they were doing advertising that they didn't want them to do --

THE COURT:  They objected to the placard, sir, yes?

MR. JACKLEY:  Yes.

THE COURT:  Okay.

MR. JACKLEY:  They never agreed to it.  I said, put it in writing and submit a consumer complaint.  You have in the record that there's been 657 consumer complaints.  I'm not standing before you saying they're all deceptive trade, you know, but they're valid in the consumer's mind to make a complaint to the Attorney General.  And so you have a gas station letter saying we don't want this, we didn't agree to this, do something about it, you have 657 consumer complaints at the consumer division, and you have the governor.  And I know there's been a discussion about the governor's intent, and I would tell you under South Dakota law, the governor, he runs a highway patrol, if he wanted to retaliate, he would have ordered and confiscated and taken it down.  It's clearly a solicitation of a crime.  He didn't do that.  He didn't act in bad faith.  He did what he's supposed to do.  Under

Q1TKMAYO

Chapter 1-11, the governor can ask the Attorney General to investigate something that he thinks is improper or illegal, and that's exactly what happened here.

And it wasn't a retaliation where the Attorney General then got the gas station complaint, 657 consumer complaints, and a letter from the governor. The Attorney General actually investigated it. The Attorney General did two things: He sent out a consumer investigator and said run this down, what is happening. You have an affidavit from her, Ms. Klemann. Because there were criminal overtones to it, he sent a DCI agent out, and he said, take a look, you've got an affidavit in the record from callers.

I will tell you, and I told you at the hearing, I made a measured decision. In my mind as a chief law enforcement officer of the state, it is an absolute criminal violation. I chose not to pursue it that way. I chose what I thought was measured and sent a cease-and-desist letter.

THE COURT: You believe it's a criminal violation why, sir? Because you are not accepting the plaintiff's argument that this is not commercial speech?

MR. JACKLEY: You know, that's where I think *Williams* says it best, United States Supreme Court. What the Court said is, when speech moves from advocacy to, quote, speech, commercial or not, that is intended to induce or commence illegal activities," then it's not protected. It's exactly

Q1TKMAYO

what Mayday is doing, in my mind, or at least there's a factual dispute to it.  That's exactly what they're doing.

They can make an argument, well, it's actually a Buzz or Aid that's actually selling.

THE COURT:  Yes.

MR. JACKLEY:  But that's not a very good argument because Aid Access or Buzz can't put a placard up in South Dakota to sell these illegal drugs.  So Mayday can't do it for them.  When you look at the law of solicitation, it's indirect or direct.  They fit the criminal statute.

So to suggest that the Attorney General is retaliatory, doing something for the governor, is simply not the facts of this case, period.

THE COURT:  But I do want you to back up a moment, please, sir.

I guess, going back to *Williams* for a moment, I don't think *Williams*, then, makes it commercial speech.  I thought you were suggesting that *Williams* makes it no longer protected speech, but does the *Williams* case actually stand for the proposition that when it moves to induce criminal activities, it becomes commercial?

MR. JACKLEY:  It doesn't matter whether it's commercial or noncommercial, it's inducing and commencing criminal activity.  It's not protected at that point.

THE COURT:  Okay.  That's what I understood — okay,

Q1TKMAYO

not protected.

But I don't understand how it fits within the ambit of the South Dakota statute that you're using.  Would you agree — and you might not — that the prong of the statute on which you're focused, or on which this enforcement action is focused, is the idea of merchandise.  It's not the solicitation of contributions for charitable purposes, unless you think it is.

MR. JACKLEY:  Well, sure it is, absolutely.

THE COURT:  I see.

So you're arguing -- wait, you're arguing that it's deceptive to maintain a website that allows for people to donate.

MR. JACKLEY:  Well, they're doing both.  They fit the whole statute.  If you look at what they're doing, and I've outlined at least five different deceptions, whether it's the FDA ten weeks versus fifteen weeks, whether it's deception with respect to children and not requiring parental notice and consent, whether it's deceptive regarding legal in all 50 states, and then putting them in contact with those companies, and it's charitable in the sense that they're selling their merchandise, I mean, it fits that statute perfect --

THE COURT:  But HBI sells merchandise, and that didn't make it commercial speech.

MR. JACKLEY:  You have to remember -- are you talking

Q1TKMAYO

about the *NIFLA* case?

