# Exhibit 1

Q1G8HEAC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MAYDAY HEALTH,

                    Plaintiff,

          v.                              26 Cv. 00078 (KPF)

MARTY J. JACKLEY,
Attorney General of South Dakota,

                    Defendant.            TRO (Remote)

------------------------------x

                                          January 16, 2026
                                          2:05 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                          District Judge

                              APPEARANCES

DAVIS WRIGHT TREMAINE LLP
     Attorneys for Plaintiff
BY:  ADAM SIEFF
     LAURA R. HANDMAN
     CHELSEA KELLY
     AMBIKA KUMAR
     NICOLE SAAD BEMBRIDGE

MARTY J. JACKLEY (Appearing *Pro Se*)
     Attorney General of South Dakota

OFFICE OF THE ATTORNEY GENERAL SOUTH DAKOTA
     Attorneys for Defendant
BY:  AMANDA MIILLER

Q1G8HEAC

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3      the record, beginning with plaintiff.

4              MR. SIEFF:  Good morning, your Honor.  This is Adam

5      Sieff, of Davis Wright Tremaine, for plaintiffs, Mayday Health.

6      With me on the line are my colleagues, Laura Handman, Chelsea

7      Kelly, Ambika Kumar, and Nicole Saad Bembridge.

8              THE COURT:  Thank you very much.  Good afternoon to

9      each of you.

10             This is Judge Failla, and I think you all have

11     realized, I am the judge to whom this case has been assigned.

12             Mr. Jackley, do I have you on the line as well, sir?

13             MR. JACKLEY:  You do, your Honor.  Marty Jackley,

14     South Dakota Attorney General.  Also appearing with me is my

15     civil chief, Amanda Miiller, and that is M-i-i-l-l-e-r.

16             THE COURT:  Good afternoon to both of you.  Thank you

17     very much for appearing on such short notice, but candidly,

18     sir, it's been short notice for me as well.

19             Mr. Jackley, should I be directing my questions this

20     afternoon to you or to Ms. Miiller?

21             MR. JACKLEY:  To me, your Honor.

22             THE COURT:  Thank you, sir.

23             So, Mr. Sieff, from my perspective, what I have

24     received from you to date, I received a complaint a few weeks

25     ago, earlier in the week I received what I believed was a

Q1G8HEAC

1    preliminary injunction motion, and last evening, at about 10

2    after 9, I received a motion for a temporary restraining order.

3    I did not check my docket sheet in the minutes before I got on

4    the call today.  Was anything else filed from your client's

5    perspective, sir?

6            MR. SIEFF:  Not from us, your Honor.

7            THE COURT:  Thank you.

8            Mr. Jackley, I have had a chance to review those

9    written materials that you have just heard me list.  And I

10   didn't think you were afforded enough time to actually respond

11   to anything, so why don't I begin by asking, have you had a

12   chance to review the complaint and the injunctive relief

13   papers?

14           MR. JACKLEY:  I have, your Honor.

15           THE COURT:  Thank you.

16           It was my understanding, from a conversation my law

17   clerk had with Mr. Sieff last evening, that your office is

18   opposing the request for a temporary restraining order.  Is

19   that correct?

20           MR. JACKLEY:  That is correct, your Honor.

21           May I ask the Court just so that I get direction.  Me

22   and my office have made the *pro hac* appearance filings, but

23   they have not been accepted yet.  I just want to be respectful

24   in not making an appearance out of place.

25           THE COURT:  I appreciate you saying that.  I did

1    understand and I thought I had seen Ms. Miiller's application

2    for *pro hac vice* admission.  You filed one as well for

3    yourself, sir?

4              MR. JACKLEY:  Your Honor, mine is in the process.

5    Once I receive the certificate of good standing, it will be

6    officially filed, but it is in the works.

7              THE COURT:  Fair enough.

8              Mr. Jackley, given that fact and the representations

9    you have made to me, and also given the fact that you have only

10   known about this motion for less than 24 hours, if it is your

11   wish to be the oralist today, I will admit you *pro hac vice* for

12   purposes of this proceeding so that you can make the arguments

13   you wish to make.

14             MR. JACKLEY:  Thank you, your Honor.  That would be my

15   request.

16             THE COURT:  That request is granted.

17             So, what I am seeing on the docket with respect to

18   your side, sir, is the *pro hac vice* motion, and I understand

19   another is coming.  Given that, may I please hear from you

20   orally as to the reasons you oppose the request for a temporary

21   restraining order.

22             MR. JACKLEY:  Thank you, your Honor.  Of course.

23             I am requesting a limited appearance to contest

24   jurisdiction only.  I would request a further opportunity, if

25   necessary, to present our arguments in writing.

