Exhibit 3

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
----------------------------:

MAYDAY HEALTH,                : Docket No.: 26-cv-00078

              Plaintiff,      :

         v.                   :

MARTY J. JACKLEY,             : New York, New York

                             : February 11, 2026

              Defendant.      :

----------------------------:

                    PROCEEDINGS BEFORE
            THE HONORABLE KATHERINE POLK FAILLA
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:        DAVIS WRIGHT TREMAINE, LLP
                      BY:  ADAM SIEFF, ESQ.
                           CHELSEA KELLY, ESQ.
                           AMBIKA KUMAR, ESQ.
                      350 S. Grand Avenue, 27th Floor
                      Los Angeles, California 90071

For Defendant:        OFFICE OF THE ATTORNEY GENERAL
                      OF SOUTH DAKOTA
                      BY:  MARTY J. JACKLEY, ESQ.
                           AMANDA MILLER, ESQ.
                           PAUL SWEDLUND, ESQ.
                      1302 East SD Highway 1889, Suite 1
                      Pierre, South Dakota 57501

Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

```
 1                THE DEPUTY CLERK:  Your Honor, this is in
 2     the matter of Mayday Health vs. Jackley.
 3                Counsel, please state your name for the
 4     record, beginning with plaintiff.
 5                MR. SIEFF:  Good afternoon, Your Honor.
 6     This is Adam Sieff of Davis Wright Tremaine for
 7     plaintiff.  I am joined on the line with Counsel
 8     Chelsea Kelly and Ambika Kumar.
 9                THE COURT:  Good afternoon.  This is
10     Judge Failla.  And I'm just confirming, Mr. Sieff,
11     that you and your team are able to hear me.
12                MR. SIEFF:  Confirmed, Your Honor.  We can
13     hear you.
14                THE COURT:  Much appreciated, thank you.
15                And then representing Mr. Jackley this
16     afternoon, which includes Mr. Jackley.
17                MR. JACKLEY:  Good afternoon, Your Honor
18     and Counsel.  South Dakota Attorney General Marty
19     Jackley, Civil Chief Amanda Miller, and Solicitor
20     General Paul Swedlund.
21                THE COURT:  Thank you all very much.  Happy
22     to have you all participating in this conference
23     this afternoon.
24                What I am going to do now is to read into
25     the record my oral decision.  And I decided to give
```

1    an oral decision because I wanted to get information

2    to you as quickly as possible.  So I'll give you an

3    opportunity to mute yourselves because there isn't

4    oral argument, and I'll begin momentarily.  Thank

5    you.

6           Let me begin also by thanking you for your

7    written submissions and for your oral presentations

8    on January 16th and 29th of this year.  I've

9    considered all of those.  I've considered as well,

10   the post-hearing submission from Mr. Jackley.  And I

11   will now issue my oral decision on plaintiff's

12   motion for a preliminary injunction.

13          As just a bit of procedural review, this

14   Court heard a telephonic oral argument on

15   plaintiff's motion for a temporary restraining order

16   on January 16th of 2026.  It issued an oral decision

17   later that day granting the motion.  And my oral

18   decision was by my standards, long for an oral

19   decision, it was nine pages.  And I am incorporating

20   here its discussion about the background section,

21   the applicable law for a temporary restraining

22   order, and its analysis of personal jurisdiction

23   under New York's long-arm statute, which is founded

24   Civil Practice Law and Rule Section 302(a).

25          And so I won't be repeating those

1  discussions here, but I will simply add to the
2  injunctive relief discussion what the parties
3  already know to be the standard, which is that a
4  party seeking a preliminary injunction must show a
5  likelihood of success on the merits, the possibility
6  of irreparable harm if preliminary injunction is not
7  granted, a balance of hardships tipping in the
8  moving party's favor and the public's interest being
9  served, or at least not disserved by relief.  One
10 case for that proposition is *Salinger v. Colting*,
11 607 F.3d 68, a Second Circuit decision from 2010.
12 Where a state or federal government is a party, then
13 factors three and four often merge.  One case for
14 that is *Nken vs. Holder,* 556 U.S. 418 from 2009.
15          So those things that I've just mentioned
16 are what I'm not reconsidering.  But what I have
17 reconsidered is my Younger abstention analysis, and
18 that is in light of the parties' submissions and my
19 own research.  In particular, and for the reasons
20 that I'm about to describe, I do believe that the
21 law requires me to abstain from exercising federal
22 jurisdiction in this case, and as a result, I am
23 denying plaintiff's motion for a preliminary
24 injunction.
25          So I am focusing my discussion this

1   afternoon on Younger abstention law.  I know that

2   the parties are aware of Younger abstentions, so

3   I'll discuss it in rather brief terms.  It was

4   summarized by the Second Circuit in the case of

5   *Diamond "D" Construction Corporation vs. McGowan*,

6   282 F.3rd 191, in 2002.  But rather than read all of

7   these cites into the record, I'm just going to

8   excerpt a couple of quotes that I think are

9   important.