THE COURT:  I am.  And Heartbeat International, yes.

MR. JACKLEY:  So a couple of things about the *NIFLA* case.

THE COURT:  Okay.

MR. JACKLEY:  Number one, I know that there was a statement about whether or not it was fundraising, that site is charitable.  This is the court at page 377:  Moreover, there is no evidence in the record at this stage of the litigation to suggest that *NIFLA* plaintiffs gained other types of economic benefits by engaging in the speech such as increased customer base — Mayday does — or capital increase through fundraising — Mayday does.  That's the court speaking.

The other challenge when you talk about *NIFLA* and you look at it, HBI was the target of the state action.  So *NIFLA* never had the opportunity of an ongoing state proceeding, like we had here and we have here.  So that's a big distinguishing factor.

And the last huge distinguishing factor, what General James was trying to do was address activity that's legal in New York.  That resuscitation or rehabilitation pill is legal in New York.  I can assure you, there's a statute in South Dakota that says what they're pedaling is not legal.

THE COURT:  I am concerned, though, with, from my perspective, interpreting too broadly what it means to be

Q1TKMAYO

involved with the sale or advertisement of either -- now you're telling me the solicitation of contributions or the merchandise, because when I've looked at the cases that -- and, sir, please understand, I only have the decisions I have, and I only have what's recorded, and I don't know, because I'm not on the ground, but I've not seen actions brought against the clearinghouse, what I'll call the middleman, which is what I think that Mayday is here.  What I've seen, when talking about the issue of inducing directly or indirectly, would be law enforcement authorities or the Government of South Dakota going after folks who have used an intermediary for advertising, but, still, going back to the original -- in this case, it would be the provider of the pills and not Mayday.

I haven't seen a situation where this statute has been used to go after the middleman here.  Are you aware of instances in which it has?

MR. JACKLEY:  Yes, your Honor.  And I think this cries out to why *Younger* abstention makes sense — because our state court judges deal with these issues every day, and they deal with constitutional challenges, including the First Amendment, every day.  It is oftentimes brought in a contract or situation where you have a contractor and a supplier, we have a contractor and a subcontractor.  We bring it all the time.

THE COURT:  And, yet, none of them get reported?  There are no decisions in these cases that I can look at?  I

Q1TKMAYO

mean, I'm trying to do my best to understand how this law applies, and, therefore, I'm bound by what gets put onto Westlaw.

MR. JACKLEY:  I think there's a couple of reported contractor cases, and my team can certainly brief it, but I would tell you, we receive about 82,000 consumer complaints a year.  We act on many of them.  We can't act on them all.  This particular one, we looked at it, we looked at the charitable fundraising it's doing, we looked at what it was saying.  We didn't just retaliate.  We did an investigation.  We did it on the criminal side with the DCI agent.  We did it on the consumer side with an investigator.  We made a determination, albeit they disagree with that, which is not uncommon in a consumer-related matter, and we sent a cease-and-desist letter. That's what we did.

THE COURT:  Yes.

MR. JACKLEY:  We didn't retaliate.  The governor did what he was supposed to do — sent a letter to the Attorney General, who did that.  And my position on that statute, the Deceptive Trade Practice Act, is it is an advertisement.  You can't — and I go back to the example — Aid Access can't advertise to sell its illegal pills in South Dakota.  So why would we allow Mayday to do it for them — to connect them, to induce it?  I don't believe that's what South Dakota law allows, and I don't believe the First Amendment prevents us

Q1TKMAYO

from stopping that from happening, that illegal activity.  It goes back to *Williams*.

THE COURT:  It is strange, though, that *NIFLA* didn't find it to be illegal activity.  You're saying that's because the reversal pills are not illegal under New York law.  I still sense that there was a very heavy undercurrent of First Amendment and noncommercial speech.  I'm having difficulty understanding why it's commercial speech here and why it wasn't in *NIFLA*.

MR. JACKLEY:  It is either commercial speech or certainly a mix of commercial speech.  And I say that because they are gaining dollars for purposes of certain things.  They are advertising it because advertisement is connecting somebody to a product they want to have, and that's what they're doing.  And that makes it commercial speech when it's advertising.

THE COURT:  If you would, though, would you please engage with me on the hypothetical I was using with your adversary.  Are you familiar with online postings that talk about sales, and you can click on things — or on the New York Times, they have a section called Wirecutter — and they will give me the best washers and dryers, the best -- which are boots.  I needed them recently.