Q1G8HEAC

1          The gist of the state of South Dakota's resistance is

2     there does not exist personal jurisdiction, neither under the

3     long-arm jurisdiction or under minimum contacts.  I can get

4     into more detail on that.  And then, secondary, based upon

5     *Younger* abstention.

6          I would advise the Court this matter was actually set

7     for a hearing today at 9:00 in South Dakota.  The plaintiffs

8     requested a continuance over the state's objection.  The court

9     was gracious and gave them a continuance in order for them to

10    prepare for the preliminary injunction hearing set in South

11    Dakota.

12         THE COURT:  And I am going to ask you a couple of

13    follow-up questions because I saw in the preliminary injunction

14    submissions the fact that a proceeding had been brought in

15    South Dakota.  I believe it was last month, sir.

16         May I ask, have those papers been served on Mayday?

17    And that's what I will refer to the entity here as.  As of the

18    time that the preliminary injunction motion was filed, I did

19    not have a sense that they had been served.  Have they been

20    served?

21         MR. JACKLEY:  Your Honor, it is the state's position

22    that that action was filed on or about December 29th, that

23    under state statute, because it's the consumer division, it is

24    allowed by notice that it has been accomplished.  It has also

25    been accomplished by personal service, but I do believe that

Q1G8HEAC

1    plaintiffs are contesting that.

2           THE COURT:  I see.  Of course, there hasn't been

3    enough time, this only having been filed at the end of

4    December, to have a judge in South Dakota to speak to the issue

5    of proper service.  So you believe they have been served, they

6    believe they haven't, and that is a fight that I don't get to

7    resolve.

8           Tell me more, please, sir, about the hearing.  When

9    you say 9 a.m., I guess that's 9 a.m. your time, which is

10   probably closer to 11 or 12 my time.  So when was it set down

11   for a hearing, sir?

12          MR. JACKLEY:  The hearing was scheduled for today at 9

13   a.m. Central Standard Time.

14          THE COURT:  Excuse me, sir.  I wasn't clear.  I

15   understand when the hearing was scheduled for.  When was it

16   scheduled?  Because I would not have scheduled this for the

17   time I scheduled it had I known that there was a hearing in the

18   South Dakota court.

19          MR. JACKLEY:  It was scheduled approximately two weeks

20   ago.

21          THE COURT:  I see.  It may be that plaintiff will tell

22   me that they did not get word of it because they don't believe

23   they have been served, but I will let them fight their own

24   battles a little bit later.

25          I appreciate knowing, and I thank the court in South

Q1G8HEAC

1    Dakota for allowing me the opportunity to use this time this

2    afternoon.

3            Has that proceeding, that hearing, been rescheduled,

4    sir?

5            MR. JACKLEY:  Yes, your Honor.

6            THE COURT:  For what date and time, please, so that I

7    don't conflict again.

8            MR. JACKLEY:  February 2, at 1:00 Central Standard

9    Time.

10           THE COURT:  Thank you for letting me know.

11           Let's go back then, please.  Why don't we begin with

12   your arguments on personal jurisdiction.  So I guess you and I

13   are both looking at New York's long-arm statute.  Tell me why

14   you believe the conduct that is alleged in the complaint before

15   me does not implicate personal jurisdiction in New York.

16           MR. JACKLEY:  Your Honor, it is the state's position

17   that there is no long-arm jurisdiction under New York Civil

18   Procedure 302(a).  I, as attorney general, under my statutory

19   duty, have sent a cease and desist letter for activity

20   occurring in South Dakota, and that is not enough under New

21   York law to qualify as a business transaction.  And I would

22   cite *America/International 1994 Venture v. Mau*, 146 A.D.3d 40,

23   at page 53.  It's a 2016 decision.

24           I would also argue that sending a lawful cease and

25   desist letter under South Dakota law does not qualify as a

Q1G8HEAC

tortious act because we have not derived any revenue, and none

of the five factors in the *Traver v. Officine* case, 233 F.Supp.

2d 404, page 412 (N.D.N.Y. 2002), have not been satisfied.

THE COURT:  OK.  Now, you have seen the complaint in

this case, sir?

MR. JACKLEY:  I have, your Honor.

THE COURT:  I am just looking back at their arguments

as to personal jurisdiction.  They are suggesting that what you

sent to them was a threat.  You're suggesting to them it is a

cease and desist letter.  And it is for that reason that you

believe there is not personal jurisdiction.  As well, I think I

heard you say there aren't minimum contacts sufficient here?

MR. JACKLEY:  Correct.  There are no minimum contacts,

either a general jurisdiction or specific jurisdiction.  There

is no general jurisdiction here because defendant is not at

home in New York.  And there is no specific jurisdiction here

because South Dakota did not purposefully avail itself of the

privilege of conducting activities within the forum state.