10        The Circuit found that *Younger v. Harris*,

11  401 U.S. 37, from 1971, generally requires federal

12  courts to abstain from taking jurisdiction over

13  federal constitutional claims that involve or call

14  into question ongoing state proceedings.  Although

15  the Younger abstention doctrine was born in the

16  context of state criminal proceedings, it now

17  applies with equal force to state administrative

18  proceedings.  This doctrine of federal abstention

19  rests foursquare on the notion that in the ordinary

20  course, a state proceeding provides an adequate

21  forum for the vindication of federal constitutional

22  rights.  Therefore, giving the respect to our

23  coequal sovereigns, the principles of our federalism

24  demand we generally prohibit federal courts from

25  intervening in such matters.  That is the end of my

1    quotation from that case.

2           Younger abstention is mandatory when,

3    number one, there is an ongoing state proceeding;

4    number two, an important state interest is involved;

5    and number three, the plaintiff has an adequate

6    opportunity for judicial review of his

7    constitutional claims during or after the

8    proceeding.  Cases for that proposition include

9    *Spargo v. New York State Commission on Judicial*

10   *Conduct*, 351 F3d 65, a Second Circuit decision from

11   2003.  When Younger applies, abstention is mandatory

12   and its application deprives the federal court of

13   jurisdiction in the matter.  And that is found in

14   cases including *Colorado Water Conservation District*

15   *versus United States*, 424 U.S. 800 from 1976.

16           There are two exceptions recognized for

17   Younger abstention.  They're commonly referred to as

18   the bad faith and extraordinary circumstances

19   exceptions.  In connection with the TRO hearing,

20   plaintiffs suggested that the bad faith exception

21   applied and as cited support the Second Circuit's

22   decision in *Cullen vs. Flagler,* 18 F.3rd 96 from

23   1994 and Judge Gershon's decision in *Brooklyn*

24   *Institute of Arts and Sciences v. City of New York*,

25   64 F. Supp. 2d 184, an Eastern District decision

1     from 1999.

2               After the TRO hearing and in connection

3     with the preliminary injunction hearing, I did a

4     deeper dive into Second Circuit case law in this

5     area, which made it clear that the bad faith

6     exception and the inquiry into it was more nuanced

7     than it originally appeared.  The *Cullen* case that I

8     mentioned was one of the first in the Circuit to

9     articulate the exception.

10              And here again, rather than putting

11    citations into the record, I'm going to excerpt a

12    few quotes from the decision.  "Intervention would

13    still be warranted upon a showing of bad faith,

14    harassment or any other exceptional circumstance

15    that would call for equitable relief.  Generally,

16    for such a showing to be made, the party bringing

17    the state action must have no reasonable expectation

18    of obtaining a favorable outcome.  But a refusal to

19    abstain is also justified where a prosecution or

20    proceeding has been brought to retaliate for or to

21    deter constitutionally protected conduct, or where a

22    prosecution or proceeding is otherwise brought in

23    bad faith or for the purpose to harass."

24              In that case, the Second Circuit found that

25    based on a past history of personal conflict between

1    the plaintiff and the local school board, the

2    strictly ad hominem manner in which the school board

3    had disciplined him, they found that the school

4    board disciplinary proceedings were retaliatory in

5    nature and calculated to chill First Amendment

6    expressive activity.

7         But later Second Circuit cases made clear

8    that the bad faith exception also has a subjective

9    component to it.  One of those cases is *Schlagler v.*

10   *Phillips*, 166 F.3rd 439, from 1999.  The plaintiff

11   in that case had posted pro-skinhead stickers in a

12   Cafe in Monroe, New York and was charged with

13   aggravated harassment under the New York penal law.