MR. JACKLEY:  Your Honor, I'm very familiar with that. I was the Attorney General that argued *South Dakota v. Wayfair*.

THE COURT:  Fantastic, sir.  And excuse me for not

Q1TKMAYO

knowing that in advance.

The point is, I wouldn't think that Wirecutter engages in commercial speech or Consumer Reports engages in commercial speech by giving a detailed account of what happened when they tested various products.  Do you think it is?

MR. JACKLEY:  Here's what I would say generally speaking:  When we shut Backpage.com down, they were doing something somewhat similar to Wayfair.  I mean, they were promoting, they were connecting, they were inducing — these are the words of *Williams* — that particular conduct.  And the First Amendment didn't save them from that inappropriate conduct.  It was illegal.

THE COURT:  All right.

So, therefore, you're saying Mayday is not Wirecutter, Mayday is Backpage?

MR. JACKLEY:  Yes.

THE COURT:  Okay.

MR. JACKLEY:  And I would tell you that in the attorney general community, we have taken issue with platforms when they induce or get involved with action that is illegal, whether it be human trafficking, child pornography.  And I point back to that's, in part, why states like South Dakota have a solicitation criminal statute.  Again, I'm not inferring that I'm bringing that.  I'm just saying it fits.  I just felt this was a more appropriate opportunity to address the

situation — not retaliatory, to just get it addressed — and if there is a legitimate First Amendment issue there, even though I believe it's illegal and they can't do it, they can raise that in the state court proceedings.

THE COURT:  Sir, it is obviously a fraught subject for me to ask you questions about bad faith when you are the actor involved.

MR. JACKLEY:  Ask away.  I've done nothing in bad faith, and I'll talk to it about subjectively, which I kind of have, about how we arrived at it and objectively.

THE COURT:  Right.

It causes me a measure of concern if you believe my order is not worth following.

MR. JACKLEY:  I never said that, and I followed it, and I want to be able to expound on what they said.

THE COURT:  Please do, because I want to feel better, because I feel like we've been respectful of each other in this proceeding, we'll continue to be so, but I just want some confidence that whatever I do, the parties will abide by the order.  They can take it up to the circuit, for sure, and one of you will, but until then.

MR. JACKLEY:  That is correct, and if I have misinterpreted the order, I'll own that.

THE COURT:  Okay.

MR. JACKLEY:  So to tell you that we took it

Q1TKMAYO

seriously, I'm standing here, and the Solicitor General is standing here, on an order to show cause during a very busy week, during South Dakota legislative session.

THE COURT:  Yes.

MR. JACKLEY:  We have not taken down any placards, we have not taken any action to take down placards, and I don't want much credit for that because we weren't going to do any of that until the state court judge had an opportunity to view this anyhow, in case there was a legitimate issue.  So there's been no action on any of that.  There appear to be two areas of disagreement.  One is setting a state court hearing date.  I feel this order was being used as an inappropriate club by opposing counsel.  I didn't read it to say we could never set a hearing date.  I understood we're not going to have that hearing until this court rules on something.

THE COURT:  I appreciate that.  And --

MR. JACKLEY:  I appreciate the state court judge, who I would remind your Honor on the record that this was a state court proceeding, that Mayday asked to continue that proceeding for them to prepare, then unbeknownst to the state judge, they filed at about 9:43 at night a temporary restraining order.

THE COURT:  Yes, I was there.

MR. JACKLEY:  Yeah.

And so I don't like to put surprises on judges.

I would further indicate that in that conference, we

Q1TKMAYO

had a date set for February 2nd, as this Court may recall.

THE COURT:  Yes.

MR. JACKLEY:  That was too soon and not realistic.

I've made it clear to them that I'm not going to dismiss the state court proceeding.  I don't read your order to say I have to.  I do read your order to say we can't have that proceeding until you've made some more determinations, but I don't read it to say that I violated it by setting a date down the road.

THE COURT:  Fair.  I understand that.

MR. JACKLEY:  I would further state, and they know this, because I said if the decision isn't made, we're going to have to continue it.  And if that is a -- if I misread it, I apologize.