We simply have, here in South Dakota, there has been

placards put up in gas stations here in South Dakota.  Pursuant

to my statutory authority, the governor requests that the

attorney general address it.  I addressed it with a cease and

desist order.  When the cease and desist order did not work, as

a measured response, rather than invoking criminal

jurisdiction, I simply filed for preliminary injunction in

1    relation to those signs that exist here in South Dakota.

2            THE COURT:  You just said a moment ago, sir, that you

3    engaged in a measured response by filing the civil enforcement

4    action.  Is it a criminal prosecution?

5            MR. JACKLEY:  Under South Dakota law, there are tools

6    available to the attorney general and there is certain conduct.

7    One option is, under our statutes, we are allowed probably the

8    most measured response of a cease and desist letter, giving the

9    opportunity for a response, an opportunity to be heard and

10   considered by the attorney general.  That occurred.

11           My understanding is all but one or two of the signs

12   have been removed.  Because signs still remain up in South

13   Dakota, I chose to file a preliminary injunction case, which is

14   what I have indicated to the Court will be heard on

15   February 2nd.  I would advise the Court, as former United

16   States attorney and attorney general, solicitation is a

17   criminal act in South Dakota, but nothing has been filed on

18   that measure at this time.

19           THE COURT:  I see.  All right.

20           You mentioned the signs.  These are the signs in the

21   gas stations, sir, and not just the website?

22           MR. JACKLEY:  Yes.  I would call them a placard.  When

23   you go to a gas station, there will be a placard above the

24   pump, or as part of the pump, that contains an advertisement.

25   So those placards exist here in South Dakota.

Q1G8HEAC

1            THE COURT:  You will excuse my ignorance, sir.  When I

2   am at a gas station here in the East Coast, the signs that I am

3   seeing are electronic, in the sense that I have seen multiple

4   ads at once while I am waiting for my tank to fill.  In South

5   Dakota, are you talking about a physical hard copy placard,

6   that's why you're using that term?

7            MR. JACKLEY:  Yes.

8            THE COURT:  There were some that were up and most have

9   been removed, but not all?

10            MR. JACKLEY:  It is my understanding, from various

11   statements by the plaintiff, that the original or at least the

12   original count was 30.  That at the time of the filing, it was

13   14.  That at the time of the filing of the preliminary

14   injunction, it was two.  And now it is my understanding it is

15   down to one.

16            THE COURT:  Now, sir, if they were to remove the one,

17   would you continue with the civil enforcement action?

18            MR. JACKLEY:  I would not, your Honor.

19            THE COURT:  Just so that I am clear, it's not the

20   existence of the website per se, it's these placards that

21   you're construing as solicitation, or am I getting ahead of

22   myself?

23            MR. JACKLEY:  That is our position, your Honor.  You

24   are not getting ahead of yourself.  That is our position.

25            THE COURT:  I see.  All right.  I understand.

1          By talking to me about personal jurisdiction, and as

2    well about *Younger* abstention, do I understand that you don't

3    believe that you and I should be discussing the merits of the

4    First Amendment claims today, that really there are these

5    threshold jurisdictional issues that I have to work my way

6    through first?

7          MR. JACKLEY:  That is the state's position.  This is a

8    limited appearance to contest jurisdiction.

9          THE COURT:  Thank you.

10         Let's then, please, talk about *Younger* abstention.  I

11   don't mean to cut you off, sir, if there are more personal

12   jurisdiction issues that you wish to raise.

13         MR. JACKLEY:  There are not, and I would be prepared

14   to talk in answering questions regarding *Younger*.

15         THE COURT:  Please go ahead, sir.

16         MR. JACKLEY:  It is the state's position that the

17   *Younger* abstention, federal courts must defer to certain state

18   proceedings, and I would point out that there are ongoing state

19   proceedings right now.  They include a catalogue of them:

20   State criminal jurisdiction and civil enforcement proceedings

21   and civil proceedings.  And I would specifically cite *Sprint v.*

22   *Jacobs*, 571 U.S. 69, page 73.  And that, of course, is a

23   Supreme Court decision.

24         THE COURT:  Actually, as I am talking to you, sir, I

25   took down some notes beforehand about *Younger* abstention.  So

1    let me please understand this.  You are invoking it based on

2    the existence of a civil enforcement action, correct?

3                MR. JACKLEY:  Yes.  Both in regarding to a cease and

4    desist, as well as regarding the filing of a preliminary or

5    permanent injunction.

6                THE COURT:  All right.  Go ahead.  I will let you

7    continue with your argument, sir.

8                MR. JACKLEY:  That would be the extent of my argument,

9    your Honor.

10               THE COURT:  Thank you very much.

11               Mr. Sieff, let me please turn to you.

12               Mr. Sieff, I will tell you, and you will all learn

13   this, I try to be as transparent as possible in my

14   communications with the parties.  I wasn't sure about the

15   personal jurisdiction issue, but I actually thought I had

16   personal jurisdiction.  I did spend a chunk of my morning this

17   morning thinking through *Younger* abstention issues akin to

18   those described by Mr. Jackley just now.