14   While the criminal case was pending, he brought a

15   Section 1983 action challenging the statute on First

16   Amendment grounds.  The district court rejected the

17   state's Younger argument, concluding that although

18   there was no evidence of any prosecutorial animus

19   towards Schlagler, the statute itself was facially

20   unconstitutional and therefore any prosecution under

21   it could only be brought in bad faith.  The Second

22   Circuit reversed, reasoning that because the

23   prosecution was not retaliatory or otherwise

24   illegitimate in its motivation and in fact was

25   nothing more than a straightforward enforcement of

1   the laws of New York, I found the case did not fall
2   within the bad faith exception.  In particular,
3   the Court in *Schlagler* found that the district
4   court's focus on the First Amendment and the issues
5   related to the First Amendment, and I'm now going to
6   quote, "Undercuts the rationale set forth in
7   Younger, which was also a First Amendment challenge
8   to a state criminal prosecution.  Younger narrowly
9   limited exceptions to cases involving retaliatory or
10  bad faith efforts to regulate speech.  If the
11  district court's interpretation of the *Cullen*
12  exception were followed to its logical conclusion,
13  the exception would swallow the Younger rule."
14          Later on, the Court found that if the facts
15  show that the prosecution is in retaliation for past
16  speech or shows a pattern of prosecution to inhibit
17  speech beyond the acts being prosecuted, the
18  exception should apply and abstention may be
19  improper.  It wasn't found there, and therefore, the
20  Court ruled as it did.
21          Later on in 2002, the Second Circuit tried
22  to harmonize its case law on the bad faith
23  exception.  And that was in the *Diamond "D"*
24  *Construction Corporation* case I mentioned a few
25  moments ago.  And that case detailed the history of

1    the exception in Second Circuit and Supreme Court
2    case law.  But it concluded, and again here I'm
3    excerpting without giving the cites, "Our most
4    recent cases concerning the bad faith exception have
5    further emphasized that the subjective motivation of
6    the state authority in bringing the proceeding is
7    critical to, if not determinative of, this inquiry.
8    A state proceeding that is legitimate in its
9    purposes but unconstitutional in its execution, even
10   when the violations of constitutional rights are
11   egregious, will not warrant the application of the
12   bad faith exception.  Later on, the Court finds that
13   we give states the first opportunity, but not the
14   only or last, to correct those errors of a federal
15   constitutional dimension that infect its
16   proceeding."
17           And then still later, the Court says,
18   "Federal interference with state proceedings,
19   because it necessarily presumes that the state court
20   review will be inadequate, affronts the dignity of
21   the state sovereign.  However, as we recognized in
22   *Cullen*, a state has no interest in continuing
23   actions brought with malevolent intent.  Thus, it is
24   only when the state proceeding is brought with no
25   legitimate purpose that the state interest in

1    correcting its own mistakes dissipates and along

2    with it, the compelling need for federal deference."

3    That's the end of that quote.

4         This court has reviewed all of these Second

5    Circuit decisions on the bad faith exception issued

6    after *Diamond "D"* -- actually, all of ones really

7    issued after *Cullen*.  And I will tell you that there

8    are some instances in which there are short-hands to

9    that are used that I think arguably conflate the

10   requirements of the exception.

11        As one example of that, in the case of

12   *Wilson v. Emond*, 373 F.App'x98 in 2010, a Second

13   Circuit decision from 2010, the Court referred to

14   the bad faith exception as covering cases of proven

15   harassment or prosecutions undertaken by state

16   officials in bad faith without hope of obtaining a

17   valid conviction.  And the Court there didn't really

18   get into the subjective element, although I suppose

19   the reference to bad faith may have made it

20   implicit.  And so there are some other cases that

21   really don't speak at length about the subjective

22   element, and they include *Weiss v. New York*, 2024

23   Westlaw 283-7623, *Daniel vs. Doe 1 through Doe 10*,

24   2024 Westlaw 213-1446, *Lowell v. Vermont Department*

25   *of Children and Families* 835 F. App'x 637, and then

1    *Glatzer v. Barone* 394 F. App'x 763.

2         But there are other Second Circuit

3    decisions that have confirmed the continuing

4    importance of the subjective component of the bad

5    faith inquiry.  They include the Second Circuit's

6    2020 decision as distinguished from its 2019

7    decision in *Trump vs. Vance* 977 F.3rd 198, *Miller*

8    *vs. Sutton* 697 F. App'x 27 from 2017, *Schorr v.*

9    *DoPico* 686 F. App'x 34 also from 2017, *Jackson*

10   *Hewitt Tax Services Incorporated vs. Kirkland*, 455

11   F. App'x 16 Second Circuit decision from 2012.

12        And I'll note as well that in the case of

13   *Kern vs. Clark*, 331 F.3d 9, a Second Circuit

14   decision from 2003, they actually remanded to the

15   district court for a hearing on the subjective

16   element of the bad faith exception.  And the quote

17   of import there is, "In the present case, the

18   factfinder could infer bad faith or improper motive

19   if it credited the evidence that Kern claims

20   demonstrates that the defendants aggressively

21   prosecuted him in a string of weak cases brought on

22   behalf of Kern's political enemies."