I will tell you the second area is, essentially, they've used this order to say that they can do whatever they want in South Dakota.  And I attune it to I'm not going to give them *Kastigar* immunity for any criminal conduct.  And probably what they didn't know until I filed this affidavit and, frankly, the Ridder affidavit that's now with the Court, there's a lot going on in addition to one placard, because we went from 30 placards to 14 to 1.  And I just want to reiterate what these are so you would understand why I would not agree to have my hands tied by what I feel is a temporary restraining order saying don't mess with the placards, don't mess with the

Q1TKMAYO

website, if it's truthful, you need to leave it alone, and we have. But I just want to reiterate, in the Ridder affidavit, this is the cases that I have and I have to look into: Number one, the case involved a male who had impregnated a patient and ordered abortion pills online. This individual slipped the pills into the patient's drink without her knowledge. The patient sought abortion pill reversal treatment after ingesting mifepristone. I feel I have to be able to do a criminal investigation if something like that happens. And if it happens to be from Mayday or one of their sites on there, I feel they could be a criminal witness. They may not be a defendant, but they could be a witness.

In addition, and it's paragraph 13(c) in another case, a patient purchased pills through Aid Access, a pill merchant hosted on Mayday Health. The pills were sent to the patient's address in South Dakota. It's a direct violation of law. The patient contacted Alpha Center with questions about the pills before taking them. After consulting with Alpha Center medical staff, the patient opted to not take the pills.

I don't read your order to say I can't look into that, I can't make phone calls, I can't investigate it. And at some point, it would be in front of the judge, the state court judge, and I guess if there's a question whether the order does say, yeah, you can't bring this criminal case, you can't do this grand jury, it's for the state court judge to determine

Q1TKMAYO

whether there is jurisdiction on a criminal matter like this.

I can go on and on.  Paragraph 6 in another case --

THE COURT:  That's okay.

MR. JACKLEY:  And so this doesn't --

THE COURT:  Sir, please, I'm not telling you you can't investigate.  I'd be surprised if, in the course of this proceeding, while this motion were pending, you would bring criminal charges against Mayday.  I don't think you would do that.  But --

MR. JACKLEY:  I would tell your Honor, unless your order says otherwise, if I get home from New York tomorrow, and there's a case that a young woman ordered a pill off Mayday's website, was given the advice that we know they're given — because here it is in an affidavit in front of the Court in another case — the patient was given instructions by Aid Access to lie and say she was having a miscarriage in the event she sought emergency medical care after taking medical abortion pills.  So in that scenario, if a young pregnant mother ordered pills off Mayday's website illegally --

THE COURT:  But according to my friends at the front table, she's not buying them from Mayday's website, she's buying them from the entity from which she's buying them.  She may have been shown available options by going to the Mayday website, but she's not buying it --

MR. JACKLEY:  And that may be aiding and abetting,

Q1TKMAYO

your Honor, depending upon the facts.

And so, in that scenario, if there's an overdose death, and it's against the law for an individual that provides a controlled substance without proper prescription resulting in an overdose death, that's a 50-year felony.  And so if the Court says if that happens, and that order is meant to say criminally, I'm not able to move forward on an investigation, I'm not able to look into these ten examples, I will respect that.

THE COURT:  All right.  I understand now your view, sir.  Thank you.

MR. JACKLEY:  But I don't read your order to say that. I read your order to say, Mr. Attorney General, I don't want you affecting truthful speech, and I don't want you to touch that particular placard and website.  And I don't read it to go further than that.  When it comes to criminal investigations, when it comes to setting a state court hearing date, that's how I read it.

So if I don't understand it right, I need direction.

THE COURT:  Of course, sir.  And the failing could well be mine because I certainly did not understand that you were entertaining the possibility of bringing criminal charges for conduct I have not yet heard about against Mayday, and I'm not sure I'm being asked to enjoin that.  It's difficult to speak in the abstract.

Q1TKMAYO

But you are not foregoing the possibility that you would bring such charges either or I'm not foregoing the possibility that I might tell you you couldn't. And we both understand each other.

Are there --

MR. JACKLEY: But I do need to apologize to the Court on kind of the third issue, the emoji comment.

THE COURT: Yeah.

MR. JACKLEY: That went too far.

THE COURT: Yeah, it did.

MR. JACKLEY: It was a response to what Mayday was saying on their website, not an appropriate response. My signature is on it. I apologize.

THE COURT: Thank you, sir.

MR. JACKLEY: And I will be addressing that further at a later time with other individuals.