19               So, Mr. Sieff, why don't you begin with personal

20   jurisdiction and then with *Younger* abstention, please.

21               MR. SIEFF:  Thank you, your Honor.  And when I address

22   *Younger*, I am more than happy to address what was scheduled to

23   be a hearing this morning that we were prepared to attend but

24   was continued for other reasons, but we'll come back to that.

25               Starting with personal jurisdiction, this case is just

Q1G8HEAC

1    like three other cases, three federal appellate courts -- or at

2    least two federal appellate courts and then the Second Circuit

3    in a factually similar circumstance held sufficient to assert

4    personal jurisdiction in the federal district court over an

5    out-of-state attorney general.

6         The first case that you should know about is the *Media*

7    *Matters for America v. Paxton*, which was a D.C. Circuit

8    decision from last year, where virtually the exact same conduct

9    transpired, where the attorney general of Texas sent a demand

10    into the district, and the process server——in that case they

11    actually effectuated service——attempted to effectuate service

12    on the plaintiff in the forum state.  And then the effect of

13    those contacts was to create censorship-based effects, that

14    have affected Mayday here as it did *Media Matters* there, in

15    their ability to engage in publication-related activities and

16    recording, and just as importantly, publish information that's

17    available to people in those forum states.  That's case number

18    one.

19         A second case --

20         THE COURT:  Before you proceed to your second case,

21    sir, can I please have the citation for the first case?

22         MR. SIEFF:  Yes.  It is in paragraph 10 of our

23    complaint, and I will read it to you.

24         THE COURT:  I see it.  And then you have *Defense*

25    *Distributed v. Grewal* and then *Twitter v. Paxton*.  Are these

Q1G8HEAC

1    the three cases that you are going to be citing to me?

2          MR. SIEFF:  Those three.  And then the one you will

3    see a few lines down, which is the *Grand River Six Nations*

4    case, which is a Second Circuit case, asserting personal

5    jurisdiction over out-of-state attorneys general whose

6    purposeful New York conduct created the basis for jurisdiction,

7    just as it does here, under the same long-arm statute.  And the

8    long-arm statute in New York, in our view, is materially

9    indistinguishable from the ones at issue in the three cases

10   cited in the beginning of that same paragraph.

11          So, we think that the Court's inclination to find

12   personal jurisdiction is correct.  We think that the contacts

13   here are more than sufficient and had been judicially

14   recognized by multiple federal courts as sufficient to find

15   personal jurisdiction in a matter like this one.  But what you

16   have is an out-of-state attorney general reaching into that

17   state, be it letters and demands and threats, to purposefully

18   halt and, at a minimum, chill the speech of a speaker in that

19   state, who is speaking not just to people in that state, but

20   across the country.

21          So, we think that this body of law is sufficient to

22   demonstrate that the type of tortious activities or

23   constitutional tort actions that we have, that this type of

24   constitutionally tortious activity is one that the Court has

25   jurisdiction to hear and to hear our Section 1983 claim arising

Q1G8HEAC

1    out of those contexts in that tortious activity.

2           If the Court has no further questions on jurisdiction,

3    I am happy to turn to *Younger*.

4           THE COURT:  It's not that I don't or do have

5    additional questions.  I want the totality of your arguments

6    for personal jurisdiction, but if what you're going to say is,

7    look, we thought this through already and we have articulated

8    in our complaint what we believe the bases of jurisdiction are,

9    that's fine too.  I don't have specific questions.  I do want

10   to hear from you because I did not know, until Mr. Jackley

11   raised the personal jurisdiction issue, that that was an issue.

12   So I do want to hear your arguments with whatever degree of

13   specificity you would like to make them.

14          MR. SIEFF:  I will add, then, in that case, Section

15   302(1), (2) and (3) all seem to squarely cover in technical

16   terms what the attorney general has done here.  And for the

17   same reason that the courts in the cases that we have cited

18   asserted jurisdiction over comparable acts as comporting with

19   the minimum due process, we believe the long-arm statute

20   embraces that conduct here, and the Constitution recognizes

21   that the assertion of personal jurisdiction over that conduct

22   is permissible and appropriate, and this Court may accordingly

23   hear the claims that we have arising from and are related to

24   that conduct.

25          THE COURT:  Thank you.  With that in mind then, let's

1    please turn to the issue of *Younger* abstention.

2    　　　　MR. SIEFF:  Thank you, your Honor.

3    　　　　There are three answers with respect to *Younger*.  And

4    it relates to the issue with respect to what Mr. Jackley

5    referred to as the hearing that was scheduled today.