23        So turning now to my analysis, with that

24   case law out of the way, as suggested by my TRO

25   decision and my questioning two weeks ago, I find

1    that the pending civil enforcement action under

2    SDCL Section 37-24-23 meets all three of the Younger

3    criteria, and that for me the remaining question was

4    whether the bad faith exception applies.  I find

5    that it does not.

6              Focusing first on the subjective analysis,

7    the Court cannot find on the record before it

8    subjective bad faith on the part of Mr. Jackley.

9    The South Dakota Attorney General's Office received

10   numerous complaints, formal and informal, regarding

11   Mayday's gas station placards.  Mr. Jackley was

12   requested by the Governor of South Dakota to look

13   into the matter.  And to be clear, I don't find that

14   to be an indication of pretext or bad faith, and I

15   don't think it is analogous to what happened in

16   Judge Gershon's decision.  Mr. Jackley then sent a

17   cease and desist letter to Mayday.  I understand him

18   to have considered proceeding under South Dakota

19   Criminal Statutes concerning solicitation and

20   facilitation, but to have instead chosen the less

21   drastic option of a civil enforcement action under

22   South Dakota's deceptive trade practices statute.

23   Mr. Jackley also cited the example of, all caps, JEN

24   as an abortion rights organization whose conduct he

25   believes balances First Amendment rights of free

1    expression with South Dakota laws restricting

2    abortion access.  On the objective front, I cannot

3    say that Mr. Jackley has no reasonable expectation

4    of obtaining a favorable outcome in the civil

5    enforcement action.

6         Now, as I will elaborate in just a moment,

7    I do believe that the proper way to view Mayday's

8    website and the materials on it is noncommercial

9    speech subject to protection under the First

10   Amendment.  But I understand that Mr. Jackley holds

11   a different view and believes that abortion pill

12   providers who cannot sell their products in

13   South Dakota are using Mayday as an end run around

14   the restrictive statutes of that state such that the

15   speech is commercial and potentially within the

16   ambit of the statute that I cited earlier, and I

17   think he should be permitted to pursue those

18   arguments in South Dakota court.

19        In light of the findings I've just made, I

20   am constrained to find that Younger abstention

21   applies and that I lack jurisdiction to consider

22   plaintiff's motion for a preliminary injunction.

23   Now, as suggested by my introductory comments to the

24   bad faith exception, federal courts have to trust

25   their state court analogs, and I trust that the

1    South Dakota court will get it right.

2          Let me just note on that point that I've

3    done my best here -- I suppose that goes without

4    saying.  I've done my best to interpret Second

5    Circuit law on the Younger abstention doctrine and

6    its bad faith exception.  If I've gone too far, if

7    I've misunderstood the law or where it is today, I

8    invite the Second Circuit to clarify my

9    jurisdictional obligations to clarify the bad faith

10   exception and, as appropriate, to reverse me.  And I

11   say that not because I'm here tempting fate, but

12   because unless there be any doubt about this, I

13   absolutely agree that this case is the mirror image

14   of the factual situation presented in the Second

15   Circuit's late 2025 decision in *National Institute*

16   *of Family and Life Advocates v. James*, 160 F.4 360.

17   I think that the Second Circuit's analysis applies

18   equally here and that absent Younger abstention,

19   this Court would be granting plaintiff's motion for

20   injunctive relief.  My read -- what the materials I

21   have before me suggest that Mayday's website

22   contains, under what I will call the NIFLA case,

23   noncommercial speech.  It is speech that is based on

24   moral beliefs with no economic motivation.  The

25   plaintiff does not charge the patrons of the website

1    or the service providers for referrals and the fact

2    that the website solicits donations does not

3    transform its contents into commercial speech, as

4    made clear by cases including *Connecticut Bar*

5    *Association vs. United States*, 620 F.3d 81, a Second

6    Circuit decision from 2010.  That in turn focused on

7    the Supreme Court's 1988 case in *Riley v. National*

8    *Federation for the Blind*.  The *NIFLA* case as well

9    made clear that if its holding were different than

10   it was, it could potentially inappropriately limit a

11   reproductive rights group in a state with abortion

12   restrictions that provides information about out of

13   state organizations that will help women obtain the

14   procedure for free.  I also do not believe that the

15   website solicits or abets acts that are illegal

16   under South Dakota law.  And here I'll just cite to

17   the parties *Ashcroft v. Free Speech Coalition*, 535

18   U.S. 234, and the section that I was focusing on is

19   found at pages 253 to 254.