THE COURT: Yes, as I say often to people, as I'm sure you say in your line of work as well, I'm not a jury. That kind of stuff sort of appeals to drama and that kind of stuff. They just don't work with me. As you can tell, sir, I am deeply concerned about my jurisdiction. You appreciate the deep concern I have for my jurisdiction.

All I care about is getting this right, and, therefore, I'm just trying to make sure I understand why you brought the action you brought and why you believe in good

Q1TKMAYO

faith that you can bring an action for Deceptive Trade Practices.  I think I do understand that.  I guess I am trying to understand a little bit more, as well, sir — just gathering my notes together from different locations — the notion of commercial speech.  Now, in part, today I think we had a breakthrough because what you're saying to me is, well, maybe it's not commercial as much as it is not protected speech.

If that's where we're going, the not protected speech route, I'm not sure that fits within the Deceptive Trade Practices statute.  There may be something else for that.  But on the commercial, it really was my understanding that one could fund-raise without making their speech commercial.  I am thinking of a lot of nonprofit organizations or entities — like I would think both the ACLU and their more conservative counterparts.  But tell me why Mayday's speech is commercial or why there's an economic motivation that they have or an economic benefit from the speech.

MR. JACKLEY:  Because it's from their charitable fundraising, that they do on their website, that they fund their operation.  In other words, it's how you pay staff, it's how you pay light bills, it's how you pay internet service, it's how you contract with gas stations.  Your Honor, I go back to they're engaged and in the process of these contracts.  I mean, it's commercial advertising.  They go to a gas station, and they -- apparently, there were a lot of contract disputes,

Q1TKMAYO

so I don't know if a lot of them were written, but they have some type of an understanding or agreement.

And it's further commercial because they are selling a product.  They are selling abortion pills.  They're putting direct links on there, and I know there's been a conversation about the middleman, and I don't want to retread water, but they're a direct part of the link, they're inducing it.  And that's an advertisement to sell those pills.  And I've just read you enough in the record — it's not a question of will they come to South Dakota; they've come to South Dakota.

THE COURT:  Sure.

Can I go one step back with you, sir.  With respect to the gas station, in the contracts with the gas station, I'm not sure that makes it necessarily commercial speech.  If I may give an example.  I know in -- well, we have families, right.  I know when I drive to my family in New Jersey at Christmastime, I pass billboards that say "Keep Christ in Christmas" or billboards from the Knights of Columbus.  I don't think of them as a for-profit organization, I don't think of language of that type telling me to remember what Christmas is about, to be commercial speech.  It is what they espouse, and it's what they want me to think about.  And if they had -- if my local gas station had placards that said it's Christmastime, you know, you're welcome to go back to church or, again, the keep Christ in Christmas idea, it may be that they may choose,

Q1TKMAYO

as an economical matter, not to do it because it may not have the bang for the buck.  But if the Knights of Columbus were advertising at a gas station on a placard, is that commercial speech?

          MR. JACKLEY:  But it's a different scenario because in the example I was trying to convey, in the gas station example, there's a contract, there's money being exchanged, and they're selling a product.

          THE COURT:  Well -- okay, I'm going to put the selling the product aside for a moment.  Your friends at the front table will tell me they're not.  I haven't made that decision just yet.  What I'm saying is, what I heard you a moment ago to say was that the genesis of all of this, really, from your perspective, sir, were the gas station placards.  Those gas station placards were the product of contracts with some organization that supplies the placards to the gas stations, and I thought you were suggesting that their production, their manufacture, and their placement at the gas station somehow rendered the speech on it commercial.  If I misunderstood your argument, then forget my whole line of questioning.

          MR. JACKLEY:  I feel it does render it commercial by the whole process.  And when you go on there, and you purchase products and -- I haven't reviewed the contracts of the gas stations, in part, because I think some of them didn't have any, and so that is a different consumer issue altogether.  But

Q1TKMAYO

I just think the way this comes down, when you look at the placards and you look at the evidence that we've submitted on the placards, it's commercial speech.

THE COURT:  Now, let's imagine — again, sir, before you say that's not what we have here, this is why we call it a hypothetical — but let's imagine I saw the placard, I clicked onto the website, and they said, well, you know, you have a lot of choices, so make sure you think really hard before you make your choice, and that's all it said.

Not commercial speech, correct?

MR. JACKLEY:  Well, can I ask a couple of questions?

THE COURT:  Of course.