6    　　　　There is no ongoing proceeding, first of all, in South

7    Dakota.  There is no complaint.  There is no summons filed.

8    That's indisputable.  And until yesterday, we had not even been

9    served with the sole pleading that exists in any South Dakota

10   court, which is a motion to enjoin our speech.  That was only

11   served by personal service.  I received notification from our

12   client that they were served with a motion by 3:00, but that

13   motion did not initiate or commence any action that is

14   cognizable.  And at the time that we filed this case on

15   January 6, all that we had was a threat of enforcement and some

16   indication that the attorney general intended to go to court to

17   bring the enforcement action against us.

18   　　　　So we think, as the Supreme Court noted in *Ellis v.*

19   *Dyson*, 421 U.S. 426, at 432, that because all that existed at

20   the time that we filed was a threat of bringing an enforcement

21   action, colored both by the cease and desist letter sent to New

22   York to cease our New York-based publishing operations, and

23   also by what we learned about through news reports and social

24   media posts was this motion that was lodged in a South Dakota

25   court, we don't believe that there is an ongoing proceeding at

1    all which would trigger any aspect of *Younger*.

2              THE COURT:  I am going to ask you to pause for a

3    moment, please, sir.  Mr. Jackley represented to me that the

4    action in South Dakota was filed on December 29.  Is that

5    incorrect?

6              MR. SIEFF:  What Mr. Jackley is referring to is that

7    his office lodged a motion, notice of just a motion, on the

8    29th.  There is no action that was filed.  There is no

9    complaint or summons.  It lodged a motion in a South Dakota

10   court on or around that date.  And we received notice of it

11   through news reports.  I believe his office issued a press

12   release in saying they had lodged that motion.  They didn't

13   file a complaint or summons, or serve a complaint or summons on

14   us.  They didn't even serve that motion on us.

15             THE COURT:  I am going to ask you to pause for a

16   moment.

17             Finish your sentence.  Go ahead.

18             MR. SIEFF:  Your Honor, I was just going to say we

19   learned on or around that date through the press, through

20   social media, that some type of motion had been filed in court.

21   But an action, an action and a proceeding had not begun, and

22   there is none today.

23             THE COURT:  I am looking at *Sprint* and other cases

24   that I took notes on as I'm talking to you.  I guess we are in

25   agreement there is not an ongoing state criminal prosecution.

Q1G8HEAC

```
 1   The question is, is this a civil proceeding that is akin to a

 2   criminal prosecution?  It would say not.  Then it would be a

 3   civil proceeding involving certain orders uniquely in

 4   furtherance of state court's ability to perform their judicial

 5   functions.  Would you agree with me that those are the

 6   exceptional circumstances where *Younger* abstention typically

 7   applies?

 8           MR. SIEFF:  Yes, your Honor, I agree that those are

 9   the criteria necessary.  And our position is, in the first

10   instance -- and there are numerous reasons why *Younger* doesn't

11   apply, and I can get to those too, but at the threshold, we

12   agree that those are the three circumstances that are essential

13   conditions for it to apply at all, and our position is that

14   none of those are met here.

15           THE COURT:  I understand that is your position.  The

16   cease and desist order I am not sure qualifies as any of

17   these -- I need to understand a little bit more this proceeding

18   filed in South Dakota, which you tell me is just a motion.  But

19   the question is, is that motion a civil proceeding involving an

20   order uniquely in furtherance of a state court's ability to

21   perform their judicial functions?  I don't know.  I am just

22   looking at a case from the District of Vermont where these

23   state interests include:  Safeguarding child welfare, managing

24   interstate utilities, regulating attorney conduct, overseeing

25   state election processes.  I suspect there are more.
```

Q1G8HEAC

1          Please help me understand why this particular motion

2     would not qualify under the third category of proceedings.

3          MR. SIEFF:  I believe that the type of cases that have

4     found that the third type of proceeding is met have involved

5     some type of engagement of the judiciary in an actually

6     adversarial process.  It might be an attorney bar investigation

7     or some other process in a judicial court run by the state that

8     is indeed adversarial.  And the key here is that the action has

9     been commenced in that body.

10          Here, there was nothing commenced in any court that

11     would recognize the existence of an adversarial proceeding.

12     That is why, once we eventually got wind of what was happening,

13     South Dakota counsel made a special appearance to alert the

14     court that we intended to contest the existence of an action.

15     And the court, the South Dakota court, by its own motion,

16     scheduled a hearing, originally set for this morning, to

17     discuss with the state whether it had, in fact, commenced an

18     action at all.  And it did so before and only keyed us into the

19     conversation after we alerted the court that we had filed a

20     federal action.  So we were prepared to make a special

21     appearance at the hearing that the court had ordered and

22     intended to ask the state about on its own motion.