20           And so as a result, I mean, I suspect -- or

21   let me say it this way, if I had jurisdiction, which

22   I don't believe I do, I think the South Dakota

23   statute would be subject to strict scrutiny analysis

24   and we would see whether it was narrowly tailored to

25   serve a compelling state interest under NIFLA, the

```
 1    answer would probably be no.  Indeed, if in fact a
 2    court were to find that the statute was
 3    noncommercial speech, not sure the statute cited to
 4    me under South Dakota law would be applied at all.
 5    But as it happens, I have to decide this issue on
 6    jurisdictional grounds and given that I am deciding
 7    the matter the way I am, I'm denying the motion.  I
 8    think the next steps for the parties would be -- and
 9    I will issue an order to show cause to explain in
10    writing why I should not dismiss this matter for
11    lack of jurisdiction.  I'm going to ask the parties
12    to file simultaneous letter briefs on or before
13    March 2nd, 2026.  I'm going to direct the clerk of
14    court to terminate the motions that are currently
15    pending at docket entries 14 and 20.  I will issue a
16    bottom line order later today that includes the
17    order to show cause language but also gives a
18    written document in case either side wishes to take
19    an appeal.  And given the disposition of the motion
20    and my issuance of an order to show cause, I am
21    staying Mr. Jackley's obligation to answer, move, or
22    otherwise respond until after the order to show
23    cause is resolved.
24         Mr. Sieff, is there anything that is
25    unclear about the decision that I've just issued?
```

1          MR. SIEFF:  No, Your Honor.  I think that

2     that was an extremely helpful explanation of your

3     reasoning, and we appreciate all aspects of the

4     order, and we understand the next steps with respect

5     to responding to the order to show cause.

6          THE COURT:  I appreciate that.  Thank you.

7     And let me say this, Mr. Sieff, something I hadn't

8     considered, and I'll say this for both sides, is I

9     suppose if either side were to file an appeal from

10    this decision, you'd have to let me know your view

11    as to whether I had jurisdiction to do anything on

12    the order to show cause.  But if you'll excuse my

13    grandmother's old expression, we'll burn that bridge

14    when we get to it.

15          Mr. Jackley, is there anything that is

16    unclear about my decision?

17          MR. JACKLEY:  Your Honor, I want to be

18    completely respectful of what the Court has said and

19    noting the March 2, 2026 order to show cause filing

20    date.  We have a state court hearing scheduled for

21    February 20th.  Is it the Court's ruling that that

22    can proceed, or do I need to seek a continuance?

23          THE COURT:  Very fair, sir.  Right now, I

24    have denied the plaintiff's application for

25    injunctive relief.  I don't even think I have

1    jurisdiction with this to proceed with the case that

2    is before me.  I don't have the power to stop you or

3    to stop the state court from proceeding.

4         MR. JACKLEY:  Thank you, Your Honor.

5         THE COURT:  Of course, sir.  Now, if

6    anybody were to tell me otherwise -- if the Second

7    Circuit disagrees, they'd let me know.  But no one's

8    told me that yet, and I think the clock is ticking.

9    So I very much appreciate your inquiry so that I

10   could clarify my decision to the extent it was

11   unclear.

12        MR. JACKLEY:  Thank you, Your Honor.

13        THE COURT:  All right.  I thank you all

14   very much.  I know you've been working very hard on

15   very short time frames.  I really do appreciate your

16   efforts.  I will let you go because I know you have

17   other things to do.  You have my thanks.  We're

18   adjourned.

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E
 2
 3       I, Marissa Lewandowski, certify that the
 4  foregoing transcript of proceedings in the case of
 5  Mayday Health v. Jackley,
 6  Docket #1:26-cv-00078-KPF, was
 7  prepared using digital transcription software and is
 8  a true and accurate record of the proceedings.
 9
10
11  Signature  _____
                      Marissa Lewandowski
12                    Marissa Lewandowski
13
14  Date:      February 12, 2026
15
16
17
18
19
20
21
22
23
24
25
```