MR. JACKLEY:  Is there any charitable fundraising associated with that?

THE COURT:  Well, let's go either way.  Let's do the decision tree both ways.  So right now, where we are is you get to a website that just says -- let's say the website, you get there, and it just says think.

MR. JACKLEY:  I don't consider that commercial speech.

THE COURT:  Okay.

Think and also donate to us.

MR. JACKLEY:  Then now you've crossed over.

THE COURT:  I see.

Even though there's no -- you're not paying for the thought, you're not paying for anything.  This isn't even -- we

Q1TKMAYO

don't even have a further link to go to.  It seems to me your argument about the fundraising here works, if at all, because if I click twice more, I'm going to be able to buy abortion pills, and maybe for that.  But I don't think I'm making this decision, sir, based on the sweatshirts or whatever the swag is that they offer.  But what I'm saying is, I'm thinking that there could be a situation in which a nonprofit organization has something -- that just has something that's untethered to merchandise, to wares, to goods, and I don't think that's commercial speech.

So I think your stronger argument is that, eventually, one can get to abortion pills.  It's not obvious to me that being a clearinghouse makes it commercial speech, but please push back, sir.

MR. JACKLEY:  Well, you get to make that decision.

THE COURT:  Sure.  But I want to do it on the right basis.

MR. JACKLEY:  I just believe when you look at what Mayday is doing, it just fits perfectly on what commercial speech is.  They are charitable raising money — that's a direct and indirect benefit for their company.  They are selling a product.  They are doing the things -- they were advertising, they were entering into contracts with gas stations — or maybe not written contracts, but agreements — they're just doing what you would think in the commercial speech arena, and I think

Q1TKMAYO

that fits them in that regulation.

I would be remiss, your Honor, if I didn't at least mention — and this really goes to all of it — about retaliation, subjective, objective.

THE COURT:  Yes.

MR. JACKLEY:  In footnote 7 of our briefs --

THE COURT:  You have several briefs, sir.  I imagine it wasn't the same footnote 7, but go ahead, tell me which one applies.

MR. JACKLEY:  Docket 36, your Honor.

THE COURT:  I'm there, sir.

MR. JACKLEY:  When we deem it that the First Amendment let's them do that, and I use as an example of JEN --

THE COURT:  One moment, please.  Perhaps I have this wrong.  36, sir?

MR. SWEDLUND:  35.

THE COURT:  Thank you.

Yes, the JEN, J-E-N, all caps.

MR. JACKLEY:  And I think that goes to a couple of things.

To me, that's the *Bigelow* direction, that the First Amendment allows a company like JEN to come to South Dakota and do an advertisement that you can go to Minnesota to have an abortion.  And, similarly, if, in Mayday's case, they put up a sign that said you can go to New York, we haven't sent a

Q1TKMAYO

cease-and-desist letter, we haven't filed a civil action, they're not selling an illegal product, so I haven't even looked at a DCI agent on the criminal side. Your Honor, that's permissible under the First Amendment. But that's not what Mayday is doing. Mayday is soliciting, inducing, commencing the illegal trafficking of pills in the State of South Dakota. There's hard evidence of that. There's an affidavit before this Court. It's not just some Attorney General saying it could happen. It's happening.

And they're doing other deceptive acts that I believe fits within the statute that the legislature says I need to enforce.

Now, if I'm not right on that, who better than a state court judge to say I disagree, it doesn't fit the advertisement prong, or it doesn't fit some level -- or the First Amendment prevents you from enforcing that. But these are serious deceptions and omissions, telling people to take a dangerous pill fifteen weeks in when the FDA says it's ten weeks, telling a young girl that you don't need to ask your parents or seek judicial review. Those are serious matters. They're deceptive, and they just fit within the statute.

THE COURT: Just one moment, please. Sorry, again, I have notes in multiple locations.

(Pause)

THE COURT: Thank you very much, sir.

Q1TKMAYO

MR. JACKLEY:  Thank you, your Honor.

THE COURT:  Does your Solicitor General wish to speak?

MR. SWEDLUND:  I would join the Attorney General in apologizing to the Court for the remarks.  They were based on, as the Court noted, the website and the talk of sending these pills in regardless, and it does have a kind of militant quality to it, but that doesn't still justify the comments. And so I apologize to the Court and to the Attorney General, as well.

THE COURT:  Much appreciated, sir.  Thank you so much.