23          So to go back to your question about *Younger*, there is

24     not at this moment, was not at the time that we filed any of

25     the pleadings in this case, an ongoing proceeding.  We are sort

1    of in this unusual liminal space where the government has told

2    us they intend to sue us.  They appear to have tried to sue us,

3    but didn't actually.  But in so doing, they have told us what

4    they intend to do to punish us and censor our speech.

5            And so for that reason, we think that our claims are

6    both ripe and justiciable.  *Younger* doesn't apply.  And I can

7    get into more reasons why, even if the Court were inclined to

8    believe that the third *Younger* criterion existed, the threshold

9    criterion for an ongoing proceeding, there is another reason,

10   and an important other reason, why *Younger* is not a bar in this

11   action.

12           THE COURT:  I promise you that I will, but I am one

13   step behind you, sir, and I am trying to catch up to where you

14   are.

15           So, I guess a question that I have is, is there no

16   utility in letting in my hearing from the South Dakota court,

17   or the South Dakota whatever, about whether they believe an

18   action has been commenced?

19           MR. SIEFF:  I think the answer to that question leads

20   to my second argument, which is that even if there were an

21   action that were ongoing -- and again, we don't think that the

22   South Dakota court will find that there is one, but even if

23   there were some type of ongoing proceeding, number one, we need

24   a temporary restraining order in the interim.  I understand

25   that you are key to assess your jurisdiction.  The point is,

1    even if there were an ongoing proceeding, *Younger* has no

2    application where the state action, if it exists, was brought

3    to retaliate against or deter First Amendment protected

4    activity.  This is a well-established exception to *Younger*.

5    The Second Circuit recognized it in a case called *Cullen v.*

6    *Fliegner*, 18 F.3d, at 103-04, and it was applied in the Eastern

7    District of New York in a case that I think is relevant here,

8    *Brooklyn Institute of Arts v. City of New York*, 64 F.Supp. 2d,

9    the relevant passage is 195-96.

10         Now, these are just two cases.  There are cases from

11    courts across the country.  But the point is that *Younger* is a

12    comity-based doctrine.  Notwithstanding the fact that it

13    continues to have vitality, the courts recognized that it has

14    no application where the state's interest is illegitimate

15    because it has undertaken to retaliate against or deter First

16    Amendment protected activity.

17         So, in the *Brooklyn* case, what you had was a situation

18    akin to ours, in the *Cullen* case as well, but the state action

19    was found to have been brought, it was alleged to have been

20    brought in order to punish a speaker, in that case it was a

21    museum, for putting on speech that the government, for whatever

22    reason, found objectionable.  And in that case, and in others,

23    *Younger* has no application.  So, too, in *Cullen*, which was a

24    case about discipline against a public school teacher.  It was

25    understood and alleged that the public school teacher was

Q1G8HEAC

1   disciplined in retaliation for his protest of school policy.

2   And notwithstanding the existence of, in each of those cases,

3   actual ongoing proceedings, which again we don't have here, but

4   notwithstanding those ongoing proceedings, because those

5   proceedings were part of an ongoing effort to retaliate against

6   and deter the plaintiff's exercise of First Amendment rights,

7   the federal court was not divested of jurisdiction in deference

8   to those types of government purposes.

9       So, that to us is controlling, and you will see that

10  our complaint is full of allegations and our motion is full of

11  evidence supporting those allegations.  So we think that even

12  if the Court thought *Younger* ought to apply because those

13  criteria are met, it cannot, it cannot because of this

14  exception.

15      One last point, your Honor, if I may.  At an absolute

16  minimum, *Younger* has no application to our claims for

17  prospective relief.  The Supreme Court addressed this squarely

18  in *Wooley v. Maynard*, 430 U.S. at 711.  The case involved

19  there, the plaintiff sought relief for future charges that the

20  state government might bring against the plaintiff.  And here,

21  you will note, in our complaint and in the request that we have

22  for relief, we have two causes of action.  We seek relief from

23  the government's prior restraint and retaliation against our

24  existing speech, and we also seek prospective relief from any

25  prior restraint or retaliation the government might wield

Q1G8HEAC

1    against our speech in the future.

2            So, even if you agree with Mr. Jackley that *Younger*

3    applies, and it doesn't, and even if you disagree with me that

4    the bad faith and illegitimate purpose exception, the

5    retaliation exception to *Younger* doesn't apply, and again, it

6    does too, at an absolute minimum, *Younger* cannot apply to our

7    request for prospective relief.  So the Court can and should,

8    at an absolute minimum, take jurisdiction over that portion of

9    our claim.

10           THE COURT:  Let me ask you this question, sir.  A lot

11   of your injunctive relief briefing is focused on what I will

12   call the *NIFLA* case, 160 F.4th 360, a Second Circuit decision

13   from last month, I believe.

14           So, first of all, I am correct, that is a lot of your

15   discussion about First Amendment issues, yes?