Mr. Sieff, I'll hear from you now in brief reply.

MR. SIEFF:  Thank you, your Honor, for spending as much time as you have with us this afternoon.

THE COURT:  Absolutely.

Just a spoiler alert:  I'm not going to decide this evening.  I'm not going to keep you here this evening.  I will do my very best to get back to you as quickly as I can.  I know the moving parts in play, and I very much respect the state court judge.  I respect all of your roles, but I also don't want to step on the toes of a state court judge.  So, thank you.

Go ahead, sir.

MR. SIEFF:  I just wanted to make three, perhaps four, quick points.

The first, your Honor, on commercial speech: *NIFLA*

Q1TKMAYO

controls with respect to most of the questions the Court was asking. The facts are analogous. I would add — and this is -- I was going to raise this to the Court today in my opening — but in the *Fox* case that is cited in the government's brief, and that we responded to, at 492 U.S. at 474, it says, and I will read the quote to the Court, that fundraising for charitable organizations, and then in parentheses citing to a different case, it says, which we have held to be fully protected speech. So to the extent that the government is arguing the speech at issue here is commercial because there's fundraising seems to be fairly squarely foreclosed by its own authority.

Second, your Honor, on --

THE COURT: That's second? That was third for me. Hold on.

MR. SIEFF: I'm sorry.

THE COURT: Okay.

Your second "second." Go ahead, sir.

MR. SIEFF: The next point I wish to make is that with respect to illegal speech, I think that our brief addresses, so I'm not going to belabor that with you, but our speech has the same lawful purposes that the JEN organization provides speech for. The deceptive and illegal things that the Attorney General raises are not on our website. We don't endorse those things.

The Attorney General asked if he could bring an action against providers who break the law.  We are not telling him not to.  In fact, we've said that is the less restrictive alternative he should pursue.  I'm not going after the speech intermediary.  And if Backpage met the standard for bringing about a particular criminal act, then it was rightly prosecuted and convicted for doing so.  Those facts don't exist here. That's not the statute he sought to enforce.  He's represented to the Court he thinks it might be aiding and abetting.  First of all, aiding and abetting, as I'm sure the Court knows better than me, requires accomplishment of an actual act with the intent to see that act achieved.  Nor does it constitute solicitation.  And I would advise the Court to look both at the *Conant* case from the Ninth Circuit, which concerns recommendations to obtain medical marijuana by a doctor who would not himself prescribe it.

And I would alert the Court to the decisions that we cited at page 9 and 10 of our opening brief — *Matsumoto v. Labrador* and *Welty v. Dunaway*.

And the last thing I'll say about *Welty v. Dunaway* is that in that case, a lawyer made statements to her clients that, quote, their options are to get abortion pills and do a self-managed abortion or to seek abortion outside the State of Tennessee.  The Court held that those suggestions to a specific person, without actually providing the means, but just

Q1TKMAYO

suggesting it to a specific person, as well as handing out information about abortion care and abortion pills with a list of websites about abortion options was protected by the First Amendment.  That's a decision by Judge Gibbons on the Sixth Circuit sitting by designation.

The speech at here isn't illegal.  It's frankly not. It doesn't encourage anything.  But to the extent the Court drew an inference of encouragement, it still falls well within the bounds of the First Amendment.

Thank the Court very much for its time.  We will endeavor to -- again, I should apologize to the Court for filing a temporary restraining order in the middle of the night.  We don't like to do that.  We won't do it again.  We appreciate the Court and chambers' work on a very thoughtful proceeding today.

I appreciate your time.  Thank you.

THE COURT:  I thank you all.  You've traveled far, some of you, and I appreciate it.

I think the soonest you'd hear from me would be the end of next week or perhaps the week following.  For various scheduling reasons, I will be unavailable after the 13th of February, so I'll have to decide it before then.  If the parties would like to get the transcript on an expedited basis, that might be useful.  I've tried to take the best notes I can. If you go home to your respective offices and wake up in the

Q1TKMAYO

middle of the night and realize there was something you had to tell me, please do.  But I feel as though this has been thoroughly aired out, and I appreciate everyone's comprehensiveness in their submissions.

I also have to thank our court reporter, who's staying well past the time he should, and I'll let you go.

Thank you very much.  I really do appreciate the care you've put into your arguments today.  Thank you.

We're adjourned.

(Adjourned)