16           MR. SIEFF:  Yes.  We think that case is on point.

17           THE COURT:  But you know that that case began with an

18   extensive *Younger* abstention discussion, and it seemed there

19   that the panel, and I believe the opinion was written by Judge

20   Bianco, but the panel seemed very concerned or moved by the

21   fact that *NIFLA* was not itself a party in the civil enforcement

22   actions that were being brought by the New York Attorney

23   General.  And so, in reading that, one might think that the

24   converse would be true, that where the entity in question

25   filing the federal lawsuit was the named party in the

1  enforcement actions, that perhaps *Younger* abstention should

2  apply.

3         So, you may just tell me that, for all the reasons you

4  have just stated, I have totally misperceived the case, and

5  that's fine.  But I do want you to engage with it just because

6  so much time was spent drawing that line in the *NIFLA* case.

7         MR. SIEFF:  Absolutely, your Honor.  That case is, in

8  a *Younger* aspect of the case, inapposite.  In that case, what

9  you had was NIFLA and you had other organizations that NIFLA

10  supported and engaged in independent activities related to, in

11  one hand, providing, and another hand, publicizing the

12  availability of an abortion reversal procedure.  And the

13  attorney general's office had brought an action only against

14  the provider.  Which, by the way, is a less restrictive

15  alternative that Mr. Jackley could have pursued in this case.

16  In that case, you had claims against provider, but no claims

17  against NIFLA.  So the *Younger* analysis was addressing a

18  separate issue.

19         In this case, there is no proceeding against Mayday

20  for a different reason, which is that no action was filed

21  against anyone.  It's not that we have been named in an action

22  pending alongside another organization, or that another

23  organization was named and we weren't.  It's that there is no

24  action at all.  So maybe that is repeating some of what I was

25  saying earlier, but the first key distinction is that in that

Q1G8HEAC

 1    case there was an action, in this case there is zero action.

 2         But beyond that, because that case concluded that

 3    there was an action that just didn't involve *NIFLA*, it had no

 4    reason to reach the type of *Younger* exception cases, which I

 5    just spoke with you about, the *Cullen* case, for example.  It

 6    did not need to engage in that because, at the threshold, it

 7    found that, well, there is an action, but it doesn't involve

 8    *NIFLA*.  Here, you can reach the same threshold determination

 9    for a different reason.  There is no action, but at a minimum,

10    *NIFLA* said nothing about what happens when there is an action,

11    in the event the Court determines that there is one here, we

12    disagree with that, but it says nothing about what you do next.

13    What you do next, in that eventuality, is you look to see

14    whether an exception applies or what the scope of the

15    abstention is.

16         So, *NIFLA* we think is extremely informative as to how

17    to apply the merits in this case, but we think the *Younger*

18    discussion, if anything, supports the conclusion that we have

19    here, insofar as the court in its *Younger* discussion emphasized

20    that *Younger* is an exceptional doctrine; it is an exception to

21    the rule the exercise of jurisdiction.  It says, there are only

22    a, quote, small number of cases in which the holding is

23    authorized equitable belief that undue interference with state

24    proceedings is the normal thing to do.  None of those

25    exceptional reasons for abstention exist here.

1              THE COURT:  All right.  Sir, I did not mean to derail

2      you, if there are other arguments that you wish to make about

3      *Younger* abstention or something else.

4              MR. SIEFF:  No.  If the Court wants to hear argument

5      on the merits, we are happy to discuss it.  If the Court wants

6      to keep this hearing to jurisdiction, I understand that.  But

7      we came to court and we were loath to file an emergency motion,

8      and we appreciate the Court's time and Mr. Jackley has offered

9      his time in preparing and coming here today to discuss it.

10             We filed this application because there is real

11     irreparable harm.  There are things that our client would like

12     to publish but are refraining from publishing, that they seek

13     the breathing space to publish.  And this is a straightforward

14     First Amendment case in those respects.  It is a case over

15     which the Court has jurisdiction, as we discussed, and it's a

16     case where *Younger* doesn't apply, because if the Court were

17     required to abstain in this case, it would swallow whole the

18     Section 1983 remedies that Congress enacted.  That's why these

19     exceptions exist.  That's why *Younger* is limited to

20     circumstances where there truly is an ongoing proceeding.

21             So, I would love to dive into the First Amendment

22     analysis.  It seemed like you were limiting your interest at

23     the moment to jurisdiction.  So I will ask the Court if you

24     would like me to proceed there.  Otherwise, I think you have

25     heard me on *Younger* and you have heard me on personal

Q1G8HEAC

1    jurisdiction.

2           THE COURT:  I have.  And for that reason, let me

3    please return to Mr. Jackley.

4           Mr. Jackley, I appreciate everything that you have

5    said, and I want to think very seriously about the arguments

6    you have made about personal jurisdiction and about *Younger*

7    abstention, because I am concerned about staying in my lane, as

8    I should.

9           You have heard me discuss the *NIFLA* case, which you

10   see as well referenced repeatedly in the plaintiff's briefing

11   in this matter.  It seemed to me that if I had jurisdiction, by

12   which I mean I had personal jurisdiction, subject matter

13   jurisdiction, and no basis to abstain, that indeed there might

14   be some serious questions or a likelihood of success in light

15   of that *NIFLA* decision from the Second Circuit.

16          Do you now, sir, want to address the merits of the

17   plaintiff's argument or are you really focusing on the

18   jurisdictional issues at this time?

19          MR. JACKLEY:  Your Honor, I am focusing on the

20   jurisdictional issues, and I would ask for a brief moment to

21   respond to both personal jurisdiction and *Younger*.

22          THE COURT:  Absolutely.  My point, sir, was I wanted

23   to give you the chance to speak to the merits if you wanted to.

24   I did not know how familiar you were with the *NIFLA* case.  I

25   have had to live with it the last two months.  Let me, please,

Q1G8HEAC

1    hear from you in reply on the jurisdictional issues we have

2    been discussing.

3        MR. JACKLEY:  As pertaining to personal jurisdiction,

4    I would note that what counsel has relied upon, including the

5    *Paxton* case, those were dramatically different than this case.

6    Those were civil enforcement demands, a completely different

7    statutory alternative, different resolves, different

8    enforcement, not the same thing.  Therefore, those cases don't

9    apply.

10       If you look, and I think it goes to *Younger* also, what

11   this is.  Under South Dakota law, our statutes allow for a

12   special proceeding for civil enforcement.  We did exactly that.

13   Under S.D.C.L. 37-24-23, our legislature and our laws allow for

14   a civil action of this nature.  This action was filed on

15   December 29th in state court.

16       I would note for the record, on January 12,

17   plaintiff's counsel made their appearance in that action.  I do

18   acknowledge that yesterday, January 15, at 11:43, plaintiff's

19   counsel requested for a continuance, didn't mention a TRO being

20   filed but indicated they needed more time to prepare.  Then

21   late that evening a TRO was filed in federal court.

22       This is a deceptive trade practice action.  It's a

23   special proceeding.  It fits directly in line with the *Younger*

24   abstention, where federal courts must defer to certain state

25   proceedings, including civil enforcement proceedings and civil

1    proceedings involving certain orders that are uniquely in

2    furtherance of state court's ability to perform their judicial

3    functions.  South Dakota state law specifically authorizes

4    this.  I again cite S.D.C.L. 37-24-23, and it would be against

5    the concept of *Younger*, and the long-established law on

6    *Younger*, for a federal court to step in, especially under these

7    facts, when it's filed pursuant to S.D.L.C. 37-24-23, an action

8    was proceeding, counsel sought a continuance for reasons they

9    weren't prepare, and then filed for a TRO that night.

10             THE COURT:  I understand the procedural history, sir.

11             Are there other arguments you wish to make?

12             MR. JACKLEY:  No, your Honor.

13             THE COURT:  I am going to place the parties on hold

14    for a moment.  I ask for your patience.  I will get back to you

15    as soon as I can.  Thank you very much.

16             (Recess)

17             THE COURT:  Mr. Sieff, are you still on the line?

18             MR. SIEFF:  Yes, your Honor.

19             THE COURT:  Thank you so much.

20             Mr. Jackley, are you still on the line as well?

21             MR. JACKLEY:  Yes, your Honor.

22             THE COURT:  I thank you very much.

23             Counsel, first of all, I thank you for your patience.

24    I have been trying, in the few minutes that I had, to see if I

25    could put together an answer, but, as I have to confess to you,

Q1G8HEAC

1    I would much prefer to get this correct than to get this to you

2    quickly.  I want to look at the provisions that each of you has

3    cited to me, both statutory provisions and cases.  So what I

4    propose, if this works for your respective schedules, is if we

5    could reconvene this phone call at 6 p.m. my time or, if you

6    will, three hours from now.  And that is because I actually

7    have a classified proceeding in another matter that begins in

8    two minutes.

9              Mr. Jackley, does your schedule permit you or Ms.

10   Miiller to get back on the phone in three hours' time?

11             MR. JACKLEY:  Yes, your Honor.

12             THE COURT:  Mr. Sieff, same for you and your team or a

13   subset thereof?

14             MR. SIEFF:  Yes, your Honor.

15             THE COURT:  Please call the number that you used last

16   time to dial in, and I will have an answer for you at that

17   time.  I thank you both very much.  I know you have been

18   working very hard on this, but I too want to come to this table

19   armed with the information I need.  I will be looking at that

20   now.  I will see you in three hours.  Take care, everyone.

21             We are adjourned.

22             (Adjourned)

23

24